**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

SONATE CORPORATION D/B/A
Vegadelphia Foods,

                    Plaintiff,

    vs.

BEYOND MEAT, INC., a Delaware
corporation,

                  Defendant.

Civil Action No.  1:23-cv-10690-IT

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF VEGADELPHIA'S MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS AND JOHN G. PLUMPE**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL STANDARD ......................................................................................... 2

III.    BACKGROUND ................................................................................................ 4

        A.     Trademark Infringement ........................................................................ 4

        B.     The Claimed Deductions......................................................................... 4

        C.     Vegadelphia's Lost Opportunity from Beyond's Infringement............ 5

IV.     ARGUMENT ...................................................................................................... 6

        A.     Legal Standard for Apportionment and Deductions to Disgorgement of
               Profits ..................................................................................................... 6

        B.     For Vegadelphia's Disgorgement of Infringing Profits for Beyond's Sales
               to Dunkin', Plumpe Should be Excluded from Opining on Deductions For
               Alleged Other Operating Expenses........................................................ 7

               1.     Plumpe Legally Cannot Deduct General Expenses by Ratio Where
                      the Infringing Sales Are Only a *De Minimis* Fraction of the Total
                      Sales .......................................................................................... 10

               2.     Plumpe's Overall Allocation For the Infringing Campaign Is
                      Speculative................................................................................. 11

               3.     Plumpe's Report and Related Opinions on Expenses
                      Corresponding to Dunkin' Must be Excluded Because They are
                      Not Based on His Knowledge..................................................... 14

        C.     Plumpe Has No Experience in the *Direct Market Data* Method, and
               Therefore Cannot Opine Upon the Same as an Expert. ....................... 17

V.      CONCLUSION................................................................................................ 19

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aamp of Fla., Inc. v. Auto. Data Solutions, Inc.*,
    2015 U.S. Dist. LEXIS 192836 (M.D. Fl. Sept. 29, 2015) ......................................................3

*Abbott Lab'ys v. Sandoz*,
    743 F. Supp. 2d 762 (N.D. Ill. 2010) ...............................................................................16, 17

*Abbott Labs. v. Unlimited Bevs., Inc.*,
    218 F.3d 1238 (11th Cir. 2000) .............................................................................................12

*American Honda Motor Co., Inc. v. Two Wheel Corp.*,
    918 F.2d 1060 (2d Cir. 1990) ..................................................................................................6

*Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.*,
    1989 WL 236526 (S.D. N.Y. 1989) .........................................................................................7

*Bambu Sales, Inc. v. Ozak Trading Inc.*,
    58 F.3d 849 (2d Cir. 1995) ..................................................................................................7, 9

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) .....................................................................................................3

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*,
    2009 WL 10674076 (S.D. Cal. Aug. 12, 2009) .....................................................................16

*Brighton Collectibles, LLC v. Believe Production, Inc.*,
    2018 WL 1381894 (C.D. Cal. Mar. 15, 2018) ......................................................................16

*Bruno v. Bozzuto's, Inc.*,
    311 F.R.D. 124 (M.D. Pa. 2015) ...........................................................................................17

*Burger King v. Pilgrim's* Pride,
    1996 U.S. Dist. LEXIS 12709 *11 (S.D. Fl. May 5, 1996) ...................................................10

*by Fleischmann Distilling Corp. v. Maier Brewing Co.*,
    386 U.S. 714 (1967) ..............................................................................................................11

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
    350 F.3d 316 (3d Cir. 2003) ............................................................................................14, 19

*Carrozza v. CVS Pharm., Inc.*,
    992 F.3d 44 (1st Cir. 2021) ..................................................................................................2, 3

*Century Distilling Co. v. Cont'l Distilling Corp.*,
    205 F.2d 140 (3d Cir. 1953)...................................................................11

*Cesari S.r.l. v. Peju Province Winery L.P.*,
    693 F. Supp. 3d 375 (S.D.N.Y. 2023)..............................................13, 15

*Clamp Mfg. Co. v. Enco Mfg. Co.*,
    5 U.S.P.Q.2D (BNA) 1643 (C.D. Cal. 1987)....................................10, 11

*CNH Am., LLC v. Champion Envtl. Servs.*,
    863 F. Supp. 2d 793 (E.D. Wis. 2012)...................................................16

*Daubert. Diesel S.p.A. v. Diesel Power Gear, LLC*,
    2023 WL 5718000 (S.D. N.Y. 2023)..................................3, 6, 7, 13

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..........................................................2, 3, 16, 19

*Fendi Adele S.r.l. v. Burlington Coat Factory Warehouse Corp.*,
    2010 WL 11586698 (S.D.N.Y. 2010).................................................6, 7

*Fujifilm N. Am. Corp. v. Big Value Inc.*,
    2018 U.S. Dist. LEXIS 150204, 2018 WL 4210132 (E.D.N.Y. Sep. 4, 2018) ....................16

*Gliottone v. Ford Motor Co.*,
    95 Mass. App. Ct. 704, 130 N.E.3d 212 (Mass. App. Ct. 2019) ...........................17

*Gucci America, Inc. v. Guess?, Inc.*,
    868 F. Supp. 2d 207 (S.D. N.Y. 2012)...................................................7

*Hamil America Inc. v. GFI*,
    193 F.3d 92 (2d. Cir. 1999)..................................................................11

*Hilsinger Co. v. Kleen Concepts, LLC*,
    2017 U.S. Dist. LEXIS 141659 (D. Mass. Sep. 1, 2017) ............................3

*Info-Hold, Inc. v. Muzak LLC*,
    1:11-CV-283, 2013 WL 4482442 (S.D. Ohio Aug. 20, 2013) ....................15

*JTH Tax v. H&R Block*,
    245 F. Supp. 2d 749 (E.D. Va. 2002) ..................................................11

*Kam Hing Enterprises, Inc. v. Wal-Mart Stores, Inc.*,
    359 F. App'x 235 (2d Cir. 2010) (Summary Order)...........................9, 16

*Levin v. Dalva Bros., Inc.*,
    459 F.3d 68 (1st Cir. 2006)..................................................................19

*Maltina Corp. v. Cawy Bottling Co.*,
    613 F.2d 582 (5th Cir. 1980) ...............................................................10

*Ntl. Products, Inc. v. Arkon Resources, Inc.*,
    2017 WL 5499801 (W.D. Wash. 2017) ..................................................11

*Olin Corp. v. Lamorak Ins. Co.*,
    2018 U.S. Dist. LEXIS 65446 (S.D.N.Y. Apr. 17, 2018) .........................3

*Pell v. E.I. DuPont De Nemours & Co.*,
    231 F.R.D. 186 (D. Del. 2005) ...............................................................18

*Playboy Enters. v. Dumas*,
    831 F. Supp. 295 (S.D.N.Y. 1993) .......................................................8, 9

*Project Strategies Corp. v. National Communs. Corp.*,
    948 F. Supp. 218 (E.D.N.Y. 1996) ..........................................................9

*Providence & Worcester R.R. v. Chevron U.S.A. Inc.*,
    416 Mass. 319, 622 N.E.2d 262 (Mass. 1993).......................................17

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998).....................................................................15

*Samaan v. St. Joseph Hosp.*,
    670 F.3d 21 (1st Cir. 2012) ......................................................................2

*SC Johnson & Son v. Drop Dead*,
    144 U.S.P.Q. (BNA) 257 (S.D. Cal. 1965) ............................................10

*Sgouros v. Trans Union LLC*,
    2022 WL 832638 (N.D. Ill. Mar. 21, 2022)...........................................17

*Tamko Roofing Prods. v. Ideal Roofing Co.*,
    282 F.3d 23 (D.N.H. 2003) ......................................................................6

*Taylor v. Meirick*,
    712 F.2d 1112 (7th Cir. 1983) ..........................................................11, 14

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999), *as amended by* 199 F.3d 158 (3d Cir. 2000)......................14, 19

*Tommy Hilfiger v. Goody's Family Clothing*,
    2003 U.S. Dist. LEXIS 8788 (N.D. Ge. May 9, 2003).........................10

*U.S. v. Chang*,
    207 F.3d 1169 (9th Cir. 2000) ...............................................................19

*USM Corp. v. Marson Fastener Corp.*,
  392 Mass. 334 (1984) ...............................................................................12, 14

**Statutes**

15 U.S. Code § 1117(a)................................................................................6, 14

Lanham Act.................................................................................................3, 17

**Other Authorities**

4 McCarthy on Trademarks and Unfair Competition § 30:66 (5th ed.) .......................................11

Fed. R. Evid. 403 .......................................................................................1, 2

Fed. R. Evid. 702 ......................................................................................... *passim*

Fed. R. Evid. 703 ...........................................................................................1

J. Hitchner, *Financial Valuation: Applications and Models* (4th ed.)...........................................18

J. Koelemay Jr., *Monetary Relief in Trademark Infringement Cases, in Litigating
  Copyright, Trademark and Unfair Competition Cases for the Experienced
  Practitioner* 287 (1997) ...................................................................................6

*Restatement of Torts Section 748* Comment I....................................................................12, 14

## I.  __INTRODUCTION__

With hundreds of millions in companywide revenue a year, for its sizable partnership with Dunkin', still Beyond simply did not keep records of any of its actual expenses other than COGs and minimal variable selling expenses. It chose this level of detail for sales it concluded were simply too *de minimis* to do otherwise. Now for these "Other Operating Expenses," a Beyond employee prepared a made-for-litigation spreadsheet based solely on its sales ratios, handed it to Beyond's expert, and asked its financial expert John G. Plumpe ("Plumpe") to essentially rubber stamp it – which he did. As relevant here, that's *all* he really did. In a similar vein, Beyond cannot bemoan the size of damage it caused to Vegadelphia's lost business opportunity by proffering Plumpe to critique a methodology he lacks expertise with. This creates two discrete items of Plumpe's broader analysis that warrant exclusion under FRE 403, 702, 703 and Daubert.

<u>First</u>, Vegadelphia seeks a narrow exclusion relating to one of two infringing revenue streams at-issue in this case – Beyond's profits realized on infringing goods sold to Dunkin'. To be clear, this does not include the broader system-wide infringing sales that Beyond made *outside* of the Dunkin' collaboration. Beyond has an "Other Operating Expenses" bucket of expenses on its system-wide balance sheet. Plumpe took a spreadsheet prepared by Beyond for litigation purposes, which allocated "Other Operating Expenses" based on the ratio of sale to Dunkin' versus all sales, listed a few items someone at Beyond told him showed up there, and said "I understand that there could be elements" of "incremental" "Other Operating Expenses," but rather than affirmatively opining on deductibility simply says "should the judgment determine [these] are appropriate to deduct," he wanted to go ahead and calculate their total effect on sales. Doc. No. 197-2 at ¶ 88. And with just such slight of hand, Plumpe took his profits calculation of ███ and turned infringing sales into an ███████████████. *Id.* at ¶¶ 87-88 & p. 60, Tab 3C.

This non-analytical calculation for convenience sake presents a host of insurmountable defects. Whether an expense hypothetically "could be" deductible, variable or related to infringement does not meet *Beyond's* burden to prove its deductions. The *de minimis* rule denies deduction as a matter of law for these infringing sales (only ███ of global sales). To the extent Plumpe is even giving an opinion, he is speculating to suggest all or any of the "other" expenses can be allocated based on a proposed sales-ratio, and a mere sales ratio basis is patently insufficient. He conducted no variable expenses analysis on these expenses, nor did he provide any expert analysis linking any (let alone all) of these "other" expenses to the infringing sales. Beyond cannot use him to opine on deductions of all or some of these "Other Operating Expenses."

<u>Second</u>, on Vegadelphia's lost business opportunity item of actual damages, Vegadelphia seeks exclusion of Plumpe's opinions on the Direct Market Data Method ("DMDM") methodology. He lacks any expertise in the method, beyond being familiar with its existence. General concepts of evaluating lost business opportunities or valuations, or using "data in some of the databases" that the DMDM method also uses, does not qualify as adequate expertise. Wagner Decl. Ex. 1, Doc. No. 197-1 at Tr. 108:1-4. Thus, Plumpe is not qualified in DMDM so as to offer a rebuttal as to its applicability here or Blum's specific application of the method to this case.

## II.    <u>LEGAL STANDARD</u>

The admission of expert testimony is governed by FRE 403 and 702 under which "district courts consider the admissibility of expert testimony by determining whether an expert's proffered testimony both rests on a reliable foundation and is relevant to the task at hand." *Carrozza v. CVS Pharm., Inc*., 992 F.3d 44, 56 (1st Cir. 2021) (cleaned up) (quoting *Samaan v. St. Joseph Hosp*., 670 F.3d 21, 31 (1st Cir. 2012)); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The First Circuit has identified three factors underlying this admissibility determination: "(1) whether the proposed expert is qualified by knowledge, skill, experience, training, or

education; (2) whether the subject matter of the proposed testimony properly concerns scientific, technical, or other specialized knowledge; and (3) whether the testimony will be helpful to the trier of fact, *i.e.*, whether it [a] rests on a reliable foundation and [b] is relevant to the facts of the case." *Carrozza*., 992 F.3d at 48. Ultimately, "[i]t is defendant's burden to prove that its expert's testimony is admissible—not plaintiff's to prove the opposite." *Hilsinger Co. v. Kleen Concepts, LLC*, 2017 U.S. Dist. LEXIS 141659, at *33 (D. Mass. Sep. 1, 2017) (citing *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96 (1st Cir. 2014)).

Regardless of the expert's beliefs and factual application, if he applies "an incorrect legal standard" he is properly excluded under *Daubert*, because "having applied the wrong test, those opinions are irrelevant, unreliable and would mislead the jury." *Aamp of Fla., Inc. v. Auto. Data Solutions, Inc.*, 2015 U.S. Dist. LEXIS 192836, *26 (M.D. Fl. Sept. 29, 2015) (granting *Daubert* motion); *Olin Corp. v. Lamorak Ins. Co.*, 2018 U.S. Dist. LEXIS 65446 **68-69 (S.D.N.Y. Apr. 17, 2018) ("Expert testimony also should be excluded when it applies the wrong legal standard.").

Thus, where an expert "fails to prove either a sufficient nexus between their expenses and sales, or an adequate formula for allocating their expenses" which is required by trademark law as a prerequisite to deducting expenses from disgorged profits, then the opinion must be excluded under FRE 702 and *Daubert*. *Diesel S.p.A. v. Diesel Power Gear, LLC*, 2023 WL 5718000, *6 (S.D. N.Y. 2023). Thus, in *Diesel S.p.A.* where the defense damages expert opined incorrectly on profit disgorgement by claiming deductible expenses generally without relating the at-issue expense to the infringement, the Court excluded his opinion under *Daubert* as "cursory and lacking sufficient support in fact or law" for "the assertion that the Court may deduct a percentage of all company-wide costs and deductions from gross sales under the Lanham Act." *Id.* at 1108.

- 3 -

## III.    BACKGROUND

### A.    Trademark Infringement

Plaintiff Vegadelphia, which owns the federally registered trademark "Where Great Taste is Plant-Based" as it pertains to vegan food, specifically meat and poultry substitutes, asserts trademark infringement claims against Defendant Beyond for its 2019-2020 (at most, early 2021) use of the confusingly similar GREAT TASTE, PLANT-BASED and PLANT-BASED, GREAT TASTE slogans in marketing. Wagner Decl. Ex. 3, Doc. No. 197-3 at 9-12. Since 2013, Vegadelphia prominently displayed this protected slogan on the packaging of products, sales sheets that food establishments share with inquiring consumers and affix to their counter space, roll-up signage at events, and Vegadelphia's website, where end-consumers are referred. Doc. No. 17, ¶ 40.

In 2019, Beyond developed an infringing slogan "PLANT-BASED GREAT TASTE," for which Beyond sought a federal trademark registration. Wagner Decl. Ex. 4, Doc. No. 197-4 at 2, 5. Beyond over the next two years prominently displayed it as its "primary" tagline in restaurants, grocery stores, food trucks, on the web – essentially anywhere its products were sold. Wagner Decl. Ex. 5, Doc. No. 197-5 at 2. For a limited Beyond-Dunkin' partnership, another national ad campaign began running concurrently with the "GREAT TASTE PLANT-BASED" slogan. Doc. No. 134-2; Ex. 2 at 14. Despite knowing of Vegadelphia and its rights from the outset, only after Vegadelphia's May 2020 cease-and-desist did infringement stop. Doc No. 17 at ¶ 68.

### B.    The Claimed Deductions

As Beyond infringed Vegadelphia's federally registered trademark through two campaigns, one collaborating with Dunkin' and one through its other Beyond only sales, Vegadelphia's damages expert Sidney P. Blum similarly broke up his profit disgorgement analysis in two. Accordingly Blum provided opinions on the revenues and later profits Beyond enjoyed:

1) from sales to Dunkin' and 2) from Beyond Meats Sales to the US, excluding Dunkin'. *See* Wagner Decl. Ex 6, Doc. No. 197-6 at ¶¶ 111, 116. To arrive at profits from the Dunkin' based sales, Blum subtracted COGS from the Beyond-provided gross revenues for the products marketed under the infringing trademarks, as well as trade discounts. *See id*. at ¶ 114.

Beyond's rebuttal expert Plumpe criticizes Blum for not accounting for other general expenses. While admitting that "Beyond's financial accounting and reporting system does not assign all costs directly to a particular product or customer sale," Plumpe contests Other Operating Expenses can be allocated to Beyond's sales to Dunkin'. Wagner Decl. Ex. 2, Doc. No. 197-2 ¶¶ 80, 88. According to Plumpe, after accounting for these undocumented Other Operating Expenses, ██████████████████████████████████████████████████████ *Id*.

## C.     **Vegadelphia's Lost Opportunity from Beyond's Infringement**

As another form of harm, recognized under the law, Vegadelphia's expert Blum calculated the lost opportunity damages faced by Vegadelphia. Specifically lost opportunity recovery seeks to make whole a plaintiff for the endeavors or opportunities lost due to the infringer's actions. Lost opportunities are amplified when a junior user, floods the market with its infringing uses. As noted by Blum, despite the substitute meat industry's rise during the infringing time-period, Vegadelphia actually experienced decline in sales, bouncing back soon after the infringement ended. Wagner Decl. Ex. 6, Doc No. 197-6 at ¶¶ 304-308. Thus Blum calculated a but-for world, to approximate what heights the Vegadelphia business could have reached absent Beyond's infringement. *Id.* at 314. One such method for that calculation is through hypothetical valuations. Helpfully, prior to this lawsuit, an actual market player already made a future valuation for Vegadelphia. *Id.* at ¶ 367. Accordingly, Blum tested such valuation against comparable companies using industry supported market approaches. *Id.* at ¶ 369.

IV.    **ARGUMENT**

    A.    **Legal Standard for Apportionment and Deductions to Disgorgement of Profits**

    Congress expressly modified the burden of proof for trademark cases: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S. Code § 1117(a). Thus, the "burden of apportionment…is on the infringer." *Tamko Roofing Prods. v. Ideal Roofing Co.*, 282 F.3d 23, 32-33 (D.N.H. 2003) (quoting J. Koelemay Jr., *Monetary Relief in Trademark Infringement Cases, in Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner* 287, 322-323 (1997)). This includes that "The defendant has the burden of producing evidence as to its costs." *Id.* The burden cannot be satisfied by only "conclusory earnings statement which included a number for costs." *Id.*; *see also American Honda Motor Co., Inc. v. Two Wheel Corp.,* 918 F.2d 1060, 1063, (2d Cir. 1990) ("This sequence of proof thus places the burden of proving costs on the party with the superior access to such information, namely the infringing defendant.").[1]

    Indeed, "Courts have consistently held that a defendant is not entitled to deduct expenses where the defendant fails to prove either a sufficient nexus between their expenses and sales, or an adequate formula for allocating their expenses" *Diesel S.p.A.*, 2023 WL 5718000, *7-8; *see also Fendi Adele S.r.l. v. Burlington Coat Factory Warehouse Corp.*, 2010 WL 11586698, *4 (S.D.N.Y. 2010) ("If an infringer seeks to deduct overhead costs, the court must first determine what overhead expense categories … are actually implicated by the production of the infringing product….") (internal quotations omitted). Instead, Courts require the defendant to "identify direct costs attributable to the infringing goods, such as the specific costs from manufacturing and selling

---

[1] Plumpe acknowledges that the focus of an appropriate deduction analysis is only on "the specific costs that would not otherwise been incurred but for production of infringing goods" or "costs that directly assisted in the production of the infringing goods." Doc. No. 197-2 at ¶ 76.

the infringing goods." *Diesel S.p.A.*, 2023 WL 5718000, *6.

"[W]hen a defendant's inadequate record-keeping is the cause of uncertainty regarding the amount of profit to be disgorged, district courts have broad discretion in determining how to calculate a reasonable approximation of those profits." *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 254 (S.D. N.Y. 2012); *see also Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.*, 1989 WL 236526, *5 (S.D. N.Y. 1989) (same). Indeed, undergirding Vegadelphia's request here, Courts frequently disallow expense deductions and related expert opinions where even when the expenses "may be related to defendants' sale of infringing goods, [but] defendants have neither adequately documented these expenses nor justified their allocation of these expenses to their infringing activities." *Fendi Adele S.r.l.*, 2010 WL 11586698, at *4; *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995) (affirming district court's refusal to deduct expenses not proven by documentary evidence). That is the case here.

### B. For Vegadelphia's Disgorgement of Infringing Profits for Beyond's Sales to Dunkin', Plumpe Should be Excluded from Opining on Deductions For Alleged Other Operating Expenses

Plumpe failed to provide any analysis or method to establish a required link between the alleged Dunkin' based expenses as a result of Beyond's trademark infringement. Rather Plumpe points to a single spreadsheet labeled "Beyond Sales to Dunkin' Brands: Profit Summary, Q1 – 2019 – Q4 – 2021." Doc. No. 197-2 at p. 60, Tab 3C. In this spreadsheet, Plumpe claims to demonstrate ███████████████████████ because, after deducting the Costs of Goods of the Infringing Products and Cariable Selling Expenses for the Infringing Products which are not at issue in this Motion to Exclude, Plumpe then seeks to deduct ████████████████ "Other Operating Expenses that increased incrementally with sales made to Dunkin'." *Id.* at ¶ 88. The "Other Operating Expenses" consists of five at large buckets of "Innovation," "Commercialization Process Engineering," "All Other Selling Expenses," "G&A Expense," "Restructuring Expense,"

each accompanied only by quarterly subtotals for those buckets. *Id.* at p. 60, Tab 3C.

Plumpe relied upon Beyond's employee's testimony that the "Other Operating Expenses" as reported for his calculations, "captures the balance of our selling general and administrative expenses. So this includes sales-related expenses, accounting, finance, operations, quality, facilities and other operating expenses relating to Beyond's business." *Id.* at ¶ 88. (citing Wagner Decl. Ex. 7, Doc. No. 197-7 at tr. 76). Plumpe then simply ipse dixit connects those general overhead expenses to the infringement, claiming "I understand that there ***could be*** elements of Beyond's innovation, commercialization process engineering, selling expenses, and general and administrative expenses included in Other Operating Expenses that increased incrementally with sales made to Dunkin'." Doc. No. 197-2 at ¶ 88.

That is not an affirmative *expert* opinion but a reservation of rights to have an opinion at some future point. It uses the magic language ("I *understand* that there could be elements") to signify it is nothing more than an untested assumption or counsel-supplied directive. At best, it is a mere casual observation that these costs theoretically "could be" (or just as easily, and with as much proof for, could not be) related to the infringement. He cannot say.  There is no tying to any facts of this case. No specific items in the lumped figure are evaluated, and nothing that would say which elements or their quantum should be deducted or why they had any connection to the infringing sales to Dunkin' – which are but a tiny part of Beyond's sales during the infringing time.

A defendant who seeks to claim a cost deduction must prove a relevant cost was actually incurred and cannot rely solely on the party's own testimony. *See, e.g., Playboy Enters. v. Dumas*, 831 F. Supp. 295, 320 (S.D.N.Y. 1993) (excluding costs that were not evidenced by invoices). "Precedent" has set that, where an infringer fails to provide "evidence as to 'which and how much' each item of overhead contributed to the sales of the infringing items, the infringer is not allowed

to deduct any of its indirect and overhead expenses from its gross revenues." *Id.* (internal quotations and citations omitted). Summaries of expenses allegedly incurred have no probative value without underlying documentation. *Project Strategies Corp. v. National Communs. Corp*., 948 F. Supp. 218, 221 (E.D.N.Y. 1996). Nor does testimony unaccompanied by documentary proof of bill payments. *See, e.g., Bambu Sales*, 58 F.3d at 854-855. In addition to being insufficient for an infringer to meet its burden to prove costs, summaries unsupported by underlying documentation are inadmissible. *Kam Hing Enterprises, Inc. v. Wal-Mart Stores, Inc*., 359 F. App'x 235, 238 (2d Cir. 2010) (Summary Order).

Here, there is simply no way to find any portion of any overhead item contributed to the infringing sales to Dunkin'. Plumpe and Beyond failed to provide any documentary evidence supporting any of these alleged Other Operating Expenses or demonstrating how these Other Operating Expenses tie to any particular infringing sales.[2] This creates three serious issues, undermining any helpfulness of Plumpe's opinion. First, despite Dunkin' sales accounting for only a small fraction of Beyond's total sales Plumpe derived the Dunkin' Other Operating Expenses by assuming the same sales ratio (of Beyond's sales to Dunkin' compared with Beyond's sales Globally) applied equally to Other Operating Expenses. Doc. No. 197-2 at 60. Second, Plumpe concedes, any link between the Other Operating Expenses and Beyond's sale or manufacturing of the Infringing Product remains a hypothetical ("could be") with no evidence linking the speculative ratio allocated to the infringement. Third it remains completely unknown what breadth types of expenses were amalgamated into the broadly and undefined Other Operating Expenses buckets,

---

[2] In fact, Beyond's 30(b)(6) financial witness noted "[o]ther operating expenses captures the balance of our selling general and administrative expenses," with examples such as expenses for "accounting, finance, quality, facilities," all items far from a link to the sale of infringing meat products to Dunkin'. Doc. No. 197-7 at 75:19-76:10.

such as "All Other Selling Expenses." The sections below further spell out these defects.

        1.      Plumpe Legally Cannot Deduct General Expenses by Ratio Where the Infringing Sales Are Only a *De Minimis* Fraction of the Total Sales

As a matter of law, under what is essentially a *de minimis* rule, "a proportionate share of overhead is not deductible when the sale of an infringing product constitute only a small percentage of total sales." *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 492 (5th Cir. 1980) (rule applied to "just over 6% of total sales").[3] This makes sense, as if at-issue sales are a minor part of the business, then all or a majority of general expenses are simply not implicated.[4]

As Plumpe's own calculations admit, during the infringing time-period Beyond's revenue from Dunkin' Brands Sales was only ███. of its total Global Net Revenue. *See* Doc. No. 197-2 at Tab 3C (row [D]). Plumpe also expressly noted the sales to Dunkin' only ever hit a high watermark of ███ of the total Global Net Revenue during Q1-2020. *Id.* Despite these de minimis numbers, Plumpe simply multiplied the Global Other Operating Expenses by this 1.86% ratio to form the Allocated Other Operating Expenses – that is the portion of the Global Operating Expenses to be allocated to the Dunkin' Brands Sales related infringement. *See Id.* (multiplying the [D] value to the Global Operating Expenses [T-X] to determine the Allocated Other Operating Expenses [AA-AE]). The proposed deduction should be denied on this basis.

---

[3] The rule has been approved and applied, for example, by Courts in at least the Fifth, Ninth and Eleventh Circuit. *See*, e.g. *Id.*; *Burger King v. Pilgrim's* Pride, 1996 U.S. Dist. LEXIS 12709 *11 (S.D. Fl. May 5, 1996) (same rule in Eleventh Circuit, applied to sales of 2.7% total); *SC Johnson & Son v. Drop Dead*, 144 U.S.P.Q. (BNA) 257 * 10 (S.D. Cal. 1965) (same, applied to 6%); *Clamp Mfg. Co. v. Enco Mfg. Co.*, 5 U.S.P.Q.2D (BNA) 1643 *16 (C.D. Cal. 1987) (same, applied to 1%); *Tommy Hilfiger v. Goody's Family Clothing*, 2003 U.S. Dist. LEXIS 8788 **21, 61 (N.D. Ge. May 9, 2003) (same; applied to sales under 1%).

[4] Even if explained as more of a strong presumption of disallowance, the n.3 cases show that a contrary showing would be a herculean task unmet by all but the most searching proof.

2.      Plumpe's Overall Allocation For the Infringing Campaign Is Speculative

In addition to being legally inappropriate under the *de minimis* rule, or supposing the rule were less than ironclad in the face of a herculean showing, or indeed disregarding it altogether, Plumpe's purported expense allocation should still be disallowed because Plumpe fails (indeed, does not even attempt) to even remotely discharge his and Beyond's "burden of offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." *Hamil America Inc. v. GFI*, 193 F.3d 92, 105 (2d. Cir. 1999).

Such "fair and acceptable" formula is clearly not to just allocate as a percent of sales. *Clamp Mfg. Co.*, 5 U.S.P.Q.2D (BNA) 1643 *16 (C.D. Cal. 1987) ("allocation basis" provides "no evidence concerning how the alleged deductible costs, which were computed on an allocation basis, contributed to the sale of the infringing products"); *e.g. Century Distilling Co. v. Cont'l Distilling Corp.*, 205 F.2d 140, 147 (3d Cir. 1953) (lower court property applied "differential cost" method, which only deducts variable expenses that increased because of the sale of the infringing goods) *disapproved on other grounds by Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714 (1967); *Ntl. Products, Inc. v. Arkon Resources, Inc.*, 2017 WL 5499801, *2-3 (W.D. Wash. 2017) (rejecting admission of "summary charts" showing allocated percentages as opposed to "actual costs incurred from the sale and manufacture of only the accused products").

Putting this rule another way: "Some courts will not allow the deduction of overhead costs if they would have been incurred even without selling the accused goods." 4 McCarthy on Trademarks and Unfair Competition § 30:66 (5th ed.). McCarthy's characterization is an understatement, as "legally authority dictates" denial of deduction for fixed overhead expenses given the "weight of authority." *JTH Tax v. H&R Block*, 245 F. Supp. 2d 749 , 751 (E.D. Va. 2002). "Costs that would be incurred anyway should not be subtracted, because by definition they cannot be avoided by curtailing the profit-making activity." *Taylor v. Meirick*, 712 F.2d 1112,

- 11 -

1121 (7th Cir. 1983) (rule in copyright infringement case); *Abbott Labs. v. Unlimited Bevs., Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000) (same, trademark case); Doc. No. 197-2 at ¶ 76 (Plumpe).

It does not appear Beyond can point to any deviation by the First Circuit, and the Massachusetts Supreme Court agrees the "differential cost" or "incremental cost" rule applies to trademark infringement, denying deductions not affirmatively shown "variable and [] incurred in the offending operation," and thus a defendant is "not entitled to allocate their SG&A expenses on the basis of sales ratios." *USM Corp. v. Marson Fastener Corp.*, 392 Mass. 334, 341-2 (1984).

In reaching this result, the Massachusetts Supreme Court agreed with the compelling reasoning of Comment I of *Restatement of Torts Section 748*, which recognizes that while sales ratios and other methods are used as a matter of "business convenience or business policy" on company books, such shortcuts for an infringer allocating general overhead and other potentially "joint expenses" that *could* involve infringing and non-infringing goods simply is impermissible:

> [T]he accounting for profits seeks to determine as accurately as possible what part of the joint expenses was incurred in the manufacture or marketing of the infringing goods and what part would have been incurred if the infringing goods had not been manufactured or marketed. If the manufacture and marketing of the infringing goods causes no increase in the general expense, no part of it is to be allocated to them, even though such a practice would be bad from the point of view of cost accounting or business policy. Only when the manufacture or marketing of the infringing goods increases the joint expenses is it proper to allocate a part of them to these goods. If the rule were otherwise, the defendant would be permitted to retain gains made by his own wrongdoing. The apportionment of joint expenses in the absence of such an increase would reduce the cost of the non-infringing goods and would thus permit gain for the defendant from his tortious conduct.

*Id.* An infringer should not be able to force the victim senior user (through deductions to disgorged profits) to hand back infringing profits to the infringer to contribute to the infringer's general expenses, expenses which would have been incurred whether or not the infringing sales were made. Thus, this analysis helps to readily delineate the difference between convenience shortcuts for business bookkeeping and *expert* opinions satisfying the *burdens of an infringing defendant*.

Accordingly Plumpe and Beyond carry the burden to "propose[] an adequate formula for allocating a portion of overhead expenses directly implicated in the manufacture of the infringing product." *Diesel S.p.A.*, 2023 WL 5718000, *7-8; *see also Cesari S.r.l. v. Peju Province Winery L.P.,* 693 F. Supp. 3d 375, 389 (S.D.N.Y. 2023) (quotation omitted, cleaned up) ("the court gives extra scrutiny to the categories of overhead expenses claimed to insure that each category is directly and validly connected to the sale and production of the infringing product"). Plumpe failed this duty. Not only, as detailed *supra* III(A)(1), did Plumpe never view any documents or invoices leading to the Other Operating Expenses, but he purely guesses as to which portion of Global Other Operating Expenses should be allocated to the Dunkin' sales in the U.S., using the exact forbidden sales ratio guessing game that lifts no finger to show how any of the Other Operating Expenses were variable so as to increase in relation to the infringing sales, or even relate to the infringement.

Similarly, Beyond only provided to Plumpe quarterly totals for the Other Operating Expenses at a Global level; such amounts even without documentation clearly do not reflect sales and manufacturing of just the infringing product. *See* Doc. No. 197-2 at Tab 3c. As Plumpe had no documents or invoices to review and actually assign which Other Operating Expenses invoked the Dunkin' Brands sales, related to them, or varied with them, Plumpe instead pivoted to applying a blanket sales ratio allocation equivalent to the "Dunkin' Brands as a Percentage of Global Net Revenue." *Id.* (calculating "Allocated Other Operating Expenses" by multiplying "Global Operating Expenses" by "Dunkin' Brands as a Percentage of Global Net Revenue."). And by Plumpe's own admissions, this allocation ratio cannot be backed by documentary evidence as "Beyond does not track expenses by product or customer." *Id.* at ¶ 82.

That is, rather than actually determining what portions of Global Other Operating Expenses actually came from verifiable expenses related to sales to Dunkin', Plumpe just assumed an exactly

mirrored correlation of Beyond's Revenue and Expenses as applied both Globally and for just Dunkin'. Plumpe provides no basis for why Beyond's Revenue and Expenses would directly mirror across all of its products. But to be reliable, testimony must be based on "the methods and procedures of science," and sufficient facts and data, rather than "subjective belief or unsupported speculation." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003); *see also In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999), *as amended by* 199 F.3d 158 (3d Cir. 2000) (excluding expert report and testimony due to its "speculative character."). And as shown by the above sound case law, bare sales ratios simply have no place in the apportionment of general categories of expenses for trademark infringement, and would eviscerate the burden-flipping of Section 1117(a). *USM Corp.*, 392 Mass. at 341-2; *Taylor*, 712 F.2d at 1121; *Rest. of Torts § 748*.

Further, exposing his bald speculation and improper methodology, Beyond's employee, whom Plumpe relied upon for all of Beyond's financial numbers, admitted he did not compare costs between U.S. and foreign facilities or test the assumption of equal cost distribution. (Wagner Decl. Ex. 7, Doc. No. 197-7. at 137:9-16.) That is, even to Beyond's most knowledgeable employees it is simply unknown how Global expenses and revenues relate. Thus for Plumpe, with even less knowledge to proclaim an exact numerical allocation amounts to nothing more than speculation.

Accordingly, Plumpe's Allocated Other Operating Expenses for Dunkin' Brands sales should be excluded for the independent reason that his allocation opinion is based on a purely speculative sales ratio allocation from the Global Other Operating Expenses to Dunkin' Brands sales, and violating even the minimum requirements for trademark infringement deductions.

3.    Plumpe's Report and Related Opinions on Expenses Corresponding to Dunkin' Must be Excluded Because They are Not Based on His Knowledge.

Plumpe's lack of familiarity with the alleged deductible Other Operating Expenses

allocated to the Dunkin' sales is also fatal. As the Court's review of the expert's methodology is commonly the "central focus of a Daubert inquiry," a lack of methodology creates an insurmountable hurdle for admission. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*., 161 F.3d 77, 81 (1st Cir. 1998). *See also Info-Hold, Inc. v. Muzak LLC*, 1:11-CV-283, 2013 WL 4482442, at *5 (S.D. Ohio Aug. 20, 2013) (excluding expert witness under Rule 702 when he "performed no independent analysis" and instead relied "without verification, on Plaintiff's employees and Plaintiff's counsel for information crucial to his opinions).

Even a cursory analysis of Plumpe's methods, in his single paragraph claiming deductible Other Operating Expenses as to the Dunkin' Brands collaborated infringement, render his report useless. Plumpe relies solely on the unverifiable, conglomerated information provided to him by an employee of Beyond. *See* Doc. No. 197-2 at ¶ 88; *see also id.* at n. 174 (citing "[d]iscussion with Paul Sheppard."). Nor did Plumpe even attempt to verify information upon which he relied; he simply assumed what he was told to assume, by an employee of the Defendant. Indeed, the single spreadsheet Plumpe opines upon only states broad categories such as "Innovation," "All Other Selling Expenses" and "Restructuring Expense" with quarterly summations allegedly attributed to those buckets. For this very reason courts have disregarded such opinions as the "[u]se of broad categories which are not described beyond a one- or two-word label make it impossible for the court – even if we disregarded defendant's burden of proof – to determine the nature of the linkage of the cost category to the sale of infringing goods.'" *Cesari S.r.l.,* 693 F. Supp. 3d at 377 (quotation omitted, cleaned up).

Indeed, no information details what actual expenses, bills, or payments feed into each of these respective buckets within "Other Operating Expenses." Nor does Plumpe claim to have

reviewed or even seen any of that information. In fact, Plumpe implies that information is simply not retained in an attributable format by Defendant Beyond at all. Doc No. 197-2 at ¶ 80.

Other Courts have similarly found that summary financial documents coupled with testimony, absent any documentary evidence, were insufficient to satisfy the burden to prove costs. *See Brighton Collectibles, Inc. v. Marc Chantal USA, Inc*., 2009 WL 10674076, at *10 (S.D. Cal. Aug. 12, 2009) (declining to deduct costs because defendant "did not submit any documentary evidence such as invoices to substantiate its claimed deductions"); *Brighton Collectibles, LLC v. Believe Production, Inc*., 2018 WL 1381894, at *7 (C.D. Cal. Mar. 15, 2018) (declining to deduct cost where only evidence of cost was witness testimony and witness-produced spreadsheets).[5]

These circumstances mirror those in *Brighton Collectibles*, where an expert impermissibly "did not explain his calculations for any individual product." 2009 WL 10674076, at *10. Such blind reliance falls short of the "standards of intellectual rigor that are demanded in their professional work." *Id.* at *7-8 (*quoting Abbott Lab'ys*, 743 F. Supp. 2d at 794); *see also CNH Am., LLC v. Champion Envtl. Servs.*, 863 F. Supp. 2d 793, 803 (E.D. Wis. 2012) ("parrot[ing] another's views" fails *Daubert*).

Plumpe did not break down Beyond's expenses with specificity or in relation to infringement, but rather claims entire categories of unverified general expenses are deductible. Instead, Plumpe only serves as a mouthpiece for relaying the alleged expenses determined by

---

[5] *See also Kam Hing*, 359 F. App'x at 237-38 (affirming district court's exclusion of expert testimony regarding cost calculations based on spreadsheet summaries where "defendants had never produced the underlying documentation on which the spreadsheet summaries were based."); *Fujifilm N. Am. Corp. v. Big Value Inc*., 2018 U.S. Dist. LEXIS 150204, *13, 2018 WL 4210132 (E.D.N.Y. Sep. 4, 2018) (excluding expert report where "expert report is based on the summary spreadsheet for which BFG Defendants refused to produce the underlying data" and "Dr. Fishman testified repeatedly that he did not review any of the underlying data for the spreadsheet and instead relied on the numbers he was given by BFG Defendants to reach his conclusion.").

Beyond's employee. Even pretending simply applying a sales ratio to determine deductible expenses were permissible in trademark cases (they are not), the lay Mr. Sheppard has done all that work, there is nothing contributed from Plumpe or his expertise. *Gliottone v. Ford Motor Co*., 95 Mass. App. Ct. 704, 130 N.E.3d 212, 216 (Mass. App. Ct. 2019) (finding that expert testimony is not necessary where "lay knowledge enables the jury to find the relevant facts" (quoting *Providence & Worcester R.R. v. Chevron U.S.A. Inc*., 416 Mass. 319, 622 N.E.2d 262, 264 (Mass. 1993))). Here Plumpe offers no more than the expert label to the lay spreadsheet of Mr. Sheppard. Plumpe provides no further or separate analysis. He simply provides the expert label to the same evidence, while simultaneously offering protection from substantive cross-examination due to Plumpe's lack of foundations for that same information.

Thus, Plumpe should also be excluded from testifying on these Other Operating Expenses for which he has no knowledge or independent verification for. "When an expert relies on data they did not personally collect, their use must meet the 'same standards of intellectual rigor that are demanded in their professional work.'" *Sgouros v. Trans Union LLC*, 2022 WL 832638, at *3 (N.D. Ill. Mar. 21, 2022) (*quoting Abbott Lab'ys v. Sandoz*, 743 F. Supp. 2d 762, 794 (N.D. Ill. 2010)); *see also Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015) (not "independently verifying the accuracy or reliability of those figures fail[s] to satisfy … reliability requirement.").

### C.    Plumpe Has No Experience in the *Direct Market Data* Method, and Therefore Cannot Opine Upon the Same as an Expert.

Vegadelphia's damages expert Blum employed the Direct Market Data Method ("DMDM") to determine the value of Vegadelphia, and lost enterprise due to Beyond's infringement. Doc. No. 197-6 at. ¶ 369. Blum came to such choice after considering multiple market approaches. *Id.* at ¶ 372. The DMDM approach was developed by Raymond Miles, the

founder of the IBA, is spoken to at length in literature such as the book, *Financial Valuation: Applications and Models* ("FVAM") *by* J. Hitchner, Fourth Edition, and is even recognized by Beyond's expert Plumpe. *Id.*; Doc. No. 197-1 at 110:4-15. More specifically, Blum's DMDM calculation tested and agreed with the reasonableness of an outside third party's valuation of Vegadelphia. Through the DMDM approach Blum utilized data from a set of companies to determine if valuations of those other companies are comparable to the instant tested company, here Vegadelphia. This Market Approach allowed Blum to estimate a valuation of Vegadelphia in a but-free world without the negative implications from Beyond's infringement.

Despite recognizing the DMDM as an established method, Plumpe asserts *ad nauseum* abstract criticisms of Blum's DMDM calculations and implementation of the same. Notwithstanding, Plumpe failed to conduct a single counter approach or any valuation in his report. This is unsurprising, and betrays the fundamental problem with allowing Plumpe to opine as a rebuttal expert concerning Blum's DMDM analysis – Plumpe admittedly *has no expertise* in the application of the DMDM. Doc. No. 197-1 at 107:23–108:10; see also *id.* at 110:4–18, 114:10–115:12. That is, Plumpe a person who has never before administered the DMDM approach, thinks appropriate to criticize how well another Expert administered it. "Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field." *Pell v. E.I. DuPont De Nemours & Co.,* 231 F.R.D. 186, 192 (D. Del. 2005).

Plumpe claims that he has at most "used some of the databases that are referred to under the DMDM method in the financial valuation book," but using some of the referenced databases is not at all performing an actual DMDM valuation. Doc. No. 197-1 at 114:15-17. Thus, despite

Plumpe's recognition that DMDM is a common "form of the market approach ... when valuing companies," he has no experience employing the actual DMDM method. *Id.* at 115:2-4.

Rather, Plumpe could only state that he has "reviewed data in some of the databases that are talked about in the financial Valuation Applications and Models book under the DMDM method" and that he "may have referred to it before." *Id.* at 108:1-4, 110:18. Such certainly falls well below any proper basis to lodge any criticisms of a DMDM analysis performed by an expert who often employs such method. *See* Wagner Decl. Ex.8 , Doc. No. 197-8 at 274:19; *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (A witness qualified as expert on certain topics "does not mean that he or she is qualified to express expert opinions as to other fields," thus "a district court acts properly by excluding opinions that are beyond the witness's expertise."); *U.S. v. Chang,* 207 F.3d 1169, 1172–73 (9th Cir. 2000) (concluding that the district court did not abuse its discretion in precluding international finance expert from testifying that a particular financial document was not authentic because the expert had no expertise in detecting counterfeit securities).

As Plumpe strays from his special knowledge and training to attempt criticisms on the DMDM method *and* Blum's specific application of the DMDM method, his opinions fail FRE 702 and Daubert. *Calhoun*, 350 F.3d 316 at 322 (finding  while "general knowledge" may be enough "to testify about general matters, more specific knowledge is required to support more specific opinions."); *In re TMI Litig*., 193 F.3d at 680 (excluding medical opinions of scientist).

In sum, Plumpe's criticism on the DMDM method and Blum's correct application of the DMDM method are simply beyond his expertise and should be stricken.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Vegadelphia respectfully requests that the Court strike Plumpe's expert opinions and bar his related expert testimony on alleged deductible expenses for the Dunkin' based revenue and the DMDM approach under *Daubert.*

Dated:  March 10, 2025

/s/ Ben L. Wagner
L. Andrew Tseng
Mass. Bar No. 689192
TROUTMAN PEPPER LOCKE LLP
19th Floor, High Street Tower
125 High Street
Boston, MA 02110-2736
Tel.: (617) 204-5100
Email: andrew.tseng@troutman.com

Ben L. Wagner (*Lead Counsel)
Cal. Bar No. 243594 (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
11682 El Camino Real, Suite 400
San Diego, CA 92130
Tel.: (858) 509-6010
Email: ben.wagner@troutman.com

*Attorneys for Plaintiff Sonate Corporation, d/b/a
Vegadelphia Foods*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>March 10, 2025,</u> Memorandum Of Law In Support Of Plaintiff Vegadelphia's Motion To Exclude Expert Opinions And John G. Plumpe was served by electronic mail on counsel of record using the email addresses registered on the CM/ECF system.

*s/ Ben L. Wagner*
Ben L. Wagner

307926300