# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

SONATE CORPORATION D/B/A
Vegadelphia FOODS,

                    Plaintiff,

    vs.

BEYOND MEAT, INC., a Delaware
corporation,

                    Defendant.

Civil Action No.  1:23-cv-10690

## DEFENDANT BEYOND MEAT, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF EXPERT RICHARD GEORGE

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF REPORT ................................................................................... 2
      A.    Qualifications .......................................................................................... 2
      B.    Research .................................................................................................. 2

III.  ARGUMENT ...................................................................................................... 5
      A.    Legal Standard ........................................................................................ 5
      B.    A Survey Was Not Required or Appropriate in this Case ...................... 6
      C.    Dr. George Is a Qualified Expert ........................................................... 8
      D.    Dr. George's Use of Internet Searches Performed by a Vendor Is
            Appropriate ........................................................................................... 10
      E.    Qualitative Analysis Does Not Require a Set Number of Third-Party Uses ....... 13
      F.    Dr. George's Report Employed Qualitative Rigor ............................... 14
      G.    The BAO Methodology Is Reliable ...................................................... 17

IV.   CONCLUSION ................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bern Unlimited, Inc. v. Burton Corp.*,
    95 F. Supp. 3d 184 (D. Mass. 2015) ......................................................................14

*Black & Decker Corp. v. Positec USA, Inc.*,
    2015 WL 5612340 (N.D. Ill. Sept. 22, 2015) ........................................................14

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*,
    443 F.3d 112 (1st Cir. 2006) ...................................................................................6

*Calamari Fisheries, Inc. v. Vill. Catch, Inc.*,
    698 F. Supp. 994 (D. Mass. 1988) ..........................................................................17

*Cue, Inc. v. GM LLC*,
    2016 U.S. Dist. LEXIS 99624 (D. Mass. 2016) .....................................................1

*Damon v. Sun Co.*,
    87 F.3d 1467 (1st Cir. 1996) ...................................................................................5

*Faulkner v. Arista Records LLC*,
    46 F. Supp. 3d 365 (S.D.N.Y. 2014) .......................................................................12

*Florida International University Board of Trustees v. Florida National
    University, Inc.*,
    830 F.3d 1242 (11th Cir. 2016) ...............................................................................15

*Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium
    Sports, S.L.U.*,
    797 F.3d 1363 (Fed. Cir. 2015) ...............................................................................15

*Juice Generation, Inc. v. GS Enterprises LLC*,
    794 F.3d 1334 (Fed. Cir. 2015) ...............................................................................16

*KP Permanent Make-Up, Inc. v. Lasting Impressions I, Inc.*,
    543 U.S. 111 (2004) .................................................................................................1

*Levin v. Dalva Bros., Inc.*,
    459 F.3d 68 (1st Cir. 2006) ......................................................................................18

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485 (S.D.N.Y. 2015) ..................................................................17, 18

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016) .............................................................7, 9, 12, 17

BN 87845830v3

*Milward v. Acuity Specialty Prods. Group*,
    639 F.3d 11 (1st Cir. 2011).................................................................................18, 19

*Polar Corp. v. PepsiCo, Inc.*,
    789 F. Supp. 2d 219 (D. Mass. 2011) ...................................................................16

*Price v. L'Oréal United States, Inc.*,
    2020 U.S. Dist. LEXIS 153255 (S.D.N.Y. Aug. 24, 2020) ...................................9

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998)...............................................................................5, 6

*Samaan v. St. Joseph Hosp.*,
    670 F.3d 21 (1st Cir. 2012)...............................................................................5, 18

*Shire City Herbals, Inc. v. Blue*,
    410 F. Supp. 3d 270 (D. Mass. 2019) ...................................................................8

*Sterilite Corp. v. Olivet Int'l, Inc.*.
    2024 U.S. Dist. LEXIS 177064, *14 (D. Mass 2024) ..........................................19

*Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores*, Inc.,
    2011 U.S. Dist. LEXIS 148786, *17 (D. Mass. 2011) ..........................................17

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024).............................................................................8, 15

*Yamaha Int'l Corp. v. Hoshino Gakki Co*.,
    840 F.2d 1572 (Fed. Cir. 1988)............................................................................8

*Yankee Candle v. Bridgewater Candle*,
    259 F.3d 25 (1st Cir. 2001)....................................................................................7

*YETI Coolers, LLC v. RTIC Coolers, LLC*,
    2017 U.S. Dist. LEXIS 11957 (W.D. Tex. Jan. 27, 2017)................................14, 17

**Statutes**

Ouellette, The Google Shortcut to Trademark Law, 102.....................................................12

**Rules**

Rule 702 .......................................................................................................................5, 18

Rule 702(c)........................................................................................................................18

**Other Authorities**

1 McCarthy on Trademarks and Unfair Competition § 11:80 (5th ed.) .........................15

BN 87845830v3

Defendant Beyond Meat, Inc. ("Beyond Meat") hereby files this Memorandum in Opposition to the Motion to Exclude the Expert Opinions of Dr. Richard George filed by Sonate Corporation ("Sonate") (Doc. 192).

## I.  INTRODUCTION

This trademark infringement action is based on Sonate's assertion that Defendants' use of Great Taste, Plant Based infringes upon its trademark, "WHERE GREAT TASTE IS PLANT BASED" (the "Sonate Slogan").  A central issue in this case is whether the Sonate Slogan is strong or weak, which, among other things, is an important likelihood of confusion factor on its own, and also impacts the degree of similarity required to show actual confusion. *See Cue, Inc. v. GM LLC*, 2016 U.S. Dist. LEXIS 99624, *30 (D. Mass. 2016) ("Use of similar marks by third-party companies in the relevant industry weakens the mark at issue.") (quoting *M2 Software, Inc. v. Madacy Entm't Co*., 421 F.3d 1073, 1088 (9th Cir. 2005)).  Another issue is whether Defendants' use of Plant Based and Great Taste is used as descriptive messaging to fairly and accurately describe qualities of Defendants' plant-based products. *See, e.g., KP Permanent Make-Up, Inc. v. Lasting Impressions I, Inc.*, 543 U.S. 111, 124 (2004) (discussing fair use defense);

To that end, Beyond Meat offered an expert report prepared by Dr. Richard George ("the Report") that analyzes the strength of the Sonate Slogan and the generic/descriptive use of Plant Based and Great Taste on plant-based products. See Dr. George Report, Doc. 191-1. Sonate seeks to exclude the Report on numerous meritless grounds, which all amount to irrelevant nitpicking and ignore the standard of admissibility. Dr. George's impressive and substantial credentials and experience in food marketing no doubt qualify Dr. George as an expert. His use of reliable, verifiable data and his thorough analysis render the report admissible.

1

## II.  SUMMARY OF REPORT

### A.    QUALIFICATIONS

Dr. George is Professor Emeritus in the Department of Food Marketing at Saint Joseph's University in Philadelphia. He has regularly taught food marketing courses in the university's Executive Food Marketing Master's Program. *Id.*, ¶ 12, Doc. No. 191-1 at 7-8. For six years, he held a fellowship involving long-term research projects, including one with the Food Marketing Institute. *Id.* ¶ 10, Doc. No. 191-1 at 7.  In addition to his academic role, he has more than 40 years of experience in food marketing, including as a marketing researcher, brand manager, and consultant. *Id.* ¶ 4, Doc. No. 191-1 at 5-6. He speaks regularly to food trade organizations, and has served on the board of directors of a foodservice broker and a foodservice distributor. He has authored or co-authored 21 books and 64 scholarly articles on food marketing. *Id.* ¶ 11, Doc. No. 191-1 at 7.

### B.    RESEARCH

Dr. George discussed the importance of taste in success of food products, which results in taste being the "clear top driver of brand predispositions," a claim supported by the $2.9 billion spent in 2021 in the U.S. to advertise great tasting products.  *Id.* ¶¶ 41-42, Doc. No. 191-1 at 19-23. He then identified numerous food companies that use "great taste" in their marketing, including many well-known brands like Coca Cola, McDonalds, Pepsi, and Special K.  *Id.* ¶ 42, Doc. No. 191-1 at 19-23. These references were provided by Voluble Insights, a litigation research firm that performed searches at Dr. George's direction. Dr. George Depo. Pgs. 59-64, Doc. No. 191-2 at 8-9.  Each reference is supported by a URL. Dr. George Report, ¶ 42, Doc. No. 191-1 at 19-23.

Dr. George asserts that the mere volume of such references, however, is insufficient to conclude that consumers associated the phrase with specific brands. *Id.* ¶ 44, Doc. No. 191-1 at

BN 87845830v3

23-24. Rather, actual consumer usage must be analyzed. *Id.* In order to examine consumer use, Dr. George reviewed social media, product reviews, search activity, and press usage. *Id.*

Therefore, Dr. George identified the ten most popular food products and the ten most popular beverage products in the U.S., as ranked by YouGov. *Id.* ¶ 45, Doc. No. 191-1 at 24. Using the Brandwatch platform, Dr. George analyzed those top-10 products as discussed by X (formerly Twitter) users and provided screenshots of numerous X posts showing generic use of "great test" in various posts. *Id.* ¶¶ 45-46, Doc. No. 191-1 at 24-29. Dr. George also looked at product reviews and Google search results, as well *Id.* ¶¶ 48-52, Doc. No. 191-1 at 30-36.

Dr. George provided his expert opinion on the history, usage, and popularity of the term "plant based" and the general vegan meat industry. *Id.* ¶¶ 54-58, Doc. No. 191-1 at 36-38. He provided data and examples on the use of "plant based" as grocery store product categories (¶¶ 59-62), in product marketing (¶¶ 63-64), in Brandwatch-assisted consumer uses on X, depicted in a word cloud (*Id.* ¶ 66), and in hashtags (*Id.* ¶¶ 67-69). Doc. No. 191-1 at 38-53. Dr. George also utilized a Brandwatch-assisted estimate of the audience sizes correlating to posts using "plant based," and noted that the top 20 accounts are primarily individual accounts, with none related to Sonate. *Id.* ¶¶ 69-70, Doc. No. 191-1 at 53-54. In a fourth line of inquiry, Dr. George ran a Google Trends report on the term "plant based," which revealed that the top 25 Google searches containing "plant based" were each unrelated to any brand or company. *Id.* ¶ 71, Doc. No. 191-1 at 54. Similarly, a Google search for "plant based" did not provide any results in which the term appeared in a trademark context until the second page of results. *Id.* ¶ 72, Doc. No. 191-1 at 56-57.

Following his analysis of "great taste" and "plant based" alone, Dr. George identified numerous references of the terms used together, including in a slogan for a vegan restaurant, on

3

product packaging, as a slogan for a third-party vegan meat company, in grocery store ads, and on social media. *Id.* ¶¶ 77-91, Doc. No. 191-1 at 60-88.

Relying on all of this data, Dr. George then applied the Barrier Outcomes ("BAO") model, which requires assessment of barriers to achieving secondary meaning, actions taken to overcome those barriers, and marketplace outcomes of successful actions. *Id.* ¶ 93, Doc. No. 191-1 at 88-89. As explained in the report:

> The BAO model can be used as a guide for assessing whether a particular brand element has acquired distinctiveness: considering the specific pre-existing barriers faced by the brand element in question, has the brand owner taken actions to overcome those barriers, and is the success of those actions illustrated through measurable marketplace outcomes? As Golder et al. explain, "[s]econdary meaning is most likely when barriers are low, company actions are well planned and executed, and empirical marketplace outcomes indicate that consumers view the brand element as a source identifier."

*Id.* ¶ 94, Doc. No. 191-1 at 90. Dr. George opined that, based on (1) the significant generic use of the terms "great taste" and "plant based" both separately and together, as identified earlier in the report, (2) Sonate's limited use of its slogan, and (3) Sonate's sales exclusively within the food service supply chain, Sonate faces significant barriers in acquiring consumer recognition of its trademark. *Id.* ¶¶ 98-102, Doc. No. 191-1 at 91-93.   Dr. George further noted additional deposition testimony revealing that there is little or no consumer-facing use of the Sonate slogan, even by the restaurants that buy vegan meat from Sonate. *Id.* ¶¶ 101-06, Doc. No. 191-1 at 92-94. Dr. George opined that Sonate's few customers are more sophisticated buyers and highly unlikely to make purchase decisions in relation to slogans," but who instead "look for sales information, market research, and otherwise rely on existing relationships and payment structures." *Id.* ¶ 107, Doc. No. 191-1 at 94-95.

Dr. George then applied the "actions" portion of the BAO model and examined what steps Sonate has taken to overcome the recognition barriers that it has faced. *Id.* ¶ 109, Doc. No. 191-1

4

at 95. He analyzed Sonate's marketing activity and brand enforcement efforts, which were minimal. *Id.* ¶¶ 110-113, Doc. 191-1 at 95-97. Dr. George noted that Sonate had not engaged in the key "actions" that would overcome barriers; namely, "developing meaningful distributor partnerships; utilizing digital marketing strategies; offering samples and conducting product demonstrations (called "Cuttings"); providing educational content, such as recipe ideas, cooking tips, and usage guides; offering incentive programs, such as discounts, rebates, or loyalty rewards; and highlighting sustainability practices and health benefits." *Id.* ¶ 114, Doc. No. 191-1 at 97-98.

Finally, Dr. George examined the "outcomes" element of the BAO model, which requires analyzing sales, consumer recognition, and media and competitor recognition. *Id.* ¶ 115, Doc. No. 191-1 at 98. Dr. George notes Sonate's low sales and minimal internet references, which were almost entirely related to this lawsuit. *Id.* ¶¶ 116-118, Doc. No. 191-1 at 98-100.

Dr. George concludes that application of the BAO model "demonstrates a lack of evidence that customers or the foodservice industry readily identify or exclusively associate [Sonate] with its slogan 'Where Great Taste is Plant Based.'" *Id.* ¶ 127, Doc. No. 191-1 at 103.

## III. ARGUMENT

### A. LEGAL STANDARD

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a *Daubert* inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). That requirement ensures that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that [the] reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In other words, Rule 702 requires the court to "ensure that there is an adequate fit between the expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591). A court

may choose to exclude an expert's opinion when it is "based on conjecture or speculation from an insufficient evidentiary foundation," *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotation marks omitted), or when it is "connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co.*, 522 U.S. at 146.

The court may not subvert the role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596; *see also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversary process").

Sonate seeks to exclude Dr. George's report on numerous hyper-technical grounds. (DOC. 192). Each is meritless. Indeed, to the extent Sonate wants to make these arguments, it should do so to a jury, which can determine the appropriate weight to give Dr. George's Report.

**B.    A SURVEY WAS NOT REQUIRED OR APPROPRIATE IN THIS CASE**

Sonate argues that, even though Dr. George did not prepare a survey, that he should be excluded with "red warning lights" because he is not qualified to prepare surveys. Motion at 3. It should go without saying that an expert should not be disqualified on the basis of his lack of expertise in irrelevant skills that were not employed, required, or even useful, to the expert's report or conclusions.

Sonate then argues that Dr. George's report is not admissible because it is not a survey. Motion at 3. Yet, evidence of unpoliced, unabated third-party use in a relevant industry is highly relevant to distinctiveness and strength. *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 121 (1st Cir. 2006) (identifying factors relevant to trademark strength, including the

trademark holder's renown in the industry, the potency of the mark in the product field as measured by the number of similar registered marks, and the trademark holder's efforts to promote and protect the mark). Thus, Sonate is arguing that it is *inadmissible* to present expert opinion on distinctiveness premised on metrics *established by law.* This is not the case, as underscored by the very case cited by Sonate.

In *Yankee Candle v. Bridgewater Candle*, 259 F.3d 25, 37 (1st Cir. 2001), the First Circuit noted the absence of a survey, *and the absence of "any circumstantial evidence indicating the public had made a conscious connection between the trade dress at issue and [plaintiff] as the source of that trade dress."* (emphasis added). In other words, the Court expressly referenced precisely the type of evidence in Dr. George's report as relevant, and missing, in the case it reviewed.

Sonate also mischaracterizes the treatise McCarthy on Trademarks, which in no way suggests that a report like the one prepared by Dr. George is inadmissible or unhelpful. Rather, McCarthy states the opposite: that "it is entirely proper and relevant for a qualified expert witness to opine as to these subsidiary factual questions, such as the ways in which the goods or services are sold and advertised." McCarthy on Trademarks, § 23:2.75. Notably, the McCarthy quote referenced by Sonate discourages the use of non-survey expert opinion on the ultimate question of likelihood of confusion, an issue Dr. George did not address.

Sonate also improperly relies on *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 637-39 (S.D.N.Y. 2016). While that court did strike the plaintiff's expert, it did so for reasons that do not exist here. The *LVL* expert did not have any background in fashion marketing, no training performing empirical analyses, had never been retained as an expert, and "*did not conduct a marketing analysis.*" *Id.* (emphasis added). Perhaps most fatally, he claimed to

have reviewed more than 100,000 social media posts, when in fact, he could only reproduce twelve of the posts he reviewed such that it was "impossible to reconstruct" the expert's searches or test his methodology. *Id.* at 644-45. None of these deficiencies exist in the qualifications, data, methodology, or conclusions provided by Dr. George.

To the extent Sonate argues that its incontestable registration renders the Report moot, this assertion is wrong. Motion at 3. Sonate's incontestable status bears absolutely no weight as to the relative strength of its trademark. "Incontestability and secondary meaning are distinct from a mark's strength." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 351 (1st Cir. 2024). (Plaintiff's "insistence that its marks are incontestable…does little to advance its claim that its marks are strong.")

As a final point on this issue, surveys are not required. *Shire City Herbals, Inc. v. Blue*, 410 F. Supp. 3d 270, 295 (D. Mass. 2019), citing *Colt Defense LLC v. Bushmaster Firearms, Inc*., 486 F.3d 701, 706, n. 4 (1st Cir. 2007). Moreover, in this case, such a survey was not practical for a variety of reasons. George Depo., pgs. 186-87, Doc. No. 191-2 at 32. Tellingly, Sonate did *not* conduct a survey to demonstrate the alleged strength of its mark.

## C.    DR. GEORGE IS A QUALIFIED EXPERT

Sonate argues that Dr. George is not a qualified expert because he has not previously offered expert testimony on the issue of distinctiveness. Motion at 4. This argument presumes that a proffered expert can only present a reliable opinion on an issue if he has done so before. This is clearly not the law.[1] *See, e.g.*, *Yamaha Int'l Corp. v. Hoshino Gakki Co*., 840 F.2d 1572 (Fed. Cir. 1988) (upholding decision to admit the expert testimony of a guitar-maker and a jazz guitarist on

---

[1] Indeed, the imposition of such a rule would, in due time, eliminate all experts, as no new expert could ever achieve a "first time" testifying on a particular topic to be qualified thereafter.

the issue of secondary meaning even though the experts had no empirical experience) (affirming *Yamaha Int'l Corp.*, 231 U.S.P.Q. (BNA) ¶ 926, 1986 TTAB LEXIS 18 (P.T.O. Oct. 9, 1986) (noting the experts' "professional 'lifetimes' of observation and experience" made it unnecessary for them to be "experts in conducting consumer surveys or to have actually conducted such surveys.")).

Sonate again relies on *LVL*, arguing that Dr. George's experience is akin to the disqualified expert in that case. The deficiencies noted by the *LVL* court simply do not exist here. The *LVL* court was clear that its chief concern regarding the expert's credentials was his lack of empirical training, as the expert was a newly-minted lawyer with no empirical training, and whose report involved no empirical methodology. *LVL*, 209 F. Supp. 3d at 639 ("The expertise most germane to such a determination thus involves training or experience performing empirical analyses. But as to this critical qualification, Colman's credentials are woefully deficient."). Here, Dr. George has decades of experience performing empirical research on matters relating to food marketing – skills he applied to the empirical analysis he provided in the present Report.    (For the Court's convenience, we have attached hereto as Appendix A, excerpts from the George CV, which is included in his Report (Doc. 191-1), reflecting examples of his empirical research).

Sonate also relies on *Price v. L'Oréal United States, Inc.*, arguing that the case mandates that an expert have specialized knowledge in precisely the product at issue. 2020 U.S. Dist. LEXIS 153255 (S.D.N.Y. Aug. 24, 2020). Yet *Price* makes no such holding. The *Price* court excluded a portion of the expert's report, not because the expert had insufficient credentials, and not because he lacked specific experience with the exact product at issue, but because his research was largely outside the timeframe relevant to the facts of the case, and he failed to maintain his records such that his "methodology [could not] be tested, challenged or replicated. *Id.* at *11-13. The Report

here presents no such deficiencies, as Dr. George's Report is based on data that is cited and identified (and therefore capable of duplication), and in the relevant time frame (discussed *infra*).

D.  **DR. GEORGE'S USE OF INTERNET SEARCHES PERFORMED BY A VENDOR IS APPROPRIATE**

Sonate argues that Dr. George's report is not expert testimony at all because he relies on internet searches, asserting that a "jury does not need an expert for this information." Motion at 6. Sonate cites cases for the position that "[a] witness who does nothing more than review and summarize data in a computer database is a lay witness, not an expert." *Id.* at 7 (citing *Henderson v. Corelogic Nat'l Background Data, LLC*, 2016 U.S. Dist. LEXIS 9885, at *11 (E.D. Va. Jan. 27, 2016)).

Sonate's argument ignores the analysis and conclusions in Dr. George's Report. Specifically, Sonate ignores Dr. George's background as an expert analysis on food marketing, brand elements, channels of distribution, and pricing impacts (see ¶¶30-37; 114), his industry awareness of the impact of taste on purchasing decisions (¶¶ 38-42), his assessment of Sonate's marketing efforts and the impact of those efforts on the strength of the mark (see ¶¶111-13; 116-18), and his analysis of food industry trends and usage related to the phrase "plant-based," which are instructive in assessing the consumer usage that arises from the search results (see ¶¶54-58). Dr. George Report, Doc. No. 191-1 at 15-23, 36-38, 96-100. Sonate then ignores the fact that Dr. George used all these sources of information as well as his industry expertise to assess the usage of the Sonate slogan on materials intended to market the Sonate products within the supply chain, where slogans and other consumer-facing marketing are less important. *Id.* ¶ 107, Doc. 191-1 at 94-95. In short, Dr. George's report *uses* internet searches, but Dr. George's report does not solely consist of internet searches.

Moreover, Dr. George's expertise is apparent in *how* he performed and used internet searches, which included his ability to utilize specialized software like Brandwatch (¶¶ 45, 70) and Google Trends (¶¶ 50, 71). Doc. 191-1 at 24, 33-34, 53-56. A lay person may be able to conduct a Google search but would not be able to assemble the full suite of analyses in the report. Sonate's suggestion that any lay person could prepare Dr. George's report is belied by even a cursory review of the Report.

Indeed, Dr. George relied on his expertise to consider top US based food brands (¶45) and to assess how retailers use and understand the term "plant-based" (¶59). Doc. No. 191-1 at 24, 38-41. The assembly of the internet searches, social media post analyses, and press reviews, as presented alongside analysis of Sonate's *de minimis* marketing budget (¶112) supported Dr. George's understanding of consumer data, the crowded food marketplace, and brand marketing, such that he could assess whether or not there is evidence that consumers uniquely associate the phrase "Where great taste is plant-based" with Sonate. (¶122). Doc. No. 191-1 at 96-97, 101-102.

To the extent Sonate complains about Dr. George's use of internet search results compiled by a vendor, this complaint is meaningless unless Sonate can identify an actual problem with the reliability of the data. Sonate makes no such complaint.

Voluble assisted Dr. George in doing the legwork of collecting data. For instance, Voluble located examples of brands that use "great taste" in marketing taglines, which are provided in Figure 1 on pages 16-19 of Dr. George's Report. Doc. No. 191-1 at 20-23. Sonate does not, because it cannot, argue that these brands do not actually use the "great taste" phrasing. Nor does Sonate argue that the pictures are altered, or that these examples could not be independently documented. The same holds true for *all* the data in Dr. George's report. The data is universally cited, and each data set could be recreated.

11

It is critical to note here that the underlying issue here is the identification of examples that show third-party use of terms. If 1,000 examples were located, and Dr. George chose 20 to show in his report, the failure to include the other 980 does not call into question the reliability of the 20 he included in his report. Indeed, any missing examples would have only served to bolster his conclusions. Sonate cannot meaningfully complain that the entire list of 1,000 results was not produced here because such exclusion could not possibly harm Sonate or its efforts to show the strength of its slogan.

In short, the mere fact that a vendor assisted Dr. George in compiling examples bears absolutely no relevance to the reliability of the data. Unless Sonate can point to an actual problem with the data, it cannot complain that Dr. George retained a vendor to assist with its collection. *See Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014) ("[A]n expert may rely on assistants or the opinions of other experts in formulating their own expert opinions." (citing *Dura Auto Sys. of Ind. v. CTS Corp.*, 285 F.3d 609, 612 (S.D.N.Y. 2014))); *Malletier*, 525 F. Supp. 2d at 664 ("It is true that experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field." (citing Fed. R. Evid. 703)).

It should also be noted that search results like the ones Dr. George collected are a standard means of assessing third party use. *See* 2 McCarthy on Trademarks § 15:30 ("[S]earch engine results, such as those of Google, can be an accurate proxy for the meaning and distinctiveness of words. This is because Google's search algorithm that determines listings is based on the frequency with which users click on the top search results and is generally able "to predict what online content consumers associate with a search term."), quoting/citing Ouellette, The Google Shortcut to Trademark Law, 102 Calif. L Rev 351, 363 (2014) ("My narrowest claim is that Google and other

online search results can serve a function similar to survey data for evaluating distinctiveness where time or cost constraints make it infeasible to conduct a survey.… My broader claim is that Google results can supplant a significant portion of current trademark strength and likelihood-of-confusion inquiries." 102 Calif. L Rev at 406).

E.    <u>QUALITATIVE ANALYSIS DOES NOT REQUIRE A SET NUMBER OF THIRD-PARTY USES</u>

Sonate argues that Dr. George's report lacks quantitative rigor because he could not identify a specific number of third-party uses that render a particular trademark weak. Of course Dr. George could not answer this question because it is un-answerable. No magic number exists, and indeed, no legal authority suggests that it does.

Sonate's case, *Spin Master v. Zobmondo Entm't*, does not suggest that an expert must identify a specific threshold of third-party uses to perform a reliable analysis. The proffered expert in *Spin Master* was excluded because he relied on only four examples to make the broad conclusion that the plaintiff's mark was generic. 2012 U.S. Dist. LEXIS 188155 (C.D. Cal. Apr. 27, 2012). When the expert attempted to add a list of 190 references to his report, he did not update the report to "explain[] what these sources are or how he relied on them, whether by way of a supplemental report, deposition testimony, . . . or even a declaration." *Id.* at * 69-70. The list of 190 results was excluded on this basis, not because 190 was a relevant number of results. While this case may be cited for the proposition that four third-party uses does not make a trademark generic, neither this case, nor any other, requires a magic number of third-party uses or an expert who could invent such a number.

F.    **D**R. **G**EORGE'S **R**EPORT **E**MPLOYED **Q**UALITATIVE **R**IGOR

Sonate argues that Dr. George "pays no heed to the *quality* of the 'examples' he chose," arguing that Dr. George did not focus on geography. Motion at 14 (emphasis original). This assertion is demonstrably untrue.

Sonate's assertion ignores the evidence provided in the report relating to numerous U.S. brands and U.S. websites. To the extent any individual reference in the report may relate to a company that markets outside the United States, such references are so *de minimus* that they bear no impact on the reliability of the report, and would not impact the conclusions. Indeed, Sonate cannot dispute that Hellman's and Impossible Foods used the "great taste" and "plant based" phrases together in slogans in 2020 in U.S. marketing campaigns, a fact that perhaps provides the greatest evidence of weakness of Sonate's slogan. (see ¶¶78-79). Moreover, a jury would be free to disregard a single non-U.S. example within the Dr. George report if so instructed. Doc. No. 191-1 at 61-63.

Sonate also makes meritless arguments that Dr. George did not appropriately employ or identify time period limitations. Motion at 15. As an initial matter, the Report identifies the relevant time period for the data: 2019-2024 in Fig. 12 (¶50); 2014-2024 in Fig. 31 (¶66); 2019-2024 in Fig 34 (¶71, see URL); 2014-2024 in Fig 64 (¶88); 2018-2024 (¶118, see URL). Doc. No. 191-1 at 33-34, 51, 54-56, 82, 99-100.

More importantly, Sonate ignores the current law in arguing that third-party uses are irrelevant if they post-date the infringement period. Sonate cites to three unreported, out-of-circuit district court cases for the proposition that secondary meaning and distinctiveness are tested as of the time of infringement. Motion at 15. Sonate's string cite purports to show that post-infringement evidence of use is irrelevant and inadmissible, but this view is both myopic and wrong as a matter

of law. Notably, each of these cases involve evidence from *plaintiffs* attempting to *prove* secondary meaning. More recently, other courts, including one in this district, have allowed post-infringement evidence to be admitted by *defendants* to show a *lack* of secondary meaning. *Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 203 (D. Mass. 2015) (allowing a survey taken well after the time of infringement and instead "examin[ing] the timing to determine the strength of the evidence."); *see also Black & Decker Corp. v. Positec USA, Inc.,* 2015 WL 5612340, *9-10 (N.D. Ill. Sept. 22, 2015) (finding that evidence of secondary meaning after the alleged infringement was relevant); *YETI Coolers, LLC v. RTIC Coolers, LLC*, 2017 U.S. Dist. LEXIS 11957, at *7 (W.D. Tex. Jan. 27, 2017) (explaining that the expert's "analysis of post [infringement] evidence does not render his opinion unreliable" and that "reliance on evidence after the alleged infringement date goes to the weight, rather than admissibility, of his testimony"). *See, e.g.,* 1 McCarthy on Trademarks and Unfair Competition § 11:80 (5th ed.) ("[t]he marketplace strength of the mark must be evaluated at the time of litigation or at the time registration is sought."); *Florida International University Board of Trustees v. Florida National University, Inc.*, 830 F.3d 1242, 1258 (11th Cir. 2016) ("It is surely true that focusing solely on conceptual strength is an 'incomplete' method of analysis, since we are also required to examine 'the marketplace strength of the mark at the time of litigation or at the time registration is sought.'").

Defendant does not dispute that Plaintiff owns an incontestable registration for the mark, or that the registration is valid.   What Sonate failed to contest—and therefore waives—is the probative value of the evidence in the George Report on the *strength* of Plaintiff's Mark. As the First Circuit has made clear, an incontestable registration relates to the *validity* of the registration, and is not an indicator of the mark's strength.  *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 351–52 (1st Cir. 2024).

15

The evidence in the Report shows voluminous examples of third-party use of "plant based," "great taste," and the terms combined, in association with plant-based meat substitutes. This evidence is highly probative of the strength (or rather, weakness) of Sonate's Slogan because "third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373 (Fed. Cir. 2015) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005).

The Federal Circuit Court of Appeals has held that "extensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact has not been established." *Id.* at 1373–74 (quoting *Juice Generation, Inc.*, 794 F.3d at 1339 (Fed. Cir. 2015). This is, in part, because no evidence of actual use is even needed to bear on the strength of the mark. When examining third-party registrations where no evidence of third-party use was shown, the Federal Circuit explained that such registrations "are relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *Juice Generation, Inc.*, 749 F. 3d at 1339; *id.* (quoting *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 917 (CCPA 1976) for the proposition that this type of evidence may be given some weight to show the meaning of a mark in the same way that dictionaries are used"). Of course, this also bears on Defendants' contention that its use of Great Taste, Plant Based for plant-based products, constitutes a permissible fair use.

Moreover, Sonate's failure to police third-party use of its slogan likewise bears on the weakness of the slogan. Third party registrations and use "weigh against the strength of plaintiff's

marks to an extent because they indicate some level of diminished potency and failure to protect the mark." *Polar Corp. v. PepsiCo, Inc.*, 789 F. Supp. 2d 219, 235 (D. Mass. 2011). The George Report reaches a similar conclusion. *Id.* ¶ 109, Doc. No. 191-1 at 95.

Finally, Sonate argues that the third-party references are irrelevant unless the report also shows that consumers are familiar with those references. Motion at 16. Sonate cites to decades-old cases that ignore current law. As explained by the Federal Circuit, "[t]he "specifics" as to the extent and impact of use of the third parties' marks may not have been proven, but in the circumstances here, [appellant's] evidence is nonetheless powerful on its face. The fact that a considerable number of third parties use similar marks was shown in uncontradicted testimony." *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015); *see also Calamari Fisheries, Inc. v. Vill. Catch, Inc.*, 698 F. Supp. 994, 1008 (D. Mass. 1988) (accepting list of restaurants with word "catch" in name as evidence of third party use); *Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores*, Inc., 2011 U.S. Dist. LEXIS 148786, *17 (D. Mass. 2011) (accepting list of marks in trademark search report as probative of mark's weakness).

Moreover, much of Dr. George's report *is* focused on consumer awareness. For example, Figure 1 is comprised of actual advertisements for national, famous brands. Doc. No. 191-1 at 20-23.  His focus on Google searches (Figures 12, 34) and social media (Figures 32, 35, 65-69) relate solely to how consumers search for and use the relevant terms. Doc. No. 191-1 at 33-34, 52-53, 55-57, 83, 86.

## G.  THE BAO METHODOLOGY IS RELIABLE

Sonate argues that Dr. George's reliance on "BAO" methodology is unreliable. Motion at 17. Sonate first argues that it was improper to analyze Sonate's slogan under the BAO analysis without also analyzing Beyond Meat's slogan under the same analysis. Motion at 17. This

argument makes no sense. It is Sonate that brought this lawsuit concerning use of Sonate's trademark, making the strength of that trademark germane to this case. Setting aside the issue that Beyond Meat used the terms "great taste" and "plant-based" generically, or at most, descriptively, its use of the terms is irrelevant to the strength of Sonate's Slogan.

Sonate also asserts that the BAO methodology has not been tested or challenged, but in support of this argument, cites to nothing but the distinguishable *LVL* case. Motion at 19. Sonate never points to any specific reason that Dr. George's report is untestable or un-challengeable. Reports like Dr. George's are routinely admitted even where *no* specific methodology is cited. *See YETI Coolers, LLC v. RTIC Coolers, LLC*, 2017 U.S. Dist. LEXIS 11957, *10 (admitting marketing expert report on secondary meaning over complaints that he "cherry picked" social media comments because such analysis "does not readily lend itself to a formal or quantitative methodology"); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp*., 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) (admitting marketing expert report comprised of internet search results because the expert "synthesize[d] this material and pull[ed] together common themes in reaching his conclusions," and even though an analysis may be qualitative does not mean that it is unreliable for the purposes of *Daubert*.").

Sonate next complains the BAO method is unreliable because it includes various strength-of-mark/consumer awareness factors that are not precisely those employed in the First Circuit. *Id.* Such contention lacks merit as there is no requirement that an analytical methodology directly overlap a legal test, nor should there be such a requirement. The BAO test is not a substitute for legal analysis, and does not replace the application of relevant First Circuit law that would be applied by a jury under proper instruction.

Sonate next argues that because the BAO model has not been used in litigation before or subject to peer review, it is unreliable. *Id.* No such rule exists, and Sonate provides no support for its argument. The rule that *does* apply is Rule 702(c), which requires that the expert's opinion be "the product of reliable principles and methods." This "necessitates an inquiry into the methodology and basis for an expert]s opinion." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012). Although the proponent of an expert witness bears the burden of proving the admissibility of his opinion, *see Daubert*, 509 U.S. at 592, the burden is not especially onerous, because "Rule 702 has been interpreted liberally in favor of the admission of expert testimony," *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006). "So long as an expert's . . . testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process . . . ." *Milward v. Acuity Specialty Prods. Group*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Daubert*, 509 U.S. at 590).

Sonate's arguments relating to Dr. George's report are similar to those raised and rejected in *Sterilite Corp. v. Olivet Int'l, Inc..* In *Sterilite,* the plaintiff's expert provided an expert report on the issue of secondary meaning of the plaintiff's trade dress. 2024 U.S. Dist. LEXIS 177064, *14 (D. Mass 2024). The court noted that the expert's report "does not rest primarily 'upon scientific foundation,'" such that the inquiry is "whether the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* The expert met that standard as, very much like Dr. George, his experience drew on 30 years of development and marketing, and he drew upon that experience "to analyze factors that, according to the First Circuit, bear on whether trade dress has acquired secondary meaning, including the length and manner of [plaintiff's] use of its trade dress as well as its advertising efforts." *Id.* The court noted that any weaknesses in the report must be solved by a jury. *Id.* (citing *Currier v. United Techs.*

*Corp.*, 393 F.3d 246, 252 (1st Cir. 2004) ("[W]eakness in [an expert's] analysis [is] a matter of weight rather than admissibility and thus properly a subject of argument and jury judgment.")).

Similarly, in *IEP Techs., LLC v. KPM Analytics, Inc.,* the court allowed the plaintiff's industry expert to opine on several likelihood of confusion factors, including the strength of the mark, based on his experience in industry marketing, noting there are "many different kinds of experts, and many different kinds of expertise." 2024 U.S. Dist. LEXIS 231686, *11-12 (D. Mass 2024) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

## IV. CONCLUSION

The question here is whether Dr. George based his opinion on conjecture, or based his opinion on data that was analyzed in a reliable and meaningful way. The George Report provides relevant data, supported by citations, analyzed in a reliable way. Any nitpicks should be managed by cross examination, not exclusion. For the reasons set forth herein, Beyond respectfully requests that the Court deny Sonate's motion to exclude expert opinions and the related testimony of Dr. George.

Dated: March 24, 2025                          Respectfully Submitted,

                                               BUCHALTER
                                               A Professional Corporation
                                               By:*/s/Willmore F. Holbrow*
                                               WILLMORE F. HOLBROW III *(Pro Hac Vice)*
                                               BUCHALTER
                                               A Professional Corporation
                                               1000 Wilshire Boulevard, Suite 1500
                                               Los Angeles, CA  90017-1730
                                               Telephone: 213.891.0700
                                               Fax: 213.896.0400
                                               Email:  wholbrow@buchalter.com

                                               *Attorneys for Defendant Beyond Meat, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on <u>March 24, 2025</u>, Defendant Beyond Meat, Inc.'s Memorandum of Points and Authorities In Opposition to Plaintiff's Motion to Exclude Testimony and Opinions of Expert Richard George Pursuant to Local Rule 7.2 was served by electronic mail on counsel of record using the email addresses registered on the CM/ECF system.

<u>/s/ Willmore F. Holbrow III</u>
Willmore F. Holbrow III

# APPENDIX A

# APPENDIX A

# Richard J. George, Ph.D.
## Examples of Empirical Research

Over the years, Dr. George has engaged in a significant amount of empirical research, using a variety of data collection methods including surveys, case studies, and field observations. For the convenience of the Court, the following provides examples of Dr. George's empirical research experience. The reference to the page of his CV, which is part of his expert report (Doc. No. 191-1) are included.

S̲C̲H̲O̲L̲A̲R̲L̲Y̲ A̲R̲T̲I̲C̲L̲E̲S̲

The following examples of empirical research studies were double-blind reviewed and published in well-known journals:

"Mavens' Price and Non-Price on Pack Extrinsic Cue Search Behaviours: Implications for Store Brands," International Journal of Retail & Distribution Management, Volume: 45 Issue: 7/8, 2017 (with Dr. Alan Collins, University College Cork). (CV – Expert Report p. 103)

"Mavens' Search Behaviors and the Use of Cues: Implications for Store Brands," Proceedings, Colloquium on European Research in Retailing, June 2016, Toulouse, France (with Dr. Alan Collins, University College Cork). (CV – Expert Report p. 103)

"Calculative Trust in the Consumer Market," Proceedings, 18th Annual Irish Academy of Management Conference 2015 (with Drs. Alan Collins, University College Cork; Ella Kavanagh, University College Cork). (CV – Expert Report p. 103)

"From Store Brands to Store Brandscapes: The Emergence of a Time and Money Saving Heuristic," The European Journal of Marketing 2015 (Vol. 49 Is: 5/6, pp.894 - 918) (with Drs. Alan Collins, University College Cork; James Cronin, Lancaster University; Steve Burt, University of Stirling). (CV – Expert Report p. 104)

"Time, Money and the Product Selection Decision." Proceedings, 17th Annual Irish Academy of Management Conference 2014 (with Drs. Alan Collins, University College Cork; James Cronin, Lancaster University; Steve Burt, University of Stirling). (CV – Expert Report p. 104)

"Money, Mavens, Time and Price Search: Modeling the Joint Creation of Utilitarian and Hedonic Value in Grocery Shopping." Journal of Marketing Management, (Volume 30, Issue 7-8, June 2014, pages 719-746) (with Drs. Alan Collins, University College Cork; Ella Kavanagh, University College Cork; James Cronin, Lancaster College UK). (CV – Expert Report p. 104)

"An Investigation into Store Brand Proneness." Proceedings, International Food Marketing Research Symposium, Budapest, Hungary, June 2013 (with Drs. Alan Collins, University College Cork; Ella Kavanagh, University College Cork; James Cronin, Lancaster College UK). (CV – Expert Report p. 104)

"In-Store Price Search and Store Brand:  Saving Time and Money." <u>Proceedings</u>, XVII International Conference on Research in the Distributive Trades of the European Association of Education and Research in Commercial Distribution (EAERCD). Valencia, Spain, July 2013 (with Drs. Alan Collins, University College Cork; Ella Kavanagh, University College Cork). (CV – Expert Report p. 104)

"Store Deal Prone Shoppers: Motivators and Implications for the Supply Chain in a Distressed Market." <u>The International Review of Retail Distribution and Consumer Research</u>, Volume 22, Issue 1, February 2012, pages 83-100 (with Drs. Alan Collins, University College Cork; Ella Kavanagh, University College Cork). (CV – Expert Report p. 104)

"Modeling Store Deal Proneness: An Economic Perspective." <u>Proceedings</u>, XVI International Conference of the EAERCD, Parma, Italy, June 29 – July 1, 2011 (with Drs. Alan Collins, University College Cork; Ella Kavanagh, University College Cork). (CV – Expert Report p. 104)

"School Day Eating Habits of Inner-City, African American Adolescents." <u>Journal of Negro Education</u>, Volume 78, Number 2, pp 114-122 (Spring 2009) (with Dr. Thomas McDuffie). (CV – Expert Report p. 105)

"Adolescents and Food Attitudes and Behaviors during the School Day: Implications for Food Marketers," <u>Journal of Food Products Marketing</u>, Vol. 14, Issue 1, 2008 (with Dr. Thomas McDuffie). (CV – Expert Report p. 105)

### E<small>MPIRICAL</small> R<small>ESEARCH AS THE</small> G<small>ERALD</small> E. P<small>ECK</small> F<small>ELLOW</small>

As Professor of Food Marketing, Dr. George held the prestigious C.J. McNutt Chair of Research. During which time he conducted empirical research, including consumer surveys, case studies & field observations for the Food Marketing Institute (FMI) and International Foodservice Distributors Association (IFDA). (CV – Expert Report p. 110). The results of the surveys and associated research were six (6) published scholarly reports.

### FMI E<small>MPIRICAL</small> R<small>ESEARCH</small> P<small>UBLICATIONS</small>

"Mature Millennials: Food Retailing Attitudes and Behaviors," <u>Food Marketing Institute</u>, September 2009. (CV – Expert Report p. 105)

"Independent Operator Insights into Wholesaler Relations and Services," <u>Food Marketing Institute</u>, September 2008. (CV – Expert Report p. 105)

"The Past and Present Landscape of Food Wholesaling," <u>Food Marketing Institute</u>, September 2007. (CV – Expert Report p. 105)

### IFDA E<small>MPIRICAL</small> R<small>ESEARCH</small> P<small>UBLICATIONS</small>

"Collaboration Pilot Results: Collaboration Works!!!" <u>International Foodservice Distributors Association</u>, September 2012. (CV – Expert Report p. 104)

**APPENDIX A**                    2

 "Mature Millennials V Mature Baby Boomers: Foodservice Attitudes and Behaviors - Similarities, Differences, Opportunities." <u>International Foodservice Distributors Association</u>, September 2011. (CV – Expert Report p. 104)

"Perspectives on the Manufacturer-Distributor Relationship: How We Got Here and How to Move Forward Together." <u>International Foodservice Distributors Association</u>, November 2010. (CV – Expert Report p. 104)

<u>**PROPRIETARY EMPIRICAL RESEARCH**</u>

Dr. George also served as the Facilitator for the Excel Share Group (ESG).  The ESG is comprised of top executives from the largest international Consumer Packaged Goods (CPG) companies, including Coca Cola, Hershey, Ralston Purina, Kraft-Heinz, Gallo and others. During these recent 12 years, using a combination of surveys as well as case studies, I have designed, fielded, analyzed the data, and published 62 empirical research-based industry-accepted studies – resulting in confidential proprietary reports.  (CV – Expert Report p. 120)

<u>**CONSULTING PROJECTS INVOLVING EMPIRICAL RESEARCH**</u>

Empirical research provided the foundation for Dr. George's  research and recommendations regarding strategic and new product development work for a variety of companies, including:

Key Impact, Pate Dawson, Campbell Soup, Tenglemann, M&M Mars, Scott Paper, Tastykake, Herr's, WAWA, Melitta, Southern Gardens, Quick Chek, Fairmount Park Commission, Del Monte, Mother's Kitchen, Kozy Shack, Hood Dairies, Uncle Ben's, Talinvest, Musgraves, Consolidated Edison, and the Irish Food Board. (CV – Expert Report p. 122)