UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SONATE CORPORATION d/b/a VEGADELPHIA FOODS, | * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 1:23-cv-10690-IT |
| BEYOND MEAT, INC., a Delaware corporation, | * * * | |
| Defendant. | * | |

MEMORANDUM & ORDER

October 29, 2025

TALWANI, D.J.

Pending before the court are Cross-Motions for Summary Judgment [Doc. Nos. 185, 202] and Motions to Strike [Doc. Nos. 190, 193, 196, 199] filed by Plaintiff Sonate Corporation d/b/a Vegadelphia Foods ("Vegadelphia") and Defendant Beyond Meat, Inc. ("Beyond"). For the reasons explained below, the summary judgment motions are DENIED as to liability, except that Vegadelphia's motion is GRANTED as unopposed as to the eligibility of its mark for trademark protection. Beyond's Motion to Strike [Doc. No. 199] the expert report and testimony of Sidney Blum proffered by Vegadelphia in support of some of its claimed damages is GRANTED and Beyond's Motion for Summary Judgment [Doc. No. 202] as to damages is GRANTED in part and DENIED in part. Vegadelphia's Motion for Summary Judgment [Doc. No. 185] as to damages and three Motions to Strike [Doc. Nos. 190, 193, 196] remain under advisement.

## I. Factual Background Based on the Summary Judgment Record

### A. Vegadelphia's Business and Trademark, WHERE GREAT TASTE IS PLANT-BASED

In March 2014, Vegadelphia filed a trademark application for "WHERE GREAT TASTE IS PLANT-BASED" and, in March 2015, successfully registered the mark. Pl.'s Response to

Def.'s Statement of Material Facts ("SOF") ¶ 39 [Doc. No. 237]; Trademark Registration History [Doc. No. 205-7]. Vegadelphia used the mark to promote its packaged food products, which include shredded beef, shredded chicken, and crab cake substitutes. SOF ¶ 34 [Doc. No. 237]; Seth Shipon Dep. 46:18–19 [Doc. No. 235-3]. About half of Vegadelphia's business is conducted through distributors. Seth Shipon Dep. 46:12–24 [Doc. No. 235-3]. Vegadelphia also sells to restaurants. Id. at 73:7. Vegadelphia's distribution channels include customers across multiple states, including at least Idaho, Virginia, Georgia, Pennsylvania, New Jersey, and New York. See, e.g., Chart of Buying Groups and Distributors [Doc. No. 235-95]; List of Locations Carrying Vegadelphia Product [Doc. No. 235-101]. Vegadelphia does not sell directly to individual consumers and is unaware of its distributors' customers. Seth Shipon Dep. 79:5–19 [Doc. No. 235-3].

Vegadelphia's trademark has appeared on its wholesale boxes for products sold to restaurants and restaurant distributors. SOF ¶ 35 [Doc. No. 237]. The mark has also appeared on Vegadelphia's website, "on a pop-up, promo banners, T-shirts, flyers, [and] sales sheets." Seth Shipon Dep. 118:16–25 [Doc. No. 235-3]. It was also visible to individual customers at certain retailers around the register. Id. at 300:2–9. End consumers have reached out to Vegadelphia directly through its website. See, e.g., Email from June 2017 [Doc. No. 235-90], Emails from August 2016 [Doc. Nos. 235-91, 235-92]. Vegadelphia also conducted "dock demos" to introduce its products and pass out sales sheets and brochures to distributors. Seth Shipon Dep. 141:16–24 [Doc. No. 244-1].

Images of Vegadelphia's trademark depict the mark either with the six words stacked in a six-line column or divided into a two-phrase column, with the word "is" in smaller font in both designs. Ex. A to May 28, 2020 Demand Letter [Doc. No. 205-8].

In the 2014–2015 timeframe, the U.S. Food and Drug Administration stopped imports of the "key main ingredient" for Vegadelphia; this had a "disastrous" impact on Vegadelphia's business. Seth Shipon Dep. 137:17–138:7, 216:11–218:23 [Doc. No. 244-1]. This supply-chain issue caused Vegadelphia to "pull[] off the gas in terms of sales[.]" Id. at 138:13–20. Vegadelphia stopped posting on its Facebook page around 2014. Id. at 150:2–15. It ceased performing demos by 2015. Id. at 141:16–142:10, 145:2–6, 149:6–150:1, 220:8–11. It last gave a presentation to chain accounts, distributors, or brokers, in approximately 2015. Id. at 166:4–168:1. It did not use any pop-up displays after 2015. Id. at 221:15–17. It has not seen its brochure at any retail outlets since 2015. Id. at 310:8–21. Since 2015, fewer than fifty end consumers have reached out directly to Vegadelphia. Id. at 313:9–19.

Vegadelphia's business started coming back in 2018 and the company "regained confidence" in 2019. Id. at 138:13–20. Nonetheless, Vegadelphia spent "no real dollars" on marketing from 2018 to present, "but just maintain[ed] the accounts and relationships [it] did have." Id. at 221:18–23.

### B. Beyond's Initial Use of PLANT-BASED GREAT TASTE and GREAT TASTE PLANT-BASED

Beyond sells meat substitutes such as "burgers, dinner sausages, chicken, ground beef, breakfast sausages, steak, meatballs, jerky, meat crumbles, pepperoni, ground pork, dry blend, sauce, dumplings, and shredded beef." SOF ¶ 12 [Doc. No. 237]. Beyond's meat substitutes fall under the same International Class 29 trademark category as the meat substitutes sold by Vegadelphia. Def.'s Response to Pl.'s Add'l Statement of Material Facts ("ASOF") ¶ 77 [Doc. No. 245]. According to its 2020 Annual Report, Beyond's products are available "at approximately 122,000 retail and foodservice outlets in more than 80 countries worldwide[.]" Beyond 2020 Annual Report 1 [Doc. No. 203-1].

In March 2019, Beyond began using the tagline[1] "PLANT-BASED GREAT TASTE." SOF ¶ 9 [Doc. No. 237]; Jamie Grass Dep. 27:13–24 [Doc. No. 203-5].

Later in 2019, Beyond collaborated with Dunkin' to offer Dunkin's existing breakfast sandwich with the meat replaced by a Beyond meat substitute. SOF ¶¶ 14–15 [Doc. No. 237]. Beyond did not communicate its prior use of "PLANT-BASED GREAT TASTE" to Dunkin'. Beth Turenne Dep. 136:14–137:12 [Doc. No. 235-4].

On June 27, 2019, in an email with the subject line "Messaging Ideas," Beyond suggested to Dunkin' several taglines for marketing the sandwich. Email from Jamie Grass to Beth Turenne [Doc. No. 203-12]. The tagline "PLANT-BASED GREAT TASTE" was not on the list. See id. Beyond and Dunkin' settled on "GREAT TASTE PLANT-BASED." SOF ¶ 18 [Doc. No. 237].

### C. Beyond Discovers Vegadelphia's Trademark

By July 11, 2019, Beyond's senior brand manager and an in-house contract attorney for Beyond had discovered Vegadelphia's trademark registration with the U.S. Patent and Trademark Office ("USPTO"). Beyond's Second Am. Responses to Interrogatories 5–6 [Doc No. 235-107]; see ASOF ¶ 21 [Doc. No. 245]. Nonetheless, through May 28, 2020, Beyond did not visit Vegadelphia's website, attempt to contact Vegadelphia, or make any test purchases from Vegadelphia. Def.'s Response to Pl.'s Requests for Admission Nos. 3, 6, 7 [Doc. No. 235-108]; Jamie Grass Dep. 154:15–155:24 [Doc. No. 235-1].

---

[1]  The parties use the terms "phrase," "tagline," and "slogan" interchangeably. To avoid confusion, the court refers to Beyond's allegedly infringing taglines or slogans as "taglines" and the term "phrase" or "phrases" to refer to the taglines' components—"Great Taste" and "Plant-Based."

### D.  The Beyond/Dunkin' Collaboration Launches Nationally

A press release, dated July 24, 2019, announced the launch of the Beyond/Dunkin'

collaboration in New York City with this headline: "Great Taste, Plant-Based: Dunkin' Partners

with Beyond Meat® to Introduce New Beyond Sausage® Breakfast Sandwich . . . ." July 2019

Press Release [Doc. No. 235-63].

A press release, dated October 21, 2019, announced the nationwide launch of the

collaboration in November 2019. October 2019 Press Release [Doc. No. 203-10]. Based on an

advertising agency report used by Dunkin', the national advertising for the collaboration reached

751 million impressions. Beth Turenne Dep. 117:3–118:13 [Doc. No. 235-4].

### E.  Variations in the Taglines

The uses of both allegedly infringing taglines vary in capitalization and punctuation. See,

e.g., Pl.'s Demand Letter 21–24 [Doc. No. 235-56] ("PLANT BASED GREAT TASTE";

"PLANT-BASED GREAT TASTE"; "Plant-Based. Great Taste"; "GREAT TASTE PLANT-

BASED"); Def.'s Statement of Facts, App. A [Doc. No. 207] ("GREAT TASTE PLANT

BASED"; "plant-based great taste"; "Great Taste, Plant-Based"; "Great taste, Plant-based!";

"GREAT TASTE, PLANT-BASED"; "GREAT TASTE, PLANT-BASED!"); Beyond Internal

Email from Jan. 28, 2020 [Doc. No. 238-27] ("Plant Based. Great Taste."; "Great Taste. Plant

Based.").[2]

In their collaboration, Beyond and Dunkin' used "Great Taste, Plant-Based" in text and

in images that also often included the logo for Beyond, Dunkin', or both. See Def.'s Statement of

---

[2] In light of these variations and the briefs' inconsistencies in rendering the taglines, the court uses "PLANT-BASED GREAT TASTE" to refer to Beyond's tagline, and "GREAT TASTE PLANT-BASED" to refer to the Beyond/Dunkin' collaboration tagline, except when quoting a document that renders the tagline differently.

Facts, App. A [Doc. No. 207] (collecting images cited throughout Vegadelphia's <u>Amended Complaint</u> [Doc. No. 17]). The images containing the tagline generally featured the words in green with white outline (or white on a green background), with the words stacked in either a four-word column or in a two-phrase column. <u>Id.</u> The exact placement and proximity of the logo(s) in relation to the tagline is different in each instance where the tagline appears. <u>See</u> <u>id.</u>

Beyond used the tagline PLANT-BASED GREAT TASTE on its wholesale packaging. Jamie Grass Dep. 170:3–172:24 [Doc. No. 203-5]. At least one image of this wholesale packaging has the phrases stacked in a column and includes Beyond's house mark just above the tagline. <u>See</u> Beyond Internal Email from Sep. 11, 2020 [Doc. No. 203-9]. Beyond also used the tagline at point-of-purchase locations, including but not limited to: "shelf wobblers and static window clings positioned in grocery retailers, product sell sheets and posters in restaurants, and shipper boxes for shelf display in wholesale stores." SOF ¶ 13 [Doc. No. 237]. The tagline was used "across a majority of [its] search ads" at least through June 23, 2020. Beyond Internal Email from June 23, 2020 [Doc. No. 235-57].

**F. Vegadelphia's Sales Decline in 2019 and Vegadelphia Learns of Dunkin' and Beyond's Use of the Tagline**

From the January–December 2019 period, Vegadelphia's sales were approximately $300,000, a decline of about one-fourth from its $390,000 in sales from the prior year. <u>See</u> Profit and Loss Sheet 1 [Doc. No. 205-2].[3]

---

[3] Sales picked up again to approximately $350,000 in 2020 and declined again to approximately $300,000 in 2021. <u>Id.</u>

In December 2019, Vegadelphia first became aware of Beyond and Dunkin's use of the allegedly infringing tagline "GREAT TASTE PLANT-BASED." Seth Shipon Dep. 251:12–252:3 [Doc. No. 200-3]. Vegadelphia did not take any immediate action.

### G.  Beyond's Counsel Discovers Vegadelphia's Trademark

In January 2020, Beyond employees discovered the use of "great taste plant based" by a competitor, Impossible Foods. Beyond Internal Emails from Jan. 28, 2020 [Doc. No. 235-27]. In a series of internal emails, one employee noted that he was "not sure if the slogan was trademarked, however, it is definitely the tagline that Dunkin has been using throughout their marketing campaign[.]" Id. Another discussed taking steps to trademark Beyond's use of the tagline, stating "I believe we have enough evidence to submit both 'Plant Based. Great Taste.' (our use) and 'Great Taste. Plant Based.' (Dunkin's version based on our use) for trademark protection under Beyond Meat." Id. The employee continued "[w]hether or not it's ownable -- we'll find out" and that he was "not as concerned about [Impossible Food's] limited use but good to start TM'ing ours now and start the filing to block their use." Id.

Beyond's outside counsel then investigated registration of the taglines and discovered Vegadelphia's trademark registration. Beyond's Second Am. Responses to Interrogatories 6 [Doc No. 235-107].

### H.  Beyond's Trademark Application

On March 16, 2020, Beyond filed a trademark application for the mark "PLANT-BASED GREAT TASTE" with the USPTO. SOF ¶ 56 [Doc. No. 237].[4] In its application, Beyond stated that both its "first use" of the mark "anywhere" and its "first use in commerce" were "[a]t least

---

[4] Beyond used "PLANT-BASED GREAT TASTE" without a comma or period in the application. See Trademark Application at 708 [Doc. No. 186-2]

as early as 03/00/2019." Trademark Application at 708, 711 [Doc. No. 186-2]. The supporting

declaration by the Senior Vice President of Marketing stated that "[t]he mark is in use in

commerce on or in connection with the goods/services in the application." Id. at 711; see also

Jamie Grass Dep. 244:18-25 [Doc. No. 186-3] (Beyond's Rule 30(b)(6) deponent testifying it

was her understanding that "this specimen was filed because Beyond believed that this was an

example of 'plant-based, great taste' being used as a trademark as of the date it swore this was an

accurate example of its mark usage").

In Beyond's "Brand Partnership Style Guide" from 2020, in the chapter titled  Key

Messaging, the tagline "PLANT-BASED GREAT TASTE" includes a "TM" symbol. 2020

Brand Partnership Style Guide 7–8 [Doc. No. 235-36]. The style guide directs as "key messaging

lock-up" that the "PLANT-BASED GREAT TASTE lock-up" should be used "to create any

marketing materials," and the "lock-up" should not be "changed in any way" or used with

"colors outside [Beyond's] brand colors," and its words should not be "move[d] or swap[ped]

out." Id. at 8.

### I.  Vegadelphia's Declaration of Use and Incontestability

On March 11, 2020, Vegadelphia filed a Combined Declaration of Use and

Incontestability under Sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058, 1065, for its

registered trademark, which the USPTO accepted and acknowledged on May 6, 2020. See

Trademark Registration History 39 [Doc. No. 205-7]; Def.'s Response to Pl.'s Statement of

Material Facts ISO Pl.'s Mot. for Summ. J. ¶ 2 [Doc. No. 232].

### J.  Vegadelphia's Cease-and-Desist Letters

On May 28, 2020, Vegadelphia's counsel sent demand letters to Beyond and Dunkin'

alleging trademark infringement. SOF ¶ 40 [Doc. No. 237]. There is no response in the record

from Beyond or Dunkin' while Beyond's trademark application remained with the USPTO.

While Vegadelphia "would have certainly been open to having [a] discussion" with Dunkin' or Beyond about a license of Vegadelphia's trademark, no such discussions ever took place. Matthew Shipon Dep. 124:16–125:11 [Doc. No. 220-7].

### K.  The Refusal of the Trademark Application

On June 12, 2020, the USPTO issued a Nonfinal Office Action refusing Beyond's application for three reasons. First, the USPTO refused the application due to "a likelihood of confusion with" Vegadelphia's registered trademark, where Beyond "applied for the mark PLANT-BASED GREAT TASTE for 'Meat substitutes; vegan and vegetarian meat products; plant-based meat substitutes" and Vegadelphia's "mark is WHERE GREAT TASTE IS PLANT BASED for 'meat substitute and poultry substitute.'" Nonfinal Office Action 120 [Doc. No. 205-12].

The USPTO also refused the application "because the applied-for mark merely describes a characteristic of applicant's goods. . . . Specifically, the stated goods are made entirely of plant, or mainly from plants of which the flavor is very good. In other words[,] the goods are PLANT-BASED GREAT TASTE substitutes for meat." Id. at 121; see also id. (citing dictionary definitions for "plant-based," "great," and "taste").

Finally, the USPTO refused the application because "the specimen appears to be mere advertising and does not properly show the applied-for mark as actually used in commerce[.]" Id. at 122.

### L.  Beyond's Abandonment of the Application and the Tagline

On June 28, 2020, Beyond submitted to the USPTO a Request for Express Abandonment to abandon its application to register "Plant-Based Great Taste" as a trademark. Trademark File History at ECF pp. 3–4 [Doc. No. 231-2]. The next day, the USPTO issued a notice that the "application is now abandoned[.]" Id. at ECF p. 2.

9

Beyond and Dunkin' have ceased using the "Great Taste. Plant-Based." tagline. SOF ¶ 42 [Doc. No. 237].[5]

### M. The Proposed Joint Venture with Paul Litten and Erik Oberholtzer

By October 2020, efforts were underway for a proposed joint venture between Vegadelphia, Paul Litten, and Erik Oberholtzer. Seth Shipon Dep. 252:4–8 [Doc. No. 200-3]; see also id. at 256:22–257:1 (discussing October emails saying "Full steam ahead, let's get the ball rolling between you and Paul and Erik").[6]

In July 2021, Vegadelphia, Litten, and Oberholtzer exchanged a draft License and Services Agreement, despite some concerns that the market was saturated with the allegedly infringing tagline. Id. at 252:22–254:22. In the draft of that agreement dated July 21, 2021, Vegadelphia was identified as the Licensor of Licensed Trademarks, recipes, and other proprietary rights, and Quality Foods, Inc., was identified as the Licensee who would be granted an exclusive license to the Proprietary Rights to operate a business and distribute the plant-based food products sold by Vegadelphia under the Licensed Trademarks. See License and Services Agreement 1 [Doc. No. 200-5]. The draft agreement provided that Quality Foods, Inc., would pay Vegadelphia a non-refundable royalty of $25,000 plus 8% of gross sales, and would use its best efforts to achieve gross sales of $1 million per year. Id. ¶ 11. The agreement also addressed the present litigation: "The Parties acknowledge and agree that Licensee shall not be entitled to

---

[5] Neither party specifies when Beyond ceased its use of "PLANT-BASED GREAT TASTE." Vegadelphia's briefing suggests the infringement period did not extend beyond 2020 for use of either tagline. See Pl.'s Opp. to Def.'s MSJ 3, 13 [Doc. No. 236] (describing the "2019-2020 infringement period").

[6] The record is unclear as to when discussions first began, but Oberholtzer first met Vegadelphia's executives in early 2020 when they reached out for guidance on an unrelated matter. Erik Oberholtzer Dep. 20:11–21:8 [Doc. No. 235-6].

any proceeds resulting from the any [sic] litigation between the Licensor, Dunkin' Brands Group, Inc. and Beyond Meat, Inc. Further, the Parties acknowledge and agree that the rights and license to the trademark, WHERE GREAT TASTE IS PLANT-BASED (U.S. Registration No. 4,698,499) may be terminated." Id. ¶ 8.7.

The draft agreement was not signed. According to Litten, the joint venture "fizzled out" because Litten went to a Dunkin' store and noticed on a billboard "one of the slogans that [Vegadelphia] used, and [he] didn't want to be involved until, you know, that mess got cleaned up. . . . I said you need to work out your issues first and then, you know, follow up with me before I move forward. I don't like to be involved in any litigation that I don't have to be involved in. But at that time I didn't want to invest or didn't want to move anything forward." Paul Litten Dep. 20:23–22:4 [Doc. No. 200-8]. According to Oberholtzer: "as we really got closer to . . . getting [the proposed joint venture] out to market. . . Paul [Litten] in particular[,] because he . . . had an existing wholesale customer channel for this[,] . . . [had] some concern. And I echoed it partly because it was less about for me the litigation itself, but the risk that if we were poking a big bear, a big company, that you know, we could be just sort of crushed out of the gate." Erik Oberholtzer Dep. 24:5–16 [Doc. No. 200-6].

In April 2022, Vegadelphia passed a resolution to resume conversations to "expand the Vegadelphia brand by building a strategic partnership with" Litten, Oberholtzer, and a digital marketing company. Seth Shipon Dep. 255:5–256:17 [Doc. No. 200-3].

**N. Expert Reports**

The parties have retained various experts for purposes of this litigation. Four reports are at issue here.

### 1. George and Harper Reports

Beyond's expert, Richard George, authored a report dated September 13, 2024, in which he opined that the phrases "great taste" and "plant based," both separately and together, are frequently used terms that are descriptive or generic in the food industry. See generally Expert Report of Richard George ("George Report") [Doc. No. 203-6]. He based this opinion on his review of, inter alia, food and beverage brands across multiple categories, consumer reviews, Google searches, and social media hashtags. See id. He also utilized the Barriers-Actions-Outcomes model, which was developed in 2023 to determine whether a particular brand element is recognized by consumers as distinctive or uniquely source-identifying. Id. at 84–87. Applying this model to Vegadelphia, he opined that consumers do not know and understand Vegadelphia's trademark to be uniquely associated with Vegadelphia. Id. at 87–97.

In response, Vegadelphia's expert, Rhonda Harper, authored a rebuttal report dated October 28, 2024. See generally Expert Rebuttal Report of Rhonda Harper ("Harper Report") [Doc. No. 235-11]. She opined that consumers view taglines as a whole and not in constituent parts, that the evidence cited by George as to use of "great taste" and "plant based" together was sporadic or otherwise undermines his opinions, that George's Barriers-Actions-Outcomes analysis was flawed and irrelevant, and that Vegadelphia's trademark has all the characteristics of effective distinctive trademarks. Id.

### 2. Maronick Report

Another of Vegadelphia's experts, Thomas J. Maronick, conducted an online survey in July 2024 to assess survey participants' likelihood of confusion between an image of the "PLANT-BASED GREAT TASTE" tagline in market conditions (a photo of a floor sticker of the tagline in front of a supermarket meat display) and an array of images with other taglines, including Vegadelphia's registered trademark. Expert Report of Thomas J. Maronick ("Maronick

Report") 6–8 [Doc. No. 235-14]. Maronick opined there was a likelihood of confusion between Vegadelphia's trademark and "PLANT-BASED GREAT TASTE," based on results showing that survey respondents perceived the two taglines to be from the same company or affiliated or associated companies. Id. at 12–16.[7]

### 3. Blum Report

Vegadelphia retained a damages expert, Sidney Blum, to perform a damages analysis and calculation. See Expert Report of Sidney P. Blum ¶¶ 6–33 ("Blum Report") [Doc. No. 220-1]. The Blum Report addressed the three categories of damages at issue here: "What is the Reasonable Royalty Defendants Would Have Paid Vegadelphia to Avoid Trademark Infringement?"; "What Is the Cost of Corrective Advertising That Defendants Should Pay Vegadelphia?"; and "What Is Lost Profit from Lost Value?" Id. ¶¶ 65–71, 73.[8]

As to corrective advertising, Blum opined that Vegadelphia was entitled to approximately $16 million based on 25% of Dunkin' and Beyond's advertising expenditures and social media impressions during the relevant time period. Id. ¶¶ 79, 280–303. The 25% figure is based on a Tenth Circuit case which "relied on the Federal Trade Commission guideline that requires businesses engaging in misleading advertising to spend 25% of their advertising budget on corrective advertising." Id. ¶ 278 (citing Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Co., 561 F.2d 1365, 1375 (10th Cir. 1977)). Blum opined that national advertising was

---

[7] The Maronick Report generally conflates "PLANT-BASED GREAT TASTE" with "GREAT TASTE PLANT-BASED" but the survey does not appear to have featured any images of "GREAT TASTE PLANT-BASED."

[8] The Blum Report also addressed "Defendants' Unjust Enrichment from Trademark Infringement," and "Lost Profit from Lost Sales" and "Interest on these Items of Monetary Recovery." Id. ¶¶ 64, 72, 74. Beyond has not challenged these damage claims in the pending motions.

appropriate given the volume of Dunkin' and Beyond's reach, and at lower cost than engaging in local advertising across multiple states. Blum Report ¶¶ 275–76 [Doc. No. 220-1].

As to reasonable royalty, he opined that Vegadelphia was entitled to approximately $40 million from Beyond, not including interest, at a rate of 8% for sales to Dunkin' and for U.S. sales excluding Dunkin'. Id. ¶ 79. He calculated this based on a hypothetical negotiation between Vegadelphia and Beyond. Id. ¶¶ 152–165. He considered three "standard quantitative valuation methods." Id. ¶ 192.[9] Of the three approaches, he rejected the "cost approach" because it is not applicable to trademarks and more suitable for patent technology. See id. ¶ 214. He synthesized the remaining two approaches. The "income approach" (as modified by one of its variations, the "analytical approach")—which compares the gross margins of profit for products incorporating the trademark with equivalent non-trademarked products and treats the delta between them as the premium a consumer would pay for the trademarked version—yielded a maximum per unit royalty rate of 33.5% from Beyond. Id. ¶¶ 194–95, 200. The "market approach"—which values assets based on comparable transactions between unrelated parties, and under which Blum reviewed publicly available royalty rates in the industry (including Dunkin') to establish a baseline—yielded a royalty rate between 5–10% of net sales for Beyond. Id. ¶¶ 201, 207–12. He found that the result of the "income approach" was too high but that it suggested the appropriateness of the top range reached by the "market approach." Id. ¶ 218. He then conducted an analysis of the fifteen Georgia-Pacific factors[10] for evaluating the likely actions of the parties

---

[9] These approaches are described in a nonauthoritative technical consulting guide published by the American Institute of Public Accountants. See id. ¶ 192 n.72 (citing Joseph A. Agiato, Jr & Michael Mard, Valuing Intellectual Property & Calculating Infringement Damages, AICPA Practice Aid 99-2 (1999) (available at https://egrove.olemiss.edu/aicpa_news/151/)).

[10] See generally Georgia-Pac. Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295

in a hypothetical negotiation. Id. ¶¶ 222–266. Finally, he supplemented the Blum Report as to the reasonable royalty rate in light of information he received from Dunkin's confidential settlement agreement. See Second Supp. to Blum Report [Doc. No. 220-3].

As to lost profits from lost value, Blum opined that Vegadelphia was entitled to $25 million, which represented a 25% share of any sale of the proposed joint venture that Oberholtzer had determined to have a three-to-five-year valuation of $100 million. Blum Report ¶¶ 327, 410 [Doc. No. 220-1]. Blum testified that, based on Oberholtzer's experience valuating 18 companies in the industry and extensive experience in fundraisers and running startups through sales, "he is the type of person that I would commonly rely upon in a valuation, someone who is aware of the capital markets, capital fundraising and taking startups through development to point of sale, which is what Vegadelphia's plan was for the valuation." Sidney Blum Dep. 252:12–253:8 [Doc. No. 220-4]. Blum also found Oberholtzer's valuation "consistent with standard valuation techniques[,]" comparing it with the valuation of other plant-based companies, and assessing Oberholtzer's deposition testimony for credibility and reliability. Blum Report ¶¶ 338–49 [Doc. No. 220-1].

## II. Legal Standard

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty

---

(2d Cir. 1971) (proceeding to determine amount of reasonable royalty to be paid by infringer to a patent holder).

Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 258.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 321.  The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 248. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

"Cross-motions for summary [judgment] do not alter the basic ... standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Alasaad v. Mayorkas, 988 F.3d 8, 16 (1st Cir. 2021); see also Cooper v. D'Amore, 881 F.3d 247, 249–50 (1st Cir. 2018) ("employ[ing] the same standard of review [for cross-motions], but view[ing] each motion separately, drawing all inferences in favor of the nonmoving party").

### B. Expert Witnesses

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Courts have a "gatekeeping responsibility" to determine whether the testimony an expert seeks to offer satisfies Rule 702's criteria. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 n.7, 592 n.10 (1993). A witness "qualified as an expert by knowledge, skill, experience, training or education" may offer expert testimony only if:

> the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Id. "[T]he proponent of the expert testimony must establish these reliability requirements by a preponderance of the evidence[.]" Doucette v. Jacobs, 106 F.4th 156, 169 n.17 (1st Cir. 2024). "While the rule does not require the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support[,] . . . it does not permit the expert to make claims that are unsupported by the expert's basis and methodology." Advisory Committee Notes for 2023 Amendments to Fed. R. Civ. P. 702.

A court "assessing a proffer of expert . . . testimony under Rule 702 should also be mindful of other applicable rules," including Rule 403. Daubert, 509 U.S. at 595. The court may

exclude evidence that is admissible under Rule 702 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Daubert, 509 U.S. at 595. "[I]n weighing possible prejudice against probative forces under Rule 403 . . . [the court] exercises more control over experts" than lay witnesses. Id. (internal quotation omitted).

"So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." Milward v. Acuity Specialty Prod. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert, 509 U.S. at 596).

## III. Liability

Beyond argues that it is entitled to summary judgment because a jury could not reasonably find a likelihood of confusion sufficient for Vegadelphia to prevail on its trademark infringement claims; or, in the alternative, because Beyond's use of the mark is protected by the fair use doctrine. Vegadelphia argues that it is entitled to partial summary judgment as to the strength of its mark in the likelihood of confusion analysis and as to the fair use doctrine defense, as detailed below.

### A. Consumer Confusion

To succeed on its trademark infringement claims, Vegadelphia must show that (1) its mark is eligible for trademark protection and (2) Beyond's allegedly infringing use is likely to

result in consumer confusion. Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 116 (1st Cir. 2006). The parties do not dispute the first element.[11]

Courts in the First Circuit consider eight factors in determining likelihood of consumer confusion: (1) the similarity of the marks; (2) the similarity of goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective buyers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark. Pignons S. A. de Mecanique de Precision Corp. v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981). "No one factor is necessarily determinative, but each must be considered." Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir. 1987). Courts in the First Circuit typically evaluate the third, fourth, and fifth factors together. See The Int'l Assoc. Machinists v. Winship Green, 103 F.3d 196, 204 (1st Cir. 1996). Courts "may accord little weight to factors that are not helpful on the particular facts of a case." Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 15 (1st Cir. 2004).

### 1. Factor 1: Similarity of the Marks

"[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." Pignons, 657 F.2d at 487 (citation omitted). "[U]nder certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." Astra Pharm. Prods., Inc. v.

---

[11] Vegadelphia argues that its trademark registration establishes this first element of a trademark infringement claim, see Pl.'s Mem. ISO Pl.'s Mot. for Summ. J. 6 [Doc. No. 187], which Beyond does not dispute, see Def.'s Opp. to Pl.'s Mot. for Summ. J. 2 [Doc. No. 234]. Accordingly, this aspect of Vegadelphia's Motion for Summary Judgment [Doc. No. 185] is GRANTED as unopposed.

Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983); see also R. G. Barry Corp. v. A. Sandler Co., 406 F.2d 114, 116 (1st Cir. 1969) ("[a] factor which appears to us to have exceptional significance is that the court found that [defendant] often and [plaintiff] 'in almost every instance' conjoined their respective 'housemark'" with the challenged terms). Courts will also "give less weight to the generic portions of the parties' respective, composite marks" and will instead "compare the nongeneric components of a mark ... in the context of the overall composite mark." Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 24 (1st Cir. 2008) (citations omitted); see also Beacon Mut. Ins. Co., 376 F.3d at 18 ("If the 'dominant' portion of both marks is the same, then confusion may be likely, notwithstanding peripheral differences.") (citation omitted).

### a.    Conjoined Use with House Mark

Beyond argues that it and Dunkin' always used their house marks in conjunction with the tagline "GREAT TASTE PLANT-BASED," and that Vegadelphia similarly used its house mark in conjunction with its trademark. Def.'s Mem. ISO Def.'s Mot. for Summ. J. ("Def.'s MSJ Mem.") 7 [Doc. No. 208].[12] However, given that the proximity of the house marks to the tagline differs in each instance of the tagline appearing in the record, the extent to which the presence of the house marks diminishes the likelihood of confusion is a factual dispute for the jury to decide. Cf. Astra, 718 F.2d at 1205 (despite presence of manufacturer's house mark, considering the evidence in light most favorable to the appellant, "the presence of the word 'ASTRA' on both

---

[12] Beyond does not make the same argument as to "PLANT-BASED GREAT TASTE," and at least one instance in the record—the style guide with a "TM" next to the tagline—does not include a housemark.

[parties'] products leads us to conclude that while the marks are not identical, they are at least similar for the purposes of the present review").[13]

### b.    Genericness and Dominant Portions of the Mark

Beyond next argues that the phrases "plant-based" and "great taste" in the taglines are generic and should be discounted in the similarity analysis because they are descriptive or laudatory phrases also used by third parties, including competitors. Def.'s MSJ Mem. 8–9 [Doc. No. 208]. However, "a complete phrase may signify something different than the sum of its parts." Bos. Duck Tours, 531 F.3d at 18–19 (finding district court erred by focusing on separate terms "duck" and "tours"). Moreover, Beyond's argument relies principally on the George Report. Where Vegadelphia has presented a rebuttal in the Harper Report, and where George at his deposition admitted to having an "analytical gap" between his statement that the phrases are "commonly used" and the actual data he gathered, George Dep. 173:8–20 [Doc. No. 235-2], the question of genericness is a factual dispute properly decided by a jury.[14]

Accordingly, a jury could reasonably find that both taglines are similar to Vegadelphia's registered trademark.

---

[13] Vegadelphia also argues for reverse confusion, which occurs when a junior user of a mark (here, Beyond) "saturates the market and overwhelms the senior user [here, Vegadelphia], such that the senior user loses the value of the trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." Attrezzi LLC v. Maytag Corp., 436 F.3d 32, 39 (1st Cir. 2006) (internal quotation marks removed). In such a case, "to the extent [Beyond] is itself the more recognized label the linkage [between the taglines and housemarks] could actually aggravate the threat to [Vegadelphia]." Id.

[14] The George Report is the subject of Vegadelphia's Motion to Strike [Doc. No. 190]. That motion remains under advisement as to George's anticipated trial testimony but is moot as to Beyond's summary judgment motion because Beyond is not entitled to summary judgment even considering the George Report.

## 2. Factor 2: Similarity of Goods

Beyond concedes that "the goods of the parties are admittedly similar in that both parties sell plant-based meat." Def.'s MSJ Mem. 10 [Doc. No. 208]. It argues, however, that the parties' products are not "practically similar" because the "GREAT TASTE PLANT-BASED" tagline was used in connection with the Dunkin' breakfast sausage sandwiches and the "PLANT-BASED GREAT TASTE" tagline related to "vegan burgers, steak, popcorn chicken, or meatballs," which Vegadelphia does not sell, while Vegadelphia used its trademark on "plant-based shredded beef, shredded chicken, and crab cakes." Id.

This attempt to narrow the level of generality for the factor is unavailing where both parties sell International Class 29 meat substitutes, ASOF ¶ 77 [Doc. No. 245], including beef and chicken substitutes, SOF ¶ 34 [Doc. No. 237]. "This is not a case in which two products are so dissimilar as to make confusion highly unlikely[.]" Attrezzi, 436 F.3d at 39 (comparing one use of Attrezzi for appliances with another's use of Attrezzi for small electric appliances alongside gourmet foods and dinnerware).

Accordingly, a jury could reasonably find the parties' goods are similar.

## 3. Factors 3–5: Relationship Between the Parties' Channels of Trade, Advertising, and Prospective Buyers

Beyond argues there is no real-world probability of confusion because Beyond aggressively markets directly to consumers and Vegadelphia sells to restaurants and distributors. Def.'s MSJ Mem. 11 [Doc. No. 208].[15]

---

[15] Beyond also asserts "[n]o evidence exists that any end consumer has seen [Vegadelphia's] tagline," id., but Vegadelphia has presented competent evidence to the contrary.

Vegadelphia has several responses. First, it argues the parties target the same end-consumers, but it cites only the fact that the parties' goods are classified the same way, Pl.'s Opp. to Def.'s MSJ 12 [Doc. No. 236], which goes toward factor 2, not factors 3–5. Next, it argues that the parties use the same distributors and thus have overlapping channels of trade. Id. at 12–13. But although Vegadelphia has presented some evidence suggesting that Beyond has used Sysco and U.S. Foods as distributors, it has presented no evidence that Vegadelphia used the same distributors. See Def.'s Response to ASOF ¶ 48 [Doc. No. 245]. To the extent the parties were marketing their products to distributors across the United States generally, the record shows that Vegadelphia's marketing efforts largely ceased in 2014 or 2015, well before Beyond began using either tagline. Third, Vegadelphia argues that both parties' taglines were used on consumer-facing materials but has presented no evidence to show that those materials were featured in the same places or reached the same consumers. As for the use of the taglines on the parties' websites, this alone is insufficient to establish an overlap in advertising. See, e.g., Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1151 (9th Cir. 2011) ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").

Accordingly, these factors do not support a likelihood of consumer confusion as to either tagline.

### 4. Factor 6: Actual Confusion

Evidence of actual confusion is "often deemed the best evidence of possible future confusion," but because "a trademark holder's burden is to show likelihood of confusion . . . proof of actual confusion is not essential to finding likelihood of confusion." Borinquen Biscuit, 443 F.3d at 120 (emphasis added) (citations omitted). "Historically, [the First Circuit has]

attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the market for a long period of time." Id. at 121. Compare id. (giving little weight to factor where defendant's product entered market in 2003, sales did not proliferate until 2004, and preliminary injunction issued in 2005), with Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 4 (1st Cir. 1993) (giving significant weight to factor where products had coexisted in same market for six years).

The relevant period for PLANT-BASED GREAT TASTE began in March 2019, and for GREAT TASTE PLANT-BASED began in July 2019. The record is unclear as to exactly when the use of both taglines ended, but even assuming that they were used through the end of 2020, the parties' products coexisted for less than two years while these taglines were in use.

Accordingly, the court does not give substantial weight to this factor here.[16]

### 5. Factor 7: Intent in Adopting the Mark

The parties do not dispute that Beyond did not discover Vegadelphia's trademark registration until after Beyond adopted both its taglines, which Beyond suggests is dispositive of the intent factor. Beyond also argues that it would not make sense for it "to intend to unfairly ride the coattails of [Vegadelphia], an unknown company with no discernable goodwill." Def.'s

---

[16] In any event, a jury could find evidence of actual reverse confusion based on Vegadelphia's decline in revenues from the 2019-2020 period, after sales had picked up again following the events in 2014. See Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 74 (1st Cir. 2008) ("While VSC presented no evidence of actual confusion at trial, the jury could have inferred actual reverse confusion from the company's decline in revenues from the sales of its software products."). Additionally, Vegadelphia points to a survey conducted by one of its experts, which found a 12.7% likelihood of confusion in which respondents mistakenly associated Vegadelphia's trademark with the company that used the tagline "PLANT-BASED GREAT TASTE." See Maronick Report 12–16 [Doc. No. 235-14]. A jury could reasonably find actual reverse confusion as to both taglines based on a decline in revenues, and as to "PLANT-BASED GREAT TASTE" based on Vegadelphia's expert report.

MSJ Mem. 11 [Doc. No. 208] (citing Pump, Inc. v. Collins Mgmt., Inc., 746 F. Supp. 1159, 1170 (D. Mass. 1990)).

Pump does not support Beyond on the facts here. In Pump, there was no evidence that "any of the defendants [a world-famous band] were even aware of the band Pump's existence before the filing of this lawsuit" other than a "rather cryptic allegation that individual members of [defendants] live within a seven mile radius of" the town where Pump had its headquarters. Pump, 746 F. Supp. at 1170 (internal quotation marks omitted). Here, by contrast, Beyond learned of Vegadelphia's trademark twice, at critical moments for both taglines: in July 2019, two weeks before the initial launch of the Beyond/Dunkin' campaign using "GREAT TASTE PLANT-BASED"; and again in January 2020, in the process of investigating and registering "PLANT-BASED GREAT TASTE" as a trademark. See id. at 1170 n.17 (contrasting facts in Pump "sharply with the deliberate actions of Goodyear" in another case, where "Goodyear knew of the plaintiff's asserted right to the name 'BIG FOOT' at least one week before it commenced its massive advertising campaign, giving it adequate time to delete the infringing use") (citing Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 408 F. Supp. 1219, 1233 (D. Colo. 1976)).

Accordingly, a jury could reasonably question Beyond's intent in proceeding to use either tagline after discovering Vegadelphia's mark.

### 6. Factor 8: Mark Strength

In the First Circuit, "[t]he factors commonly considered as to strength . . . are concerned with practical matters and not the legal classification of the mark." Attrezzi, 436 F.3d at 40. Such practical matters include "the length of time the mark has been used, the trademark holder's renown in the industry, the potency of the mark in the product field (as measured by the number

of similar marks), and the trademark holder's efforts to promote and protect the mark."

Borinquen Biscuit Corp., 443 F.3d at 121.

Beyond argues that the strength of Vegadelphia's registered trademark is weak because it is a generic and descriptive phrase that has not been promoted in an appreciable way and is only used on a product sold to limited commercial customers. Def.'s MSJ Mem. 11–12 [Doc. No. 208].

As discussed above with regard to the similarity of marks factor, the parties have created a factual dispute with competing experts on the relative genericness or distinctiveness of Vegadelphia's trademark, which a jury is best suited to resolve.

Moreover, Beyond has identified only a few "highly similar marks" that have been registered as trademarks, Def.'s Reply 9 [Doc. No. 246] (emphasis in original), the closest of which is "CLASSIC TASTE PLANT BASED", but none of which include the same phrasing and grammatical structure of "WHERE GREAT TASTE IS PLANT-BASED." See SOF, App. C, No. 34 [Doc. No. 207].[17] And as Vegadelphia points out, its trademark registration, which has been valid since 2014, was a ground for denying Beyond's own trademark application. See Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 547 (1st Cir. 1995) (finding moderate mark strength where, in addition to marketing efforts and receipt of favorable publicity, plaintiff had used the mark for four years, successfully compelled one infringing competitor to change its name, and the USPTO rejected at least one attempt by a competitor to register a similar name).

---

[17] Beyond's reply also cites other similar registrations not included in its appendix. See Reply 9 [Doc. No. 246] ("Reg[.] No. 6206410 (THE BEST TASTE IS PLANT BASED); Reg. No. 6489547 (PHILLY VEGAN PLANT BASED AND TASTE GREAT[])").

Notwithstanding Vegadelphia's promotional efforts largely ceasing in 2014 or 2015, these facts are sufficient for a jury to reasonably find that Vegadelphia's trademark was at least of moderate strength.[18]

In sum, where only three of the eight consumer confusion factors clearly do not favor a likelihood of confusion as to either "PLANT-BASED GREAT TASTE" or "GREAT TASTE PLANT-BASED", Beyond is not entitled to summary judgment as to either tagline and its Motion for Summary Judgment [Doc. No. 202] on this basis is DENIED.

### 7. Vegadelphia's Motion as to Mark Strength

Vegadelphia moves for partial summary judgment as to the mark strength factor based on the incontestable status of its trademark registration. See Pl.'s Mem. ISO Pl.'s Mot. for Summ. J. ("Pl.'s MSJ Mem.") 8–9 [Doc. No. 187].

Vegadelphia relies on the First Circuit's holding that when "the PTO registers a mark without first requiring the applicant to prove secondary meaning, the holder of the mark is entitled 'to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive.'" Borinquen Biscuit, 443 F.3d at 117 (quoting Equine Techs., 68 F.3d at 545). But that presumption of inherent distinctiveness goes toward eligibility for trademark

---

[18] For purposes of reverse confusion, "the focus is on the relative strengths of the marks so as to gauge the ability of the junior user's mark to overcome the senior user's mark." Visible Sys. Corp., 551 F.3d at 74. Beyond argues that in a reverse confusion case, Vegadelphia must still prove the likelihood of confusion factors, and that reverse confusion is inapplicable where it cannot show it has "a recognizable trademark that has been used and promoted[.]" Def.'s Reply 3–5 [Doc. No. 246]. But as discussed above, a jury could reasonably find from the facts that Vegadelphia has at least a moderately strong mark, and that Beyond's commercial strength reached at least 751 million impressions for its collaborative advertising with Dunkin' and included the backing of various celebrities. Thus, the "jury could conclude the [Beyond] mark could overcome the [Vegadelphia] mark" so as to support reverse confusion. Visible Sys. Corp., 551 F.3d at 74.

protection (which is undisputed by Beyond), and not toward any of the likelihood of confusion factors. See id. at 121 (discussing mark strength factor without reference to presumption based on USPTO determination); see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 196 (1985) (holding that "an incontestable mark" cannot be "challenged as merely descriptive" when determining its enforceability).

A similar argument has been rejected by the First Circuit: a trademark holder's "insistence that its marks are incontestable and have secondary meaning does little to advance its claim that its marks are strong." US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 351–52 (1st Cir. 2024). As explained above, the mark strength factor is assessed based on practical considerations such as how long the mark has been used and efforts to promote it. See id. at 351; Beacon Mut. Ins. Co., 376 F.3d at 19; Borinquen Biscuit Corp., 443 F.3d at 121. By contrast,

> [a]n incontestable mark is presumed to have acquired secondary meaning. . . . The determination of secondary meaning "is a threshold issue of trademark validity" that we need not tackle because [Beyond] concedes that [Vegadelphia's] mark[] [is] valid. . . . Secondary meaning relates to the strength of a mark only to the extent that it is "a label given to that quantum of 'strength' sufficient to activate some terms into life as a valid trademark." . . . Once a mark has more than the minimum amount of strength required to create secondary meaning, the existence of secondary meaning does not affect the degree of strength.

US Ghost Adventures, 121 F.4th at 351; see also Pub. Impact, LLC v. Bos. Consulting Grp., Inc., 169 F. Supp. 3d 278, 292 (D. Mass. 2016) ("In the First Circuit, however, courts analyze the strength of a mark by focusing on its commercial strength instead of its theoretical classification.").

Accordingly, Vegadelphia's Motion for Summary Judgment [Doc. No. 185] as to mark strength based on its trademark's incontestable status is DENIED.

### B. Fair Use

Even if Vegadelphia is able to show consumer confusion, Beyond may not be found liable if it establishes that "the use of the . . . term . . . charged to be an infringement is a use, [1] otherwise than as a mark, . . . [2] of a term . . . which is descriptive of and [3] used fairly and in good faith only to describe [Beyond's] goods[.]" 15 U.S.C. § 1115(b)(4); United States Patent and Trademark Office v. Booking.com B.V., 591 U.S. 549, 562 (2020) ("the doctrine known as classic fair use . . . protects from liability anyone who uses a descriptive term, 'fairly and in good faith' and 'otherwise than as a mark,' merely to describe her own goods"). This affirmative defense does not entail any burden to negate confusion, and thus the risk of confusion does not rule out fair use. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 123 (2004); see also Booking.com B.V., 591 U.S. at 562 (the doctrine applies "even where some consumer confusion exists").

The parties do not dispute that the terms "great taste" and "plant-based" are descriptive, but dispute whether Beyond used its taglines only descriptively or as a mark, and whether it used them fairly and in good faith.

### 1. GREAT TASTE PLANT-BASED

As to the "GREAT TASTE PLANT-BASED" tagline used to market Beyond/Dunkin's sandwich, Beyond argues that (1) Beyond had no actual notice of Vegadelphia's trademark until after adopting the tagline; (2) "the tagline was used with the brand or logo of Beyond and/or Dunkin' together with the tagline so as to reflect non-mark use of the tagline itself; and (3) the tagline fairly describes Beyond's products. Def.'s MSJ Mem. 13–16 [Doc. No. 208].

A jury could reasonably find otherwise. Although Beyond learned of Vegadelphia's trademark after Beyond and Dunkin' settled on their tagline, they were aware of the trademark before using the similar tagline in the regional and nationwide launches for their sandwich. As to

the presence of a Beyond and/or Dunkin logo together with the tagline, where the record contains multiple variations of the tagline with those logos placed in different locations, the logos' proximity and relationship to the tagline are fact questions for a jury to resolve. Finally, although the phrases "great taste" and "plant-based" in isolation may each be descriptive of a product, a jury could reasonably find that the phrases combined may serve as a source-identifying mark.

Based on these facts, Beyond is not entitled to summary judgment on the fair use defense as to its use of the "GREAT TASTE PLANT-BASED" tagline.

### 2.   PLANT-BASED GREAT TASTE

#### a.   Beyond's Motion

Beyond argues that the USPTO's rejection of its application to trademark "PLANT-BASED GREAT TASTE" as descriptive of its plant-based products confirmed that the tagline "does not function" as a trademark. Def.'s MSJ Mem. 14 [Doc. No. 208]. The rejection underscores that the terms are descriptive, but that is not the dispute. Instead, the issue is how Beyond <u>used</u> the tagline, and Beyond's application to the USPTO to register this tagline as a trademark (and its Rule 30(6)(b) deponent's subsequent testimony about that application) includes its admission that it had used the tagline as a mark in commerce since March 2019. <u>See, e.g.</u>, <u>Adjusters Int'l, Inc. v. Pub. Adjusters Int'l, Inc.</u>, 1996 WL 492905, at *15 (N.D.N.Y. Aug. 27, 1996) ("find[ing application to register mark] to be highly persuasive, if not conclusive, evidence that defendants were using the words 'Public Adjusters International' in a trademark sense"); <u>Feathercombs, Inc. v. Solo Prods. Corp.</u>, 306 F.2d 251, 256 (2d Cir. 1962) ("That Solo had intended to use the term 'Featherlight' in a trademark sense is further suggested by its application in 1958 for registration . . . Solo cannot now justify its trademark use by contending that the term is merely descriptive.").

Moreover, there is a genuine dispute as to Beyond's good faith where Beyond was aware of Vegadelphia's registered trademark when it filed its trademark application, and Beyond did not abandon its application despite receiving a demand letter from Vegadelphia until the USPTO refused Beyond's application.

Based on these facts, Beyond is not entitled to summary judgment on the fair use defense as to its use of the "PLANT-BASED GREAT TASTE" tagline.

Accordingly, Beyond's <u>Motion for Summary Judgment</u> [Doc. No. 202] is DENIED as to the fair use defense for both taglines.

### b.    Vegadelphia's Motion

Vegadelphia moves for partial summary judgment on the fair use defense based on Beyond's trademark application, arguing that it is judicially estopped from arguing it used its tagline other than as a mark because of its sworn statement in connection with the application that "[t]he mark is in use in commerce on or in connection with the goods/services in the application[,]" Trademark Application at 711 [Doc. No. 186-2], and the testimony of its Rule 30(b)(6) deponent confirming her understanding that the specimen Beyond filed with its application "was filed because Beyond believed that this was an example of 'plant-based, great taste' being used as a trademark as of the date it swore this was an accurate example of its mark usage[,]" Jamie Grass Dep. 244:18-25 [Doc. No. 186-3]. <u>See</u> Pl.'s MSJ Mem. 8–9 [Doc. No. 187].

"[I]n general," however, "courts do not bind parties to their statements made or positions taken in ex parte application proceedings in front of the PTO." <u>Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.</u>, 887 F. Supp. 2d 519, 534 (S.D.N.Y. 2012) (citations omitted). In <u>Attrezzi</u>, for example, in reviewing a jury's factual determination of whether a name was "suggestive" or "descriptive" use, the First Circuit considered the fact of a party's position before the USPTO but

did not make its determination solely on this basis. 436 F.3d at 38; see also, e.g., Feathercombs,

306 F.2d at 256 (considering use and placement of mark in addition to filing of application);

Adjusters Int'l, 1996 WL 492905, at *15 (finding filing of application "[m]ost significant[]"

among facts considered).

Thus, although the statements made in connection with Beyond's trademark application

and in Beyond's Rule 30(b)(6) deposition are persuasive facts for a jury to consider, Vegadelphia

is not entitled to summary judgment on the fair use defense solely on their basis. Moreover,

viewing the evidence in the light most favorable to Beyond, a jury could reasonably consider as

countervailing the facts that: the specimen included in Beyond's application was rejected as "not

properly show[ing] the applied-for mark as actually used in commerce," Nonfinal Office Action

122 [Doc. No. 205-12]; Beyond did not contest the USPTO's refusal of its application; and

Beyond subsequently abandoned that application.

Accordingly, Vegadelphia's Motion for Summary Judgment [Doc. No. 185] is DENIED

as to the fair use defense.

### IV.    Damages

The remedy for a violation of trademark rights is governed by 15 U.S.C. § 1117. The

statute "provides . . .  that when a trademark violation occurs, the victim shall be entitled,

'subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained

by the plaintiff, and (3) the costs of the action.'" Aktiebolaget Electrolux v. Armatron Int'l, Inc.,

999 F.2d 1, 5 (1st Cir. 1993) (citing 15 U.S.C. § 1117).

Beyond moves for summary judgment and to exclude Blum's opinion as to

Vegadelphia's claim for: (1) corrective advertising damages; (2) reasonable royalty damages;

and (3) lost profits from the lost value of Vegadelphia's proposed joint venture agreement.

### A. Corrective Advertising Damages

Beyond argues that it is entitled to summary judgment on corrective advertising damages, and that Blum's opinion regarding the same should be excluded, because Vegadelphia has not presented evidence of actual reputational harm that a corrective advertising award is needed to remedy. Def.'s Mot. to Strike ("MTS") 4 [Doc. No. 201-1]; Def.'s MSJ Mem. 19 [Doc. No. 208-1]. The court agrees.

The record contains no evidence of actual reputational harm. Vegadelphia asserts that "Defendant's data (impressions, ad spend, etc.) is enough to send this to the jury, with or without an expert[,]" Pl.'s Opp. to Def.'s MSJ 20 [Doc. No. 236-1], but Defendant's data shows nothing of actual reputational harm to Vegadelphia.[19] And although the confusion surveys conducted by both parties for purposes of this litigation may be probative of the likelihood of consumer confusion for liability purposes, the hypothetical environments of those surveys is not evidence of actual harm for damages purposes. Cf. Monahan Prods. LLC v. Sam's E., Inc., 463 F. Supp. 3d 128, 146 (D. Mass. 2020) (finding "some evidence of identifiable harm to UPPAbaby's brand in the record" based on customers calling the support hotline or reaching out to online support staff due to confusion and uncertainty).

Where a plaintiff

seeks prospective damages[,] that is, damages to fund post-trial corrective advertising that has yet to take place . . . courts have hesitated to award such damages [due to] the substantial potential for inaccuracy. . . . And a corrective

---

[19] Vegadelphia's President was asked at his deposition: "[O]ther than your own awareness of the use by defendants of the tagline, you're not aware of any evidence which suggest that there needs to be a correction in the marketplace based on the defendants' use of the tagline, correct?" Seth Shipon Dep. 258:1–6 [Doc. No. 204-9]. He answered, "No." Id. at 258:9. Even construing this double negative in Vegadelphia's favor, that is, to indicate that the premise of the question was incorrect and that Shipon was aware of evidence, no such evidence has been introduced in the record.

> advertising award must be tailored to the injury suffered; it is meant only to repair
> the plaintiff's business goodwill, not to provide a free advertising campaign. . . . .
> Thus, courts in this district have awarded prospective advertising damages only if
> it compensates the injured party for identifiable harm to its reputation.

Monahan, 463 F. Supp. 3d at 146 (internal quotation marks and citations omitted); accord Nat'l

Fire Prot. Ass'n, Inc. v. Int'l Code Council, Inc., 2006 WL 839501, at *29 (D. Mass. Mar. 29,

2006) ("In certain circumstances an award equaling the amount necessary for corrective

advertising is recoverable as a remedy where there was actual harm."). Vegadelphia attempts to

distinguish the facts of these cases, which were predicated on price discounting and false

advertising, see Pl.'s Opp. to MTS 13–14 [Doc. No. 221-2], but the principles underlying the

courts' analyses as to corrective advertising damages remain sound and applicable here.

Vegadelphia cites the Eleventh Circuit's decision in Aronowitz v. Health-Chem Corp. as

an example of a corrective advertising damages award being upheld despite arguments that the

plaintiff "has not demonstrated the value of its mark, made use of its mark, or spent any money

on corrective advertising." 513 F.3d 1229, 1241 (11th Cir. 2008). However, that case involved

evidence of actual harm and specific corrective actions that could be used to address the problem

generally rather than on an individual basis. Id. ("Brody testified that confusion engendered by

Aronowitz's website among Health–Chem's customers and potential employees caused concern,

which cost Health–Chem both time and money to explain away on an individual basis"). Finally,

Vegadelphia's citation to the First Circuit's opinion in Attrezzi, LLC v. Maytag Corp. is

unavailing, where the damages at issue were not for corrective advertising but for the $5,400 cost

of the plaintiff's opposition to the defendant's application before the USPTO; moreover,

evidence was presented at trial of complaints related to the brand products at issue. 436 F.3d at

36, 39.

Accordingly, Beyond's <u>Motion to Strike</u> [Doc. No. 199] and <u>Motion for Summary Judgment</u> [Doc. No. 202] are GRANTED as to corrective damages. The court need not reach Beyond's other arguments as to Blum's qualifications to opine on corrective damages.

**B.  Reasonable Royalty Damages**

Beyond argues it is entitled to summary judgment on royalty damages because there is no licensing history, prior discussion, or demonstration of a willingness to license the mark at issue between the parties. Def.'s MSJ Mem. 18 [Doc. No. 208-1]. Beyond argues further that Blum's opinion regarding royalty damages should be excluded because it is premised on flawed methodologies. <u>Id.</u>

**1.  Absence of Prior Licensing History**

Beyond argues that Vegadelphia is not entitled to such damages as a matter of law where the parties have no prior licensing history.

"A royalty is a measure of damages for past infringement, often used in patent cases and in the context of trade secrets, but its use in trademark has been atypical." <u>A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 166 F.3d 197, 208 (3d Cir. 1999). "Where courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated." <u>Id.</u> at 208–09.

"[T]he Seventh Circuit has permitted such an award without evidence of a prior licensing relationship or when the parties had not shown a willingness to license the mark." <u>Nat'l Fire Prot. Ass'n</u>, 2006 WL 839501, at *29 (citing <u>Sands, Taylor & Wood Co. v. Quaker Oats Co.</u>, 978 F.2d 947, 963 (7th Cir.1992), <u>remanded and aff'd in part</u>, 34 F.3d 1340 (7th Cir.1994)). The court in <u>Nat'l Fire Prot. Ass'n</u> declined to follow the Seventh Circuit's approach "given the lack

of 'any evidence that plaintiff [ ] in this case would have licensed the rights to the mark.'" Id. (citation omitted).

Here, there is no prior licensing history between the parties and Vegadelphia does not contend otherwise. Vegadelphia's corporate designee and founder testified that "we would have certainly been open to having [a] discussion" with Dunkin' or Beyond about a license of Vegadelphia's trademark. Matthew Shipon Dep. 124:16–125:11 [Doc. No. 220-7]. But despite this sentiment regarding such "openness" there is no evidence in the summary judgment record of any efforts or willingness by Vegadelphia to engage in discussions to license its trademark to its competitor. To the contrary, although Vegadelphia first became aware of Beyond and Dunkin's use of the allegedly infringing tagline "GREAT TASTE PLANT-BASED" in December 2019, see Seth Shipon Dep. 251:12–252:3 [Doc. No. 200-3], Vegadelphia took no action to negotiate a license agreement with Dunkin' or Beyond. Instead, six months later when Vegadelphia did contact Dunkin' and Beyond, it did so by a demand to cease use of the allegedly infringing tagline, not an invitation to discuss a license. See Demand Letter at 158 [Doc. No. 205-8].

Vegadelphia argues that "[a]bsent a past license, any 'sufficiently reliable basis' will do." Pl.'s Opp. to Def.'s MSJ 19 [Doc. No. 236-1] (emphasis in original, quoting QS Wholesale v. World Mktg., 2013 WL 1953719, *4 (C.D. Cal. May 9, 2013).[20] In QS Wholesale, the court denied summary judgment on this ground, acknowledging that such damages must still "be

---

[20] Vegadelphia also relies on Proccor Pharaceuticals, Inc. v. World Health Prods., 2024 WL 4604206, at *1 (M.D. Fla. Sept. 30, 2024), where the court found on a motion in limine that an expert witness was not precluded from offering testimony regarding royalty damages despite the absence of a licensing agreement. Proccor did not address whether the anticipated evidence would be sufficient to overcome a motion for summary judgment as to damages.

established with reasonable certainty," 2013 WL 1953719, at *4 (citation omitted), and pointing

in that case to the substantial business negotiations regarding the sale of the mark. See also, e.g.,

Adidas Am., Inc. v. Skechers USA, Inc., 2017 WL 3319190, at *29 (D. Or. Aug. 3, 2017) (citing

cases from Ninth Circuit permitting reasonable royalty damages in trademark infringement case

"in the absence of prior licensing agreements between the parties where evidence provided a

sufficiently reliable basis from which the courts could calculate such damages"); Gucci Am., Inc.

v. Guess?, Inc., 858 F. Supp. 2d 250, 255 (S.D.N.Y. 2012) (denying motion in limine to exclude

evidence concerning reasonable royalty damages in absence of previous licensing discussions or

agreement, because "such damages are available if they can be calculated based on reliable

evidence").

Accepting for purposes of summary judgment that royalty damages may be proven by

some reliable means other than by a prior license agreement or negotiations, the court considers

whether Vegadelphia's expert Blum has provided a sufficiently reliable basis for a hypothetical

license agreement between a willing licensor and a willing licensee as to the use of

Vegadelphia's trademark to avoid summary judgment on Vegadelphia's claim for royalty

damages.

### 2.  Unreliable Data Points

Beyond argues Blum's opinion should be excluded because it is premised on unreliable

data points, specifically: (1) a joint venture agreement that was never executed, and (2) license

agreements from "the licensing of famous house marks, such as Godiva and Ben & Jerry's."

Def.'s MTS 7 [Doc. No. 201-1].

As to the unexecuted joint venture agreement, Beyond argues that it is not relevant

because it was not a license negotiation with Beyond, and because the royalty payment due was

not contingent on the licensing of the trademark at issue in this case. See License and Services

Agreement ¶ 11 [Doc. No. 200-5]; see also id. ¶ 8.7 (acknowledging that rights and license to trademark at issue "may be terminated"). The fact that the agreement was unexecuted or with a third party does not necessarily preclude its consideration by Vegadelphia's expert. See, e.g., Vidstream, LLC v. Twitter, Inc., 2025 WL 624514, at *2–3 (N.D. Tex. Feb. 25, 2025) (denying motion to exclude expert testimony based on "an unexecuted memorandum of understanding between" plaintiff and a third party). But where the agreement covers the use of other proprietary rights, such as the recipes to Vegadelphia's products, and specifically contemplates that the rights to the trademark at issue here could be terminated without any other change to the agreement, the draft agreement does not represent any reliable data point as to the value of the trademark alone. And as discussed above, there is no evidence of efforts or willingness on the part of either Vegadelphia and Beyond to enter an agreement concerning use of a trademark without other proprietary rights. Accordingly, the court agrees that the unexecuted joint venture agreement may not serve as a reference point for reasonable royalty damages.

As to the reference to licensing agreements for famous house marks, Beyond argues that the use of well-known companies' primary marks is not comparable to Vegadelphia's largely unknown trademark. Def.'s MTS 7–8 [Doc. No. 201-1]. Again the court agrees. In those negotiations, the licensee was obtaining a mark that carried the value of the association with the well-known company. Blum offers no grounds to infer a similar rate where the mark is not known.

Blum's report also considered other sources to determine general industry-wide practices, see Blum Report ¶¶ 207–12 [Doc. No. 220-1], including licenses for marks that were used secondary to a house mark, id. ¶ 233; furthermore, he considered the differential of parties' bargaining power based on how well-established a company was, see id.; see also Second Supp.

to Blum Report ¶ 8 [Doc. No. 220-3]. But none of this more general information would amount to a "sufficiently reliable basis for royalty damages" to survive summary judgment in the absence of a prior licensing agreement between the parties or efforts to obtain the same.

Accordingly, Beyond's <u>Motion to Strike</u> [Doc. No. 199] and <u>Motion for Summary Judgment</u> [Doc. No. 202] are GRANTED as to reasonable royalty rates and Blum's opinion regarding the same.

### C.  Lost Profits from Lost Value

Finally, Beyond argues it is entitled to summary judgment as to lost profits from lost value because Vegadelphia's proffered valuation "is wholly speculative and not supported by facts." Def.'s MSJ Mem. 17–18 [Doc. No. 208-1]. Beyond contends that non-expert Erik Oberholtzer's testimony—that, in 2021, he thought Plaintiff's business had the potential to grow into a $100 million company—was only "his own wishful opinion as to the potential future value of Plaintiff's business," and that Plaintiff's "principals confirm that the $100 million valuation was aspirational[.]" <u>Id.</u> at 17. Beyond seeks exclusion of the Blum Report as to lost profits from lost value on two grounds: (1) Blum did not conduct a firsthand valuation of the proposed joint venture to reach his damages calculation and instead merely incorporated Oberholtzer's claim, and (2) he assumes without factual support that the proposed joint venture would have succeeded but for the alleged infringement. Def.'s MTS 9 [Doc. No. 201-1].

The court agrees that Blum may not provide an opinion as to the $100 million valuation. A damages expert's testimony is admissible where he "derive[s] his damage estimates by reviewing [a party's] business and financial records and through interviews with company personnel." <u>Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.</u>, 851 F.2d 540, 545 (1st Cir. 1988). Here, however, Blum is one step removed from that review. As he acknowledges, he "did not perform a valuation" and "instead evaluated somebody else's valuation[,]" namely

Oberholtzer. Sidney Blum Dep. 245:24–246:6 [Doc. No. 200-2]. Blum testified that he vetted Oberholtzer's qualifications to perform such a valuation and concluded that, based on Oberholtzer's experience valuating 18 companies in the industry and extensive experience in fundraisers and running startups through sales, Oberholtzer "is the type of person that I would commonly rely upon in a valuation, someone who is aware of the capital markets, capital fundraising and taking startups through development to point of sale, which is what Vegadelphia's plan was for the valuation." Sidney Blum Dep. 252:12–253:8 [Doc. No. 220-4]. Blum also assessed Oberholtzer's deposition testimony for credibility and reliability. Blum Report ¶¶ 340–49 [Doc. No. 220-1]. But whether Oberholtzer's testimony is reliable is a question for the jury, not Blum.

Vegadelphia argues that Beyond does not challenge Blum's implementation of a methodology to compare three alternative meat companies and "ultimately confirm[] the reasonableness and reliability of" Oberholtzer's valuation. Pl.'s Opp. to MTS 19 [Doc. No. 221-2]. But Blum's explanation of the methodologies he employed is only that he used methods within his discretion and his professional judgment, see, e.g., Blum Report ¶¶ 380, 382, 386, 390 [Doc. No. 220-1], to draw comparisons based on information Oberholtzer testified to regarding the comparability of one company's valuation, id. ¶ 344, and based on public data on the valuation of two other companies, Beyond and its competitor Impossible Foods, id. ¶¶ 342–43. Again, where Blum is one step removed from performing a valuation himself, his assessment of the reasonableness of Oberholtzer's valuation would not assist a jury in understanding the evidence before it.

Accordingly, Beyond's <u>Motion to Strike</u> [Doc. No. 199] is GRANTED as to Blum's opinion regarding lost profits from lost value. The court need not reach Beyond's other argument as to Blum's assumption of but-for causation.

Beyond's <u>Motion for Summary Judgment</u> [Doc. No. 202] on lost profits from lost value is predicated only on Blum's opinion, and in this limited respect is also GRANTED. However, Beyond's summary judgment motion does not argue that Beyond is entitled to summary judgment on lost profits from lost value based on a challenge to the factual predicate of Oberholtzer's valuation as a lay witness. Where a jury could reasonably find Vegadelphia is entitled to lost profits from lost value based on Oberholtzer's testimony, the motion is DENIED as to lost profits from lost value more generally.

### V.    Conclusion

Vegadelphia's <u>Motion for Summary Judgment</u> [Doc. No. 185] is DENIED as to liability, except that the motion is GRANTED as unopposed as to Vegadelphia's eligibility for trademark protection. The motion remains under advisement as to damages.

Beyond's <u>Motion for Summary Judgment</u> [Doc. No. 202] as to liability for either tagline is DENIED. As to damages, summary judgment is GRANTED in part as to corrective advertising and reasonable royalty damages and DENIED in part as to lost profits from lost value. Beyond's <u>Motion to Strike</u> [Doc. No. 199] Blum's expert report and testimony as to corrective advertising damages, reasonable royalty damages, and lost profits from lost value is GRANTED.

IT IS SO ORDERED.

October 29, 2025                              /s/ Indira Talwani
                                             United States District Judge