**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| SONATE CORPORATION D/B/A Vegadelphia Foods,<br><br>             Plaintiff,<br><br>   vs.<br><br>BEYOND MEAT, INC., a Delaware corporation,<br><br>             Defendant. | Civil Action No. 1:23-cv-10690-IT |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S RULE 50(B)**
<u>**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**</u>

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                        **Page(s)**

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*,
  591 F.3d 1 (1st Cir. 2009) .................................................................................7, 16, 20

*Bielunas v. F/V Misty Dawn, Inc.*,
  621 F.3d 72 (1st Cir. 2010) ..........................................................................................9

*Borges Colon v. Roman-Abreu*,
  438 F.3d 1 (1st Cir 2006) ..............................................................................................1

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
  762 F.3d 829 (9th Cir. 2014) .................................................................................16, 20

*Gutierrez-Rodriguez v. Cartagena*,
  882 F.2d 553 (1st Cir. 1989) ......................................................................................14

*Insulet Corp. v. EOFlow Co.*,
  779 F. Supp. 3d 101 (D. Mass. 2025) .....................................................................8, 12

*Johnson v. Nat'l Sea Prods. Ltd*,
  35 F.3d 626 (1st Cir. 1994) ..........................................................................................9

*Kuras v. Int'l Harvester Co.*,
  820 F.2d 15 (1st Cir. 1987) ........................................................................................14

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
  2018 U.S. Dist. LEXIS 3035 (S.D.N.Y. Jan. 8, 2018) ..........................................15, 19

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
  287 F. Supp. 2d 355 (S.D.N.Y. 2003) ........................................................................15

*Ramos v. Davis & Geck, Inc.*,
  224 F.3d 30 (1stir. 2000) ............................................................................................20

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ...................................................................................8, 9, 10, 17

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 1333 (2000) ...................................................................................................2

*RFF Family P'ship, LP v. Ross*,
  814 F.3d 520 (1st Cir. 2016) ......................................................................................11

*Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*,
  954 F.2d 19 (1st Cir. 1992) ..........................................................................................8

*Shepp v. Uehlinger*,
    775 F.2d 452 (1st Cir. 1985)........................................................................................9, 18

*Skehel v. DePaulis*,
    2016 U.S. Dist. LEXIS 143403 (D. Mass. Oct. 17, 2016).......................................................18

*Sonicsolutions Algae Control, LLC v. Diversified Power Int'l, LLC*,
    2025 U.S. Dist. LEXIS 144912 (D. Mass. July 29, 2025).......................................................8

*T G Plastics Trading Co. v. Toray Plastics (Am.), Inc.*,
    775 F.3d 31 (1st Cir. 2014)................................................................................7, 11, 12

*Tamko Roofing Prods. v. Ideal Roofing Co.*,
    282 F.3d 23 (1st Cir. 2002)........................................................................................15

*Teva Pharms. Int'l GMBH v. Eli Lilly & Co.*,
    2023 U.S. Dist. LEXIS 171953 (D. Mass. Sept. 26, 2023) .................................................16, 18

*Veilleux v. NBC*,
    206 F.3d 92 (1st Cir. 2000)....................................................................................12, 15

**Statutes**

15 U.S.C. §§ 1051 et seq.......................................................................................12, 14, 15

**Other Authorities**

Fed. R. Evid. 103(a)(1) .............................................................................................18

Fed. R. Civ. P. 701...................................................................................................8

Fed. R. Civ. P. 50(a) ..........................................................................................2, 10, 11

Fed. R. Civ. P. 50(b) ........................................................................................... *passim*

S. Rep. 93-1400......................................................................................................15

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................. 2
      A.    Formation of Vegadelphia 2.0 in a Favorable Market ............................ 2
      B.    Litten's Prior Success and Available "Plug-and-Play" Infrastructure .................. 3
      C.    Discovery of Infringement ...................................................................... 4
      D.    Oberholtzer and the $100 Million Valuation .......................................... 5
      E.    On the Tarmac ......................................................................................... 6

III.  LEGAL STANDARD ............................................................................................ 7

IV.   ARGUMENT ......................................................................................................... 8
      A.    Beyond Seeks Reinterpretation and Reweighing of Evidence ............... 8
      B.    The Record is Sufficient to Support A Reasonable Finding of Causation .......... 10
            1.    Beyond's Renewed Motion Advances New Grounds Not Preserved
                  Under Rule 50(A) ...................................................................... 10
            2.    The Record Contains Sufficient Evidence to Support a Reasonable
                  Jury's Finding That Infringement Caused Vegadelphia 2.0 to Fail ......... 12
      C.    The Record Contains Sufficient Evidence Through Which a Jury Could
            Calculate Damages ................................................................................. 16
            1.    A Reasonable Jury Could have Awarded Damages Based on the
                  Evidence Presented .................................................................... 16
            2.    Beyond's Cited Law is Inapposite ............................................. 18
            3.    The Jury Was Entitled to Award Damages For Reputation,
                  Goodwill, and Business Value ................................................... 19

V.    CONCLUSION .................................................................................................... 20

## I.    INTRODUCTION

The jury's verdict "must be upheld 'unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict.]" *Borges Colon v. Roman-Abreu*, 438 F.3d 1, 14 (1st Cir 2006) (modifications in original). In view of this exacting standard, the evidence presented at trial, and the insufficiency of arguments raised, Defendant's motion should be denied.

The jury heard and saw evidence supporting its findings on both damages and causation. It heard detailed testimony that Vegadelphia's planned expansion (also referred to as the "New Venture" in Beyond's Memorandum or "Vegadelphia 2.0" at trial) was a concrete, near launch venture with a lined up copacker, infrastructure in place, and national accounts ready for action; that Oberholtzer, Litten, and Shippon valued the venture at a $100 million exit, of which Vegadelphia's stake was $25 million; that Vegadelphia's Veggie lean sales declined sharply after Beyond and Dunkin' launched "Great Taste, Plant Based"; and that concern over Beyond's use of Vegadelphia's mark and the resulting "cloud" over the brand was a major reason the venture did not proceed. The jury heard instructions that it could award damages for lost profits, loss of business value, and injury to reputation and goodwill, and it did so. Evidence sufficient to sustain any one of Vegadelphia's damages theories—including (1) the loss of its $25 million stake in a $100 million Vegadelphia 2.0 venture and (2) lost profits from sales through Paul Litten's national chain accounts—or those others such as lost business value evaluated by the Jury requires denial of Beyond's motion.

Defendant's claim that Vegadelphia somehow "induced" the jury to award an improper verdict falls flat. (Defendant's Memorandum of Law in Support of Renewed Motion, Dkt. 436 (hereinafter "Mem.") at 1.) Defendant's own citations make clear the jury heard all the evidence and cross-examination testimony that Defendant cites in its brief, leaving nothing to support its

1

Rule 50(b) motion other than a request for this Court to reinterpret and reweigh the evidence. It is black letter law that this is not proper under Rule 50(b). *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 1333, 150-51 (2000) (credibility "determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); (Dkt. 402, Nos. 4-8) (careful jury instructions on this role).

Defendant's argument further cannot be saved by the untimely hearsay, discovery, and other evidentiary arguments raised in its briefing. Its arguments that the jury shouldn't have heard certain statements from counsel, that Vegadelphia introduced new theories, or that the jury relied on hearsay, all admitted without objection, demonstrates that Defendant is dissatisfied with its elected trial strategy. But the time to raise evidentiary issues is not after the jury has sat through a trial and made its decision. Regardless, Defendant's own brief again acknowledges that the jury received instructions allowing them to reach their decision only on evidence properly before them. (Mem. at 11 (citing Jury Instruction No. 7, Dkt. 402-4).)

Further, elements of Beyond's Rule 50(b) motion are procedurally improper. A Rule 50(b) movant is "bounded by" its Rule 50(a) motion. Beyond now advances new grounds—most notably a causation challenge—that was never distinctly articulated in its Rule 50(a) motion, and it also seemingly attacks a verdict form and jury instructions it did not timely challenge. Those arguments are waived and cannot be considered. Accordingly, there is no reason to set aside the jury's well-supported, carefully considered verdict.

## II.    FACTUAL BACKGROUND

### A.    Formation of Vegadelphia 2.0 in a Favorable Market

In 2019, Vegadelphia's Seth Shipon approached Paul Litten about "grow[ing] this plant based product" through Quality Foods' distribution, sales, and R&D capabilities. (2025-11-12 Tr. (Dkt. 449-1) at 97:5–18.). Vegadelphia was already a copacked, distributor-supported brand at the

2

time, with an undisputed 35% gross profit margin and minimal staff and *de minimis* and fixed overhead requirements. (Trial Exhibit 82 (Dkt. 449-9); 2025-11-19 Tr. (Dkt. 449-5) at 138:3–7; 2025-11-13 Tr. (Dkt. 449-2) at 94:24–96:5.) Litten was "absolutely" interested. (Dkt. 449-1, Tr. 97:5–18.) Litten testified that the timing was ideal. He was operating at capacity, his plant and sales team generating "about $35 million a year in business." (Dkt. 449-2, Tr. 35:3–36:17.) As the plant-based market began "buzz[ing]" with "activity and excitement," Quality Foods was "already in distribution with most of the chains" but was still manufacturing only Philly steak. (Dkt. 449-1, Tr. 98:6–21, 99:11-15.) Around the end of 2019, a large chain launched a plant-based meat product, and Quality's customers began expressing interest in a similar offering "good timing," as Litten put it. (Dkt. 449-1, Tr. 97:11–18.) Quality's customer base already included distributors, national accounts, Restaurant Depot, and others. (Dkt. 449-2, Tr. 36:12–17.)

**B.      Litten's Prior Success and Available "Plug-and-Play" Infrastructure**

Apart from Quality Foods, the jury also heard about Litten's broader track record in acquiring, growing, and exiting food businesses. He explained that he looked for companies with "flat revenue, but good brands", grew the brand before selling the company in five to seven years. (Dkt. 449-1 at Tr. 95:11–14). He testified he had acquired and grown three companies, including one with $20 million in revenue that sold for $865 million. (Dkt. 449-1 at Tr. 95:15–96:4.)

Litten testified Vegadelphia's products would be a "real good bolt on" for Quality Foods, allowing him to meet existing customer demand and complement his other offerings: "I can say to a customer not only do we have a protein, we also have veggie." (Dkt. 449-1, Tr. 98:6–99:19.) Litten and Shipon both testified that because Vegadelphia's products were co-packed, they would be produced in another facility but run through the same sales and distribution format and logistics infrastructure as Quality's existing products, without straining plant capacity. (Dkt. 449-1, Tr. 98:14–99:19; Dkt. 449-2, Tr. 38:5–39:2.).

Shipon testified he intended to launch Vegadelphia's current product to Litten's customers "as fast as possible." (Dkt. 449-2, Tr. 37:1-6). By late 2019, the parties could support "endless" sales, having secured a copacker with "plenty" sufficient capacity and readiness for production, and Shipon confirmed his ingredients distributor had comparable capacity without limit. (Dkt. 449-1, Tr. 98:22-99:19; Dkt. 449-2, Tr. 37:1-38:4, 41:25-42:6). Shipon also met with Quality's sales team, many of whom he already knew from decades of business with Mr. Litten, which was complimented by a broker network. (Dkt. 449-2, Tr. 34:19-36:11); *see* also Opp. To Beyond Supp. Trial Brief (filed concurrently).

## C.    Discovery of Infringement

Shipon testified he first encountered the Beyond/Dunkin' "Great Taste, Plant Based" campaign shortly after launch—first on a billboard, then "everywhere." (Dkt. 449-2, Tr. 16:4–17:8; Dkt. 449-9, T.E. 82; Dkt. 449-18, T.E. 606-32.) Around the same time, Vegadelphia's veggie lean products experienced an approximately 20% sales decline in 2019 and a 45% decline in 2020, a pattern not seen in the Shipons' meat-based line, which grew alongside Beyond's sales even amid COVID. (Dkt. 449-2, Tr. 17:9-19:21, 33:12-14; Dkt. 449-10, T.E. 83; Dkt. 449-11, T.E. 84; Dkt. 449-16, T.E. 606-4.001; Dkt. 449-17, T.E. 606-43). Litten discovered the infringement around the same time, while getting his coffee at Dunkin' Donuts: "I noticed that Seth's tagline was on the billboard. And I called [Seth] up, and I said, Seth, what's going on here? Because at first, I thought he was in Dunkin' Donuts." (Dkt. 449-1, Tr. 100:1–6.)

Shipon testified that Beyond's infringement directly blocked the planned launch. (Dkt. 449-2, Tr. 38:25–39:10.) By April 2020, Vegadelphia still had not even been "allowed to ship any samples or approach any [of Litten's] accounts" because "there was concern around…the trademark being used by Beyond and Dunkin', and we didn't want to appear as if we were coming into the market as a copycat." (Dkt. 449-2, Tr. 38:25–39:10.) Vegadelphia sent cease and desist

4

letters to Beyond and Dunkin' on May 28, 2020. (Dkt. 449-8, T.E. 37) Litten did not immediately abandon the venture because he "kind of thought [the infringement] was really blatant and…they would get it worked out." (Dkt. 449-1, Tr. 100:7–10.) As he later testified, however, "it didn't work out that way." (Dkt. 449-1, Tr. 133:18–24.)

### D.      Oberholtzer and the $100 Million Valuation

While the current Veggie lean product was "ready to go," Litten and the Shipons did their best to make constructive use of the infringement-forced delay to Vegadelphia brand expansion and brought chef Eric Oberholtzer onboard. (Dkt. 449-2, Tr. 41:1-16, 42:7-23, 43:6-44:4, 91:13-24; Dkt. 449-15, T.E. 270). Oberholtzer testified that he had 30 years' experience on the "buy side," "sell side," and "agricultural side" of plant-based and food ventures, serving as an advisor and stakeholder in multiple brands. He built his own company, Tender Greens, "from a concept to exit" at a $200 million valuation. (Dkt. 424-1 at 110-111, Tr. 114:08–15, 115:10–116:15.) He also brought access to his wife's national digital advertising and marketing agency. (Dkt. 449-2, Tr. 39:11–40:2.)

Drawing upon this experience, Oberholtzer testified that he, Litten, and Shippon collectively valued the Vegadelphia 2.0 venture at a $100 million exit in three to five years. (Dkt. 424-1 at 111, 116, Tr. 116:02–15, 133:05–15.) The exit would include the entire business, customer list, products, and R&D knowhow developed. (*Id.*) The Shipons would receive 25% of revenue this sale. (*Id.*) In reaching this valuation, he considered valuations of other plant-based companies at the time—including Tender Greens, Quality Foods, Beyond, Impossible, and smaller projects like Tindle—reviewed Vegadelphia's sales data and benchmarked against 36 other food industry opportunities presented to him for investment from 2020 onward, about half of which included company valuations. (Dkt. 424-1 at 91-116, Tr. 6:06-20:17, 113:06-117:20, 129:06.)

He characterized the $100 million valuation as "conservative," noting that plant-based companies were "really grabbing the big valuations before the product even hit the market" and that there was "a lot of activity" in the space. (Dkt. 424-1 at 110-114, Tr. 113:06–114:20, 125:24–126:09.) He testified that Vegadelphia's brand had "local appeal," was "underutilized or ahead of its time," and fit a pattern of "boutique or local or mom and pop" brands scaling into "something quite big." (Dkt. 424-1 at 105, 112, Tr. 93:23-94:14, 118:08–20.) He emphasized his willingness to commit time to Vegadelphia 2.0 was predicated on his confidence in the projected value. (*Id*. 110:113:06-114:20.)

### E.      On the Tarmac

Oberholtzer's reformulated Vegadelphia patty received its "final, minor tweaks" and proved scalable in successful 500-pound test batches. (Dkt. 449-2, Tr. 41:1–16, 42:7–23, 43:6–44:4; Dkt. 499-15.) After circulation of deal points (including an 8% royalty and 25% of exit value, the July 21, 2001 Agreement was, "aside from the Beyond issue," "signature-ready" and "ready to go." (*Id*. 42:24–43:5, 47:2–14; Dkt. 449-7; Dkt. 449-12, T.E. 88. *See also* Dkt. 449-1, Tr. 115:11–118:16; Dkt. 449-14, T.E. 266.) The parties continued preparing for expansion "even though the Beyond issue hadn't been resolved," expecting it eventually would be. (Dkt. 449-2, Tr. 50:4–12.) When Litten and Oberholtzer withdrew, Vegadelphia 2.0 was, in Oberholtzer's view, "on the tarmac" and "ready to commercialize." Apart from the infringement, he saw no major impediments to success beyond the ordinary challenges of growing a business. (Dkt. 424-1 at 112, Tr. 119:14 - 120:19.)

Litten confirmed that Dunkin's use of "Great Taste, Plant Based" "was an issue with the joint venture," which intended to use "Where Great Taste Is Plant Based" as its slogan. (Dkt. 449-1, Tr. 125:11–14.) As noted above, his real-world confusion at a Dunkin' is what precipitated not allowing Vegadelphia to ship samples or approach his extensive accounts. He testified that "the

6

ongoing battle here with this trademark and the brand was kind of … out front. So it kind of clouds everybody's judgment, and I just didn't want to be involved in that." (Dkt. 449-1, Tr. 100:25-102:12). By late 2020, he "just didn't have the bandwidth" and "didn't want to deal with the aggravation," so "we just moved on." (*Id*.) He reaffirmed that he had no reason for ending the collaboration "beyond the cloud of [this] case," and that although "one thing" remained to be worked out in the contract, that term "could have been worked out" had the venture been allowed to proceed. (Dkt. 449-1, Tr. 102:3–12.)

Oberholtzer likewise viewed Beyond's infringement as a serious problem. He testified that, as a first mover brand, he had "personally experienced the dilution of messaging … [when] others come in later and dilute our language … which can cause confusion and just dilution." He saw the infringement as "a potential threat" capable of "coopting a legacy or identity statement." (Dkt. 424-1 at 113, Tr. 121:06–14.) He further explained that he to abandoned the venture when the Shipons needed "bandwidth" to deal with the "legal tangle" of infringement. (Dkt. 424-1 at 109, Tr. 108:9–24, 109:14–23.) Both he and Litten were busy; the expectation was "go take care of this and then come back." *Id.* Ultimately, neither Litten nor Oberholtzer was "willing to move forward with the partnership of expanding Vegadelphia's sales, without the Beyond issue being resolved." (Dkt. 449-2, Tr. 49:18–21.)

## III.    LEGAL STANDARD

Motions under Fed. R. Civ. P. 50(b) are "subject to a demanding standard," and those seeking to overturn a jury verdict "face[] an uphill battle." *T G Plastics Trading Co. v. Toray Plastics (Am.), Inc.*, 775 F.3d 31, 38 (1st Cir. 2014) (internal citations omitted). A jury's verdict "must be upheld unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of [the moving party] that a reasonable jury could not have returned the verdict." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1,

13 (1st Cir. 2009). In evaluating a Rule 50(b) motion, Courts examine the record, disregarding "all evidence favorable to [defendants] that the jury was not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 22 (1st Cir. 1992).

## IV.   ARGUMENT

### A.   Beyond Seeks Reinterpretation and Reweighing of Evidence

Rather than show the jury verdict unsupportable, Beyond ***first*** seeks to relitigate evidentiary issues it either lost or failed to raise at trial. For example, Beyond argues Vegadelphia improperly presented Mr. Oberholtzer as an expert witness. (Mem. at 2.) This Court already rejected that challenge, holding that "whether Oberholtzer's testimony is reliable is a question for the jury," and noting that Beyond "failed to object to Oberholtzer's presentation as a lay witness." (Dkt. 344 at 40.) Beyond then failed to object to Oberholtzer's testimony at trial, permitting his pre-recorded deposition designations to be played to the jury without objection. (2025-11-17 Tr. (Dkt. 449-4) at 46:20-47:6.) Having failed to object, Beyond cannot recast its disagreement with that testimony as a ground for judgment as a matter of law after the jury has credited it. *Insulet Corp. v. EOFlow Co.*, 779 F. Supp. 3d 101, 121 (D. Mass. 2025). Nor was an expert required to verify Oberholtzer's valuation; courts routinely uphold lost profit and lost value awards supported by lay witnesses such as Oberholtzer. *See* FRCP 701, 2000 Adv. Comm. ("most courts" hold no need to qualify as an "expert" for "owner or officer of a business to testify to the value or projected profits of the business"); *e.g. Sonicsolutions Algae Control, LLC v. Diversified Power Int'l, LLC*, 2025 U.S. Dist. LEXIS 144912, at *13 (D. Mass. July 29, 2025).

Beyond also argues that the jury verdict should be set aside because Vegadelphia's counsel made improper statements in closing. (Mem. at 6, 10-12, n.5, 16, n.7.) Again, the time to raise

8

such an objection is not in a later Rule 50(b) motion. *Johnson v. Nat'l Sea Prods. Ltd*, 35 F.3d 626, 631 (1st Cir. 1994); *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 78 (1st Cir. 2010) (failure to object to plaintiff's specific damages calculation in closing forfeits challenge in posttrial motion); Regardless, Beyond acknowledges that the jury was given several instruction that closing arguments are not evidence. (Mem. at 10-11 (citing Jury Instruction No. 7, Dkt. 402-4); Dkt. 449-1, Tr. 33:15). Further, as discussed below, the closing statements Beyond now challenges merely summarized directly from admitted testimony, including by Beyond's own expert, Plumpe (*see* Section C1, *infra*). Underlying testimony is evidence and, here, it *does* support the jury's verdict.

Beyond's memorandum is replete with similar late-blooming objections.  (*See* Mem. at 5 n. 3 (no prior objection to Oberholzer's testimony or to reference in closing), 10-12 (no prior objection to allegedly new closing damages theory or $35m testimony), 16 n. 7 (no objection to product capacity in closing).) Beyond has forfeited each and should not be permitted to nullify a two-week jury trial with issues it failed to timely raise. *Bielunas*, 621 F.3d at 78; *Shepp v. Uehlinger*, 775 F.2d 452, 454 (1st Cir. 1985).

***Second***, Beyond seeks improper reinterpretation of the evidence of record. For example, on page 7, Beyond asks the Court to find Vegadelphia 2.0 was not worth $100M because "Litten testified that he was 'surprise[d]'" by certain deal terms, and the agreement included a $1M sales minimum. (Mem. at 7.) Importantly, Litten never testified that the deal terms Beyond highlights were indicative of its value. (*See* Trial Day 2, 94:16-135:17.) As such, Beyond is plainly asking the Court to infer what these terms meant in a way that likely differs from how the jury interpreted this testimony and is most favorable to Beyond. Both are improper. *Reeves*, 530 U.S. at 150.

There are several other instances where Beyond requests this Court draw inferences from testimony in a light most favorable to Beyond. (*See, e.g.*, Mem. at 6-7 (deal not actually worth $100M because plant-based market in decline), 8 (Litten placed no value on trademark based on

9

deal terms), 9 (Vegadelphia 2.0 would have proceeded but for litigation).) Each should be rejected under the Rule 50(b) standard. *Reeves*, 530 U.S. at 150.

**Third,** Beyond takes certain testimony out of the context in which the jury heard it. It cites, for example, deposition testimony played to impeach Litten that states, "Dunkin's use of 'great taste, plant based' wasn't an issue for him." (Mem. at 8.) But it leaves out the immediately following testimony from Mr. Litten explaining, "I must have misunderstood the question." (Dkt. 449-1, Tr. 126:2-25). It likewise leaves out the redirect examination addressing the issue. (*Id.* at 130:16-134:20.) The jury was not required to believe Litten's statements at trial, but this Court may not reweigh his credibility to overturn the jury's verdict. *Reeves*, 530 U.S. at 150. The majority of Beyond's brief falls into these three categories of arguments (Mem. at 3-13), none are proper support for a Rule 50(b) motion.

**B.      The Record is Sufficient to Support A Reasonable Finding of Causation**

Beyond's first argument posits that the record contains insufficient evidence for a reasonable jury to find Beyond's infringement caused the failure of Vegadelphia 2.0., and, instead, the only reasonable conclusion is that litigation, as an intervening factor, caused the failure. (Mem. at 9-10.) This argument should be rejected because it is procedurally improper, usurps the jury's role in interpreting the evidence, and relies on an unsupported legal theory contrary to precedent.

1.      Beyond's Renewed Motion Advances New Grounds Not Preserved Under Rule 50(A)

Beyond's renewed motion improperly advances a new causation theory it did not raise in its Rule 50(a) motion. There, Beyond argued that the amount is speculative and uncertain because the deal did not exist and required expert testimony to substantiate. (Mem. at n.1; Dkt 449-4, Tr. 64:21–65:22.) Beyond did raise its interpretation of Litten's testimony, noting "he didn't go forward with [the venture] not because of any trademark issue with Beyond or alleged

10

infringement, but because he was concerned about the litigation potential" (Mem. at n.1.), but a litigant's characterization of witness testimony is not a distinct legal claim that the entire record is devoid of causation evidence. Beyond failed to claim that this testimony, or the record generally, lacked evidence to support a finding of causation for the failure of the venture.

A Rule 50(b) motion is "bounded by the movant's earlier Rule 50(a) motion," and may not be used "to introduce a legal theory not <u>distinctly</u> articulated in the Rule 50(a) motion." *RFF Family P'ship, LP v. Ross*, 814 F.3d 520, 537 (1st Cir. 2016) (emphasis original) (internal quotations omitted). Nor may a party "expand" a theory in its Rule 50(b) motion that was "merely a toehold in the Rule 50(a) motion". *RFF Family P'ship, LP*, 814 F.3d at 536–37. The First Circuit has strictly enforced this rule to reject arguments much like the one Beyond attempts here.

In *RFF Family Partnership*, for example, plaintiff's Rule 50(a) motion asked the court to direct a verdict awarding "the amount of money necessary" to achieve the plaintiff's mortgage discharge "with that amount to be determined by the jury." 814 F.3d at 536. When Plaintiff argued in its Rule 50(b) motion that "no reasonable jury" could have awarded less than $866,000 to achieve plaintiff's mortgage discharge based on evidence at trial, the First Circuit rejected this narrowing as an impermissible new theory. *Id.* The Court highlighted the general 50(a) request "gave no hint" of the later, more specific evidentiary sufficiency argument, thus failing to preserve it. *RFF Family P'ship, LP*, 814 F.3d at 536–37. Likewise, in *T G Plastics*, where defendant's Rule 50(a) motion made only generalized, revenue-based attacks on the calculation sufficiency of the jury's damages award, the court prohibited defendant from later arguing in their Rule 50(b) motion that the absence of specific *cost* evidence made damages legally insufficient. *TG Plastics Trading Co. v. Toray Plastics (Am.), Inc.,* 775 F.3d 31, 39 (1st Cir. 2014). The First Circuit held that the earlier, broad damages challenge was "too vague" to preserve the specific cost theory. *Id*. In line with this precedent, the Court should find Beyond's expansion impermissible.

11

    2.    <u>The Record Contains Sufficient Evidence to Support a Reasonable Jury's Finding That Infringement Caused Vegadelphia 2.0 to Fail</u>

    a.    *The trial record contains sufficient evidence of direct causation.*

To establish causation under the Lanham Act, the evidence must support a finding that the harm proximately resulted from the infringer's wrongful acts, meaning infringement was "a substantial factor in bringing about the harm." *Veilleux v. NBC*, 206 F.3d 92, 123–24 (1st Cir. 2000) (quotation omitted). However, Vegadelphia was not required to "negate every conceivable intervening factor" to prove causation (*id),* and in trademark cases guided by business tort principles like this one, "where the focus is on the wrongfulness of the defendant's conduct, the award of damages is permissible on meager evidence." *Insulet Corp.*, 779 F. Supp. 3d at 121 (internal quotation marks omitted). The question for Rule 50(b) is simply whether a reasonable jury could find that Beyond's use of Vegadelphia's mark was a substantial factor in bringing about the loss of Vegadelphia 2.0 or other business harm. The record supports this finding.

Here, the jury heard Beyond's use derailed Vegadelphia's planned expansion. It heard testimony regarding the value of the Vegadelphia brand underutilization and local recognition. Litten, for example, testified he immediately confused Vegadelphia's brand with Beyond's upon exposure to the infringing slogan. Shipon testified he understood Vegadelphia would launch its products to Litten's customers by April 2020, which they took steps toward, but, ultimately "we weren't allowed to ship any samples or approach any accounts" because Litten and the Shipons were concerned about "the trademark being used by Beyond and Dunkin'" and a did not want to appear as "coming into the market as the copycat." (Dkt. 449-2, Tr. 38:25–39:10.)

Shipon's testimony highlights that Vegadelphia was ready but prevented from going to market until the trademark rights were secured. Litten confirmed that Dunkin's use of the similar slogan "was an issue with the joint venture". (Dkt. 449-1, Tr. 125:12–14.). He testified that he

12

didn't abandon the Vegadelphia 2.0 venture immediately upon discovering the infringement *because* he thought the issue resolved and the cloud on their rights cleared, highlighting the defining importance of this issue. Oberholtzer saw the threat that dilution and confusion from infringement posed to the brand he had previously valued for its local appeal and underutilization. (Dkt. 424-1 at 105, Tr. 121:06–14; 100:1-14). Expert Dr. Susan McDonald also explained how a slogan defines a brand. (2025-11-20 Tr. (Dkt. 449-6) at 69:22-70:9). Litten testified that the "ongoing battle here with this trademark and the brand was kind of…out front," and he wanted no involvement. (Dkt. 449-1, Tr. 101:12–14). Oberholtzer also testified that the ongoing dispute over the slogan created a "cloud" over the mark and the deal—the main reason the venture did not proceed; when the issue did not resolve, Oberholtzer testified the Shipons eventually needed the "bandwidth" to deal with the "legal tangle" of infringement; both he and Litten were busy, so the idea was "go take care of this and then come back." (Dkt. 424-1 at 108-109, Tr. 107:24–109:23; Dkt. 449-1, Tr. 101:02-102:12.)

Beyond also ignores the evidence that the lost 2020/2021 launch timing before litigation was critical, given (1) that was when the market was "hot", (2) this is when companies like Beyond were exploding growth, and (3) that is when Litton's accounts were clamoring. The jury was entitled to treat the infringement-delayed timing as critical, and Beyond's emphasis on the April 2022 filing of litigation an irrelevant (and irreverent) kicking of the dead horse. On this record, the jury had before them sufficient evidence to find that Beyond's infringement was a direct cause of the failure of Vegadelphia 2.0.

      b.     *Beyond misapplies intervening causation law and draws artificial distinction between its infringement and this litigation.*

Beyond's argument is that the record supports only a finding that Vegadelphia's intervening decision to pursue "this litigation"—not Beyond's infringement—caused Vegadelphia

13

2.0 to fail; therefore, Beyond did not cause this failure. (*See generally* Mem. at 14-16.) This artificial distinction runs contrary to established law of intervening cause, and the very intent of the Lanham Act. Regardless, the jury was not required to accept Beyond's interpretation.

**First**, suing an infringer for infringement is not an independent intervening cause that breaks the causal chain; it is the natural and proximate outcome of infringement. An act "continues to be a proximate concurring cause of the injury if the intervening act could reasonably have been foreseen as a natural and probable result" of the wrongdoing even if that foreseeable act is "conduct by the plaintiff." *Kuras v. Int'l Harvester Co.*, 820 F.2d 15, 17 (1st Cir. 1987). Thus, a defendant "will not be relieved of liability by an intervening cause that was reasonably foreseeable, even if the intervening force may have 'directly' caused the harm." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989) (a civilian injured by police fire responding to defendant's drawn weapon was "eminently foreseeable"). There is sufficient evidence in the record to support the jury's finding that litigation was the foreseeable result of Beyond's infringement. Shipon testified regarding Vegadelphia's cease-and-desist letter to Beyond, identifying its rights and litigation risk should Beyond not cooperate. (Dkt. 449-2, Tr. 20:16-26:11; Dkt. 449-8.) The jury found Beyond willfully infringed, meaning it knowingly proceeded despite litigation risk. (Dkt. 419 at 4.)

**Second**, Beyond's delineation between the infringement and the litigation for the purposes of causation is artificial, Beyond cites to no authority supporting such a distinction. Nor does Beyond cite authority that litigation resulting from trademark infringement cannot be cause to support an award of damages. That is because Beyond's distinction is illogical. "When a trademark is infringed, trademark owners have more at stake than just the damages or loss of profits in that case." *Tamko Roofing Prods. v. Ideal Roofing Co.*, 282 F.3d 23, 34 (1st Cir. 2002). Trademark owners are expected—and often compelled—to enforce their marks or risk losing them under the Lanham Act. *See Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 364–65

14

(S.D.N.Y. 2003); S. Rep. 93-1400 (noting the intent of the act was to encourage enforcement, even where measurable damages are modest). Courts even suspend general fee-shifting principles so as not to deter such enforcement. *See, e.g., Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 2018 U.S. Dist. LEXIS 3035, at *10 (S.D.N.Y. Jan. 8, 2018) ("Courts should proceed cautiously before imposing fees on trademark owners, lest they face a "Hobson's Choice" between defending their marks and risking punitive fee awards or turning a blind eye and risking loss of rights").

*Third*, the jury was not required to accept Beyond's proposed separation. Beyond presented its arguments that litigation was the cause of the lost opportunity. (*See, e.g.*, Mem. at 15-16 (citing testimony).) Jurors were free to find that this meant Beyond did not cause damages. Instead, the jury accepted the contrary evidence presented by Vegadelphia, which Beyond's memorandum ignores: Beyond's infringing use created confusion and a cloud over Vegadelphia's rights; defense was required; this generated litigation risk and then actual litigation; and together these factors led Vegadelphia's partners to walk away from Vegadelphia 2.0. The Court cannot simply adopt Beyond's selective interpretation while ignoring witness testimony directly tying the decision to leave the venture to Beyond's use of the mark and Vegadelphia's resulting enforcement of its rights. The combined impact of Beyond's infringing use and the foreseeably resulting litigation risk caused Litten and Oberholtzer not to move forward with Vegadelphia 2.0. This conclusion is sufficient to satisfy the proximate cause standard under *Cashmere* and *Veilleux*, especially where causation hinged on credibility and competing inferences the jury was uniquely positioned to resolve. Viewing these facts and inferences in the light most favorable to the jury's finding of causation, Beyond cannot make the required showing. *Astro-Med, Inc.*, 591 F.3d at 13.

C.      **The Record Contains Sufficient Evidence Through Which a Jury Could Calculate Damages**

Beyond's second substantive argument—that the actual damages verdict be thrown out because the evidence is allegedly too speculative—should also be denied. Beyond's argues the jury relied on Oberholtzer's $100 million valuation of Vegadelphia 2.0, and that this estimate was too speculative to support an award. (Mem. at 1–2, 4–8, 16.) Beyond concedes this evidence was presented to the jury along with proper jury instructions; its complaint is that the jury believed it. This is not a basis for Rule 50(b) relief.

"The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pic.*, 327 U.S. 251, 165 (1946). Estimates of future profits or business value "necessarily contain some speculative elements"; a court may not overturn an award on this basis only. *Teva Pharms. Int'l GMBH v. Eli Lilly & Co.*, 2023 U.S. Dist. LEXIS 171953, at 77 (D. Mass. Sept. 26, 2023) (internal citations omitted). This is especially true where, as here, a jury is instructed to consider injuries to goodwill, reputation, and the overall value of a business—categories that rarely admit to exact calculation. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 845 (9th Cir. 2014). So long as the jury can logically point to a reasonable basis for its computation, courts uphold it. *Astro-Med, Inc.*, 591 F.3d at 19. Here, the record gives at least three bases upon which a reasonable jury could calculate Vegadelphia's actual damages with reasonable certainty: (1) the lost value of Vegadelphia's 25% stake in Vegadelphia 2.0, (2) lost profits from sales to Litten's national accounts, and (3) injury to Vegadelphia's goodwill, reputation, and overall business value.

1.      A Reasonable Jury Could have Awarded Damages Based on the Evidence Presented

Without rehashing the detailed evidence above (*see* Section II, *supra*), the jury heard extensive evidence about Vegadelphia 2.0's structure and readiness: Vegadelphia, Litten, and

16

Oberholtzer had identified and secured a copacker with sufficient capacity; integrated Vegadelphia's products into Quality Foods' existing distribution structure; exchanged contract drafts; and prepared for a rollout through Litten's national chain accounts. Oberholtzer testified—drawing on his 30 years in the industry, his experience building and exiting Tender Greens at a $200 million valuation, and his advisory work with other brands—that he, Litten, and Seth valued Vegadelphia 2.0 at a $100 million exit within three to five years, encompassing the business, customer relationships, products, and accumulated knowhow. He explained this valuation was informed by comparable companies (including Beyond, Impossible, and Tindle) and by Vegadelphia's performance, and that he considered the $100 million figure "conservative." (*See* Section II, *supra.*)

Beyond cross-examined Oberholtzer at length about his valuation and declining market conditions. (Dkt. 424-1 at 115-116, Tr. 130:8–134:03.) The jury also heard testimony from Beyond's witness that any industry "decline" was in "mid-single-digits percentages." (2025-11-14 Tr. (Dkt. 449-3) at 93:1-11.) Beyond's criticisms—that the plant-based market was "in decline," that some contract terms (such as a $1 million sales threshold or a proposed $50,000 license fee) reflected risk, and that future success was not guaranteed—go to weight, not sufficiency, which the jury resolved in Vegadelphia's favor. Importantly, while Beyond claims that the only reasonable conclusion is the Vegadelphia 2.0 deal was not worth $100M, a jury can interpret this statement multiple ways. (Mem. at 18.) The jury may have concluded the loss of the chance to participate at market peak damaged the business value and was grounds for the award. We may never know exactly how the jury interpreted the evidence, but Beyond cannot meet its high burden under Rule 50(b) by merely advancing its preferred interpretation. *Reeves*, 530 U.S. at 150.

Litten and Shippon also testified about the mechanics of Vegadelphia's expansion plan to Quality Foods customers, and Sidney Blum discussed Vegadelphia's profit margins. Litten

planned to offer Vegadelphia to Quality's customers, who were requesting a plant-based offering, as a bolt on to his products. (Dkt. 449-1, Tr. 98:6–99:19.) Shipon noted these customers accounted for "$35 million a year in business." (Dkt. 449-2, Tr. 35:3–36:17.) Shipon testified the plan was to launch immediately with their existing patty. (Dkt. 449-2, Tr. 38:25-39:10). From this evidence, the jury could reasonably infer Litten's existing $35 million sales base represented the scale of accounts to which Vegadelphia's products would also be offered. Additionally, because Beyond made no timely objection to the admission of Shipon's testimony or Vegadelphia's closing summary, it has forfeited the right to do so now. Fed. R. Evid. 103(a)(1); *Skehel v. DePaulis*, 2016 U.S. Dist. LEXIS 143403, at *6 (D. Mass. Oct. 17, 2016); *see also Shepp v. Uehlinger*, 775 F.2d 452, 454 (1st Cir. 1985) (Jury free to rest its determination on properly admitted evidence).

Even if the Court were to disregard entirely the "$35 million sales" approach, evidence remains to support a $23.5 million award from lost profits given Litton's first-hand testimony of the magnitude of his reach ("in most of the chains") and success (a near $1 billion exit), and Vegadelphia's 35% margins with *de minimis* fixed overhead. (*See* Section II, *supra*.) The $23.5 million award is also independently sustainable based on the Vegadelphia 2.0 lost value evidence and the other harms the jury was instructed to consider. And, notably, the jury awarded $1.5 million less than Vegadelphia was set to receive upon sale of the enterprise, suggesting it accounted for Beyond's arguments about the potential single-digit market downturn. *See Teva Pharms. Int'l GMBH,* 2023 LX 72277, at *79 (Jury's award of lower future profits than proposed suggests jury "weighed the evidence and accounted for future market dynamics.").

### 2.    Beyond's Cited Law is Inapposite

Beyond's cited cases do not control or compel a different result. In *McClaran,* the Ninth Circuit rejected Plaintiff's damages model as speculative because it was based on production volumes that were impossible given the defendant's general production capacity and resistance to

18

expansion. 97 F.3d 347, 357 (9th Cir. 1996). Instead of evidence that the necessary capacity was impossible, the jury here heard evidence Vegadelphia had identified and secured the requisite suppliers for the venture, as well as a copacker with sufficient production capacity. (Dkt. 449-1, Tr. 98:22-99:19; Dkt. 449-2, Tr. 37:7-38:4, 41:25-42:6).  In *Zazu Designs v. L'Oréal, S.A.*, the Seventh Circuit rejected a court's lost profits calculation as speculative because it was based solely on Plaintiff's ownership of 25,000 empty shampoo bottles, ignoring the fact that defendant had never previously sold his own products, provided little to no evidence of his intent to advance the business to the point of sale, and offered no evidence of comparable profits made by other salons in the industry. 979 F.2d 499, 505 (7th Cir. 1992). Here, in addition to securing a copacker and suppliers, testimony established that Vegadelphia had an established sales history, as did Litten (at a far larger scale), to whose existing distributors, chain accounts and other customers the product would be sold. Litten and Oberholtzer had demonstrated success with national accounts; and the jury heard concrete testimony about how that infrastructure would be used for Vegadelphia 2.0. Oberholtzer conservatively based the valuation on competing companies in the industry at the time. In sum, the valuation at issue here was anchored in real operations, relationships, and track records—not in the kind of "rank speculation" condemned in those cases. And unlike those cases, this Court considered and rejected this attack *before* trial, denying Beyond's motion for summary judgment as to lost value generally "[w]here a jury could reasonably find Vegadelphia is entitled to lost value based on Oberholtzer's testimony." (Dkt. 344 at 41.)

3.      <u>The Jury Was Entitled to Award Damages For Reputation, Goodwill, and Business Value</u>

Finally, the jury's award could have been accounted for in ways apart from lost profits from Vegadelphia 2.0. The instructions permitted recovery for injury to reputation, injury to goodwill, and loss of business value, and the verdict form did not require allocation. (*See* Jury

19

Instructions, Dkt. 402; Jury Verdict, Dkt. 419.) The record contained evidence for each of these. It further supports lost value to Vegadelphia through inability to approach national accounts without appearing to be a "copycat" of Beyond and Dunkin (Shippon and Litten) and decline in Vegadelphia's revenues during Beyond's and Dunkin's use of a "virtually identical trademark," supported by financial statements and tax returns.

Harm to goodwill and reputation is inherently not subject to precise quantification. As *Experience Hendrix* and similar cases recognize, declines in revenue, opportunities, or licensing during the infringement period can provide a legally sufficient basis for the jury's estimate of such harm. 762 F.3d at 845. Beyond's insistence on a single-damages formula also ignores that the jury was entitled to combine multiple categories—lost venture value, lost profits, and injury to goodwill, reputation, and business value—to reach its $23.5 million figure.

In sum, the jury heard sufficient evidence to quantify Vegadelphia's actual damages under any of the authorized categories. Given that "[o]n this record, there is no way to determine what the jury [actually] did," with respect to their damages calculations*, Ramos v. Davis & Geck, Inc.,* 224 F.3d 30, 32 (1st Cir. 2000), Beyond cannot be said to have met their stringent burden to show necessary to support reversal of the verdict. *Astro-Med, Inc.*, 591 F.3d at 13.

## V.    CONCLUSION

Because Beyond's renewed Rule 50(b) motion is procedurally barred, rests on an improper attempt to reweigh the evidence, and ignores substantial trial evidence and substantive law supporting the jury's findings on damages and causation, the motion should be denied in its entirety.

Dated: January 26, 2026

Respectfully submitted,

/s/ Ben Wagner
Ben L. Wagner (*lead counsel, *pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
11682 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 509-6010
Email: Ben.Wagner@troutman.com

L. Andrew Tseng (BBO #689192)
Gwendolyn Tawresey (BBO #692887)
Danni L. Shanel (BBO #710378)
TROUTMAN PEPPER LOCKE LLP
111 Huntington Avenue, 9th Floor Boston,
MA 02199-7613
Tel: (617) 239-0100
Email: Andrew.Tseng@troutman.com
Gwendolyn.Tawresey@troutman.com
Danni.Shanel@troutman.com

Jacob M. Burr (pro hac vice)
TROUTMAN PEPPER LOCKE LLP 600
Peachtree Street, N.E., Suite 3000 Atlanta,
GA 30308
Tel: (404) 885-3000
Email: Jacob.Burr@troutman.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 26, 2026, I electronically filed the foregoing with the Clerk's Office using the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants, and paper copies will be sent to those indicated as non-registered participants.

/s/ Ben Wagner
Ben L. Wagner (*lead counsel, *pro hac vice*)

21