**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| SONATE CORPORATION D/B/A VEGADELPHIA FOODS,<br><br>                  Plaintiff,<br><br>vs.<br><br>BEYOND MEAT, INC., a Delaware corporation,<br><br>                  Defendant. | Civil Action No.  1:23-cv-10690 |

**DEFENDANT BEYOND MEAT, INC.'S OPPOSITION TO PLAINTIFF SONATE CORPORATION D/B/A VEGADELPHIA FOODS' MOTION FOR EQUITABLE ENHANCEMENT AND ADDITIONAL PROFIT DISGORGEMENT**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION.................................................................................................................1

II.   FACTUAL BACKGROUND..............................................................................................2

    A.    Plaintiffs Limited Evidence of Harm...................................................................2

    B.    Plaintiff's Evidence of Direct Competition Is Lacking.......................................4

    C.    Dubious Evidence of Actual Confusion...............................................................6

    D.    Plaintiff's Limited Evidence of Willfulness........................................................7

III.  PLAINTIFF'S REQUESTED INCREASE IS PREMATURE BECAUSE THE
    AMOUNT OF PLAINTIFF'S DAMAGES IS UNCLEAR AND THE SUBJECT
    OF MULTIPLE PENDING BRIEFINGS..........................................................................9

IV.   PLAINTIFF FAILS TO DEMONSTRATE THAT THIS COURT SHOULD
    ENHANCE THE AMOUNT OF ACTUAL DAMAGES OR INCREASE THE
    DISGORGEMENT AWARD ...........................................................................................11

    A.    Enhancement of Actual Damages Not Appropriate............................................11

    B.    Plaintiff Is Not Entitled to Any Disgorgement – Never Mind an Increase..........13

        1.    Case Law Confirms Plaintiff Is Not Entitled to Disgorgement Here.......14

        2.    Beyond Was Not Unjustly Enriched by the Use of Its Tagline................16

        3.    No Support for Disgorgement Based on Deterrence..............................18

V.    CONCLUSION .................................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*4 Pillar Dynasty LLC v NY & Co.*,
933 F.3d 202 (2d Cir. 2019) ......................................................................................18

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*,
829 F. Supp. 458 (D. Mass. 1992), *aff'd* 999 F.2d 1 (1st Cir. 1993) ....................12

*Alamo Rodriguez v. MCS Life Inc., Co.*
283 F. Supp. 2d 459 (D. P.R. 2003) ..........................................................................10

*Am. Express Co. v. Lipscomb*,
No. 79-72892, 1981 U.S. Dist. LEXIS 15049 (E.D. Mich. Jan. 12, 1981) .....................12, 13

*Bandag, Inc. v. Al Bolster's Tire Stores*,
750 F.2d 903 (Fed. Cir. 1984).....................................................................................16

*Dialogo, LLC v. Bauza*,
549 F. Supp. 2d 131 (D. Mass. 2008)....................................................................11, 12

*First Act Inc. v. Brook Mays Music Co.*,
429 F. Supp. 2d 429 (D. Mass. 2006)...........................................................................9

*Fishman Transducers, Inc. v. Paul*,
2011 WL 1157529, at *1 (D. Mass. Mar. 29, 2011) ...................................................4

*Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*,
874 F.2d 431 (7th Cir. 1989) ................................................................................13, 20

*HipSaver Co. Inc. v. J.T. Posey Co.*,
497 F.Supp. 2d 96 (D. Mass. 2007) ...........................................................................19

*Holiday Inns, Inc. v. Airport Holiday Corp.*,
493 F. Supp. 1025 (N.D. Tex. 1980)...........................................................................12

*Larsen v. Terk Techs. Corp.*,
151 F.3d 140 (4th Cir. 1998) ......................................................................................12

*Lontex Corp. v. Nike, Inc.*,
107 F.4th 139 (3d Cir. 2024) ......................................................................................12

*Monahan Prods. LLC v. Sam's E., Inc.*,
463 F. Supp. 3d 128 (D. Mass. 2020).............................................................13, 18, 20

*Nat'l Fire Prot. Ass'n, Inc. v. Int'l Code Council, Inc.*,
No. CIV.A.03-10848 DPW, 2006 WL 839501 ...................................................12

*Quabaug Rubber Co. v. Fabiano Shoe Co.*,
567 F.2d 154 (1st Cir. 1977)...................................................................9, 10

*RFF Family P'ship, LP v. Link Dev., LLC*,
932 F. Supp. 2d 213 (D. Mass. 2013)...............................................................10

*Romag Fasteners v. Fossil Inc.*,
3:10CV1827, 2021 WL 1700695 (D. Conn. Apr. 29, 2021)....................................17

*Safeway Transit v. Disc. Party Bus*,
954 F.3d (8th Cir. 2020) ..............................................................................16

*Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*,
282 F.3d 23 (1st Cir. 2002)................................................. 14, 15, 18, 20

*Truck Equip. Serv. Co. v. Fruehauf Corp.*,
536 F.2d 1210 (8th Cir, 1976) ........................................................................20

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
121 F.4th 339 (1st Cir. 2024).........................................................................7

*Venture Tape Corp. v. McGillis Glass Warehouse*
540 F.3d 56 (1st Cir. 2008)................................................. 15, 19, 20

*Visible Sys. v. Unisys Corp.*,
551 F.3d 65 (1st Cir. 2008)................................................. 15, 16

**Statutes**

15 U.S.C. § 1117....................................................................................11

15 U.S.C. § 1117(a) ................................................. 1, 11, 12, 14

15 U.S.C. § 1117(b) ................................................................................12

**Other Authorities**

5 McCarthy, *§*30:59, at 30-138 to -139 ...........................................................16

Fed. R. Civ. P. 37.....................................................................................3

Fed. R. Civ. *. 50.....................................................................................9

Fed. R. Civ. P. 50(b) ................................................. 2, 9, 10

Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d) ...................16

iii

Defendant Beyond Meat, Inc. ("Beyond" or "Defendant") submits this Opposition to Plaintiff Sonate Corporation D/B/A Vegadelphia Food's ("Vegadelphia" or "Plaintiff") Motion for Equitable Enhancement and Additional Profit Disgorgement. Dkt. No. 430.

## I.    **INTRODUCTION**

Far from demonstrating an entitlement to *additional* damages, Plaintiff's Motion underscores why the jury's existing award is unsustainable.  Plaintiff's entire argument boils down to the suggestion that direct competition + willfulness = an entitlement to the entirety of Beyond's profits for the period of infringement, even though such damages admittedly exceed Plaintiff's own harm and were not the result of confusion in the marketplace.  That is not the law, and unsurprisingly, Plaintiff offers no support for the extraordinary relief it seeks.

While willfulness and direct competition may allow a district court "*to consider*" whether "awarding defendant's profits" is justified under an unjust enrichment or deterrence theory, whether it is appropriate to award such relief is a highly fact-dependent determination that turns on the particular equities of the case.  Unsurprisingly, Plaintiff does not even attempt to show that the particular facts and equities of *this* case warrant the extraordinary relief it demands.  They do not.  As it is, the evidence presented at trial does not support the jury's speculative damages award, let alone its further advisory verdict on disgorgement.  And it certainly does not warrant a further increase to those numbers by another $10 to $30 million, a broad additional range that Plaintiff does not even bother to tether to any specific evidence or metric.

Ultimately, consistent with its hyperaggressive and scattershot approach to damages in this case, Plaintiff invites this Court to award a total of nearly *$70 million* in damages to a company whose annual revenue was close to $100,000, despite purported use—for nearly a decade—of the trademark at issue in this case.   That sort of wholly disproportionate windfall would be highly inequitable, and amount to a penalty on Beyond irreconcilable with 15 U.S.C § 1117(a)'s provisions.  Plaintiff's request for enhanced damages and additional disgorgement should be denied.

Plaintiff's Motion also reinforces that the issues presented in Beyond's Supplemental Trial

1

Brief Regarding the Court's Equitable Determinations (Dkt. 440) and Beyond's Rule 50(b) motion for judgment as a matter of law (Dkt. 433) should be decided before this Court resolves the instant Motion. Plaintiff's motion is inexorably tied to the ultimate amount that this Court awards for actual damages, as well as its determination of whether disgorgement is warranted at all. Accordingly, this Court should resolve those pending motions before turning to Plaintiff's extraordinary request to *expand* on the amount of damages awarded in this case. Plaintiff's motion for equitable enhancement and disgorgement should be denied.

## II.   FACTUAL BACKGROUND[1]

Although Plaintiff does little to connect its request for enhanced damages or an increase in the disgorgement award with the facts of the case, a brief recitation of key facts is important to evaluate Plaintiff's claims. We therefore reprise some of the key factual considerations below.

### A.   Plaintiffs Limited Evidence of Harm

As the evidence offered at trial demonstrated, for years before and after the alleged period of infringement, Plaintiff consistently generated around $100,000 in annual revenue (not profits) of its plant-based "chicken" and "meat" product, selling to the same narrow roster of four customers. Dkt. No. 452-6 (Trial Exhibit ("T.E.") 606-30). Given its modest sales activity and limited geographic reach, it is unsurprising that at trial, Plaintiff identified a maximum of $37,500 in purported lost profits stemming from Beyond's asserted impact on its business. Dkt. No. 451-4 (T.E. 82); Dkt. No. 451-13 (Trial Transcript Day 7) 89:1-90:12. Notwithstanding Plaintiff's purported actual damages of $37,500, the jury awarded Plaintiff *$23.5 million* in actual damages. To support that result, Plaintiff contends that the jury was persuaded by the wholly speculative theory that Plaintiff failed to consummate a proposed venture ("New Endeavor") between Plaintiff, Paul Litten and Erik Oberholtzer, which would have miraculously resulted in new products, massive growth, and the sale of the company in 3-5 years for $100 million, *if* it produced a new,

---

[1] Beyond only provides a limited summary of the related facts, as more extensive discussions were included in memorandums filed in connection with other filings, namely its Rule 50(b) Motion (Dkt. 433) and Trial Memo re: Disgorgement (Dkt.440), which are hereby incorporated by reference.

saleable product (which it did not), *if* the alternative meat market continued to grow (which it did not), *if* COVID never occurred (which it did), and *if* a buyer was willing to pay $100 million. Dkt. No. 451-1 (T.E. 36); Dkt. No. 451-14 (Trial Transcript Day 9), 63:9-11. Plaintiff did not present any valuation or expert testimony to support its wholly speculative dream.  Instead, it rested on a single line of testimony:  Mr. Oberholtzer's "estimate" of the value for which the business may sell in 3-5 years "if we got it all right" and "everything went according to – to plan."  Dkt. No. 435-9, 113:13-20.

Plaintiff alternatively alleges it "lost" $36.75 million because, despite being in business for over a decade and consistently generating roughly $100,000 in sales, it asserts that it could have increased sales overnight to over $35 million a year (a 20,000%+ increase), generating $36.75 million in profits over three years, had it only consummated a supposed opportunity to work with Paul Litten's sales team—on the theory that that sales team had generated $35 million a year from selling a completely different product made from meat.  Dkt. No. 451-14 (Trial Transcript Day 9), 62:12-17. Again, Plaintiff presented no expert testimony and did not even obtain testimony from Mr. Litten to support this specious theory, which Plaintiff failed to even raise until after trial commenced.  Indeed, Mr. Litten testified to the contrary, indicating that his decision not to move forward was not because of any possible confusion in the marketplace allegedly caused by Beyond. Dkt. No. 451-9 (Trial Transcript Day 2), 124:23-126:2. So in addition to being rejected because it is entirely speculative, this damage theory should also be rejected because it was not timely disclosed.  See - Dkt. 436, pg. 14 (confirming its inadmissibility due to Plaintiff's failure to timely disclose pursuant to FRCP 37). The evidence presented at trial also demonstrated the significant differences between the operations of Plaintiff and Beyond. While Plaintiff's *two* products (no sausage products) were sold to only *four* customers with limited geographic reach [Dkt. No. 451-6 (T.E. 606-30)] Beyond's numerous products were sold through club stores, grocery stores, restaurant partners and other retailers nationwide. Dkt. No. 451-12 (Trial Transcript Day 6), 26:1-9; 26:15-17; 27:13-16; 27:24-28:2. Obviously, as Plaintiff does not even sell a plant-based sausage product, it cannot claim that it would have made such sales or that consumers purchased Beyond's sausage product mistakenly believing it was Plaintiff's.  Given those material differences between

3

the parties, they were not actual direct competitors, competing against each other for the same business. As such, the notion that a sale by Beyond "is almost automatically a lost sale by Plaintiff" is directly contradicted by the evidence. Dkt. No. 402, pg. 28-9 (Jury Instruction No. 18).

The jury also rendered an advisory verdict[2] on a proposed disgorgement award, suggesting that Plaintiff was entitled to an additional $15.4 million in disgorgement damages, as a rough measure of Plaintiff's harm over and above Plaintiff's actual damage award. Dkt. No. 418. But that cannot be squared even with the slender evidence on which Plaintiff relied at trial. Again, as discussed above, Plaintiff's only timely-disclosed basis for damages was the speculative discussions relating to the New Endeavor, which, among other things, lacked a saleable product and an agreement. Moreover, even Plaintiff only alleged $25 million of harm from the New Endeavor, such that that theory could not justify an additional $15.4 million in damages above the jury's actual $23.5 million award. At best, therefore, the jury's proposed disgorgement award is duplicative of its actual damages award and should be rejected, further undermining Plaintiff's request for even more damages.

**B.      Plaintiff's Evidence of Direct Competition Is Lacking**

Although Plaintiff appears to recognize that evidence of customer overlap is required in order to justify a disgorgement award, the evidence at trial confirmed that the parties do not directly compete via shared customers or distributors. Even recognizing the jury's contrary finding, any evidence of competition was negligible, deeply undermining Plaintiff's demand for any disgorgement in equity, let alone its extraordinary request for tens of millions in additional disgorgement here. *See Fishman Transducers*, 2011 WL 1157529, at *1 (D. Mass. Mar. 29, 2011). Plaintiff's attempts to suggest otherwise here flatly contradict the record.

**No Meaningful Overlap in Products, Outlets or Geographic Distribution:** As discussed in more detail in Beyond's Supplemental Trial Brief, Dkt. 440, pp. 13-15, which is incorporated by reference, Plaintiff sold two products (neither a sausage product) to the same four customers,

---

[2] See Beyond's Trial Brief re: Disgorgement. (Dkt. 440, pp. 1-3) re: the advisory nature of the jury's disgorgement award.

for use at restaurants with limited geographic reach from 2018-2022.  Beyond, on the other hand, sold dozens of products, through thousands of channels, including grocery stores, nationwide. There is no evidentiary basis, therefore, to conclude that Beyond made sales that Plaintiff would have made but for the infringement at issue.

**No Overlap in Distributors:**  Plaintiff attempts to demonstrate that Plaintiff and Beyond were competitors by claiming there existed a purported overlap in distributors, namely Sysco and U.S. Foods. (Dkt. 432, pp. 4, 9 and 10).  Such statements actually conflict with the evidence presented at trial.  While it is true that Beyond sold products through these major distributors, Plaintiff only sold its products to four customers, three restaurants and C.W. Dunnet.  Plaintiff's witness, Matt Shipon, conceded that aside from these four customers, which were located in Florida, Puerto Rico, Chicago and in the mid-Atlantic region, Plaintiff had no knowledge as to whether any of its products were sold in any other states. Dkt. No. 451-11 (Trial Transcript Day 4), 26:5-27:11. Moreover, while Mr. Shipon testified that both Sysco and US Foods were distributors who worked with C.W. Dunnet, Plaintiff offered no evidence to demonstrate that either of these distributors ever distributed a single unit of Plaintiff's products.  Again, Plaintiff does not know where or to whom C.W. Dunnet sold Plaintiff's products.  Dkt. No. 451-11 (Trial Transcript Day 4), 26:5-27:11) ("I don't have direct knowledge of that, because the distributors pick up at C.W. Dunnett don't provide us with reports of where the products end up.")   Plaintiff further misleadingly cites Seth Shipon's trial testimony in support of the notion that Plaintiff's products were sold through US Foods - citing to Doc. No. 431-1, Transcript (11/12/2025), 161:3-10. An examination of his actual testimony (and the related exhibit), however, does not reflect any actual distribution of product by Plaintiff through U.S. Foods. Instead, the exhibit offered at trial (and the corresponding testimony) reflect an email exchange with a potential customer where Seth Shipon indicated that U.S. Foods had the ability to pick up product from C.W. Dunnet. Dkt No. 451-9 (Trial Transcript Day 2) 159:23-161:2; see also Dkt No. 451-10 (Trial Transcript Day 3), 95:17-21) In short, while Sysco and US Foods are merely identified as distributors who work with C.W. Dunnet, there is no evidence that either one actually distributed any of the approximately $30,000 in Plaintiff's products purchased by CW Dunnet on an annual basis. Dkt. No. 451-6 (TE 606-30.)

5

Tellingly, Plaintiff chose not to ask C.W. Dunnet's CEO, Mr. Leibowitz, about whether C.W. Dunnet shipped its limited Vegadelphia products via these distributors. It is undisputed, meanwhile, that Beyond did not sell products to C.W. Dunnet.

**No Overlap in Customers:** Plaintiff's attempt to draw an overlap between the parties' respective interactions with Wawa and Restaurant Depo also conflicts with the evidence at trial. Plaintiff never sold product to Wawa or Restaurant Depot. Rather, Mr. Litten, through his company Quality Foods, provided *samples* to Wawa of the potential new product Plaintiff was developing in connection with the New Endeavor, not Plaintiff's existing product. Dkt. No. 451-11 (Trial Transcript Day 4), 18:2-9; 21:18-22:3. The same is true with respect to Restaurant Depot, which was also a contact of Mr. Litten (and his entity Quality Foods). There was no evidence presented that Plaintiff (or the New Endeavor) ever sold or sampled Plaintiff's products to Restaurant Depot. Dkt. No. 451-11 (Trial Transcript Day 4), 18:2-9; 21:18-22:3. Mr. Litten's limited communication with these companies, with respect to the New Endeavor, are not relevant to Plaintiff's contention that it directly competed with Beyond during the period of the alleged infringement.[3]

## C. Dubious Evidence of Actual Confusion

In an attempt to establish actual confusion, Plaintiff raises arguments that directly conflict with the evidence at trial. For example, Plaintiff now contends that Paul Litten's testimony evidences actual confusion. Dkt. 432 p. 3. First, this convenient testimony raised for the first time at trial, directly conflicts with Mr. Shipon's testimony that he was not aware of any instances of actual confusion. Dkt. No. 451-11 (Trial Transcript Day 4), 34:20-25. Moreover, this new testimony only came out after Plaintiff's litigation counsel engaged Mr. Litten as a "client" for purposes of his testimony at trial (which was only uncovered during Defendant's cross examination of Mr. Litten), in an attempt to conceal conversations with him, pursuant to the attorney-client privilege. Dkt. No. 451-9 (Trial Testimony Day 2), 104:3-107:4. As a result, all of his testimony is highly suspect. Tellingly, at the time of his deposition, when he was not represented

---

[3] Plaintiff's contention that El Meson competes with Dunkin' (Dkt. 432. p. 10) is a red herring. Any potential competition between El Meson and Dunkin' is irrelevant to whether Beyond actually competes with Plaintiff.

by Plaintiff's counsel, Mr. Litten testified that the use of the tagline "wasn't an issue for" him – and didn't testify that he was confused.  Dkt. No. 451-9 (Trial Transcript Day 2), 125:21-125:25. Furthermore, Mr. Litten is a business partner and longtime friend of the Shipons and not a "consumer" – as a result, his testimony does not support any inference of actual confusion. Dkt. 451-9 (Trial Transcript Day 2), 108:13-15; *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 346, 348, (1st Cir. 2024) (infringement must create a "likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." (citations omitted)). The survey and testimony introduced by expert Brian Sowers further confirmed that actual confusion was not likely.  Mr. Sowers conducted both a forward and a reverse confusion survey – both of which resulted in *de minimis* amount of confusion. Dkt. No. 451-13 (Trial Transcript Day 7), 166:3-15. Plaintiff opted not to introduce the confusion surveys conducted by its expert Maronick, in light of their considerable flaws (See Dkt. 258 - Order granting motion to compel Plaintiff to produce flawed surveys concealed by Plaintiff).  As a result, there is no evidence of actual confusion.

Plaintiff also relies on its alleged "sharp decline" in sales, during the time in question (i.e., the end of 2019 through 2020) to evidence actual confusion. Dkt. 432 p. 3.  In doing so, Plaintiff changes course and shifts the focus to its actual sales, as opposed to the highly speculative New Endeavor.   As noted in Beyond's Supplemental Trial Brief (Dkt. 440 p. 4), the only customer to whom Plaintiff's actual sales decreased during the period in question was a *restaurant chain*—El Meson—which would have been expected to purchase less product as a result of the COVID-19 related restaurant shutdowns. There is also no evidence that any customer saw Plaintiff's slogan, or decided not to purchase Plaintiff's products due to Beyond's use of a slogan in connection with its plant-based sausage sandwiches.[4]

### D.    Plaintiff's Limited Evidence of Willfulness

To support its claim that Beyond willfully infringed upon Plaintiff's trademark, Plaintiff

---

[4] The absence of any consumer-facing usage of Plaintiff's slogan at El Meson was confirmed by Jonathan Ballard. Dkt. No. 451-12 (Trial Transcript Day 6),160:23-161:1.

misleadingly relies on the concern expressed by a few of Beyond's employees with the fact that Beyond's primary competitor, Impossible Foods, was using an identical tagline to Beyond (Plant Based Great Taste). (Dkt. 432 p. 3). That not only ignores the differences between Beyond and Plaintiff's taglines, but also the significant differences between Impossible Foods and Plaintiff— only the former of which Beyond considered a competitor, with a history of copying Beyond.[5]

Plaintiff also relies on the trademark application filed by Beyond and the PTO's initial finding that the tagline was confusingly similar to Plaintiff's slogan. It ignores, however, the PTO's conclusion that Beyond's tagline was not entitled to trademark protection at all because it was merely descriptive. Dkt. 451-3 (T.E. 43). The PTO's conclusion was consistent with Ms. Grass' understanding that the tagline "described and represented [Beyond's] product." In other words, Beyond could not get a trademark registration on the tagline, because the PTO concluded that *no one* could claim the exclusive right to use the descriptive tagline "Plant Based Great Taste" (i.e., it was fair for all to use non-exclusively, including Beyond). The PTO's finding thus undermines Plaintiff's willfulness claim; it does not support it. The jury's willfulness finding thus finds little evidentiary support, and is likely attributable to misleading attorney argument. In closing argument, Plaintiff's counsel stated: "But it gets worse. They kept sending out their brand guides to these partners. You saw a ***February email of 2021*** where they continued to tell folks "'Plant-Based, Great Taste' is our key message." Dkt. 451-14 (Trial Transcript Day 9), 33:19-22 (emphasis added).) Plaintiff's counsel made the statement to convince the jury that Beyond's February 2021 Brand Guides still featured PBGT, which was well after Beyond said it transitioned to a new tagline. Plaintiff's counsel knew this wasn't true, as the referenced Brand Guide was dated ***May 2020*** (Dkt. No. 451-5 (T.E. 128)) not February 2021 as suggested by Plaintiff's counsel.[6] Plaintiff continues to misleadingly rely on this email, stating in its brief: in reference to

---

[5] On a related note, Plaintiff "lost sales" calculation fails to account for the fact that Impossible Foods was using the same tagline during the same time period, choosing instead to claim that Impossible Meat's use of the tagline did not contribute to Plaintiff's harm, while Beyond's contributed 100%.

[6] Counsel's implication that the May 2020 Brand Guide was being used in February 2021 was not an innocent mistake or slip of the tongue, as evidenced by the discussion during trial in which the Court noted counsel's misleading

8

PBGT, Beyond "nevertheless continued to tell retailers 'Don't…swap out any words clear into 2021.'" Dkt. 432, pp. 1-2.

### III. PLAINTIFF'S REQUESTED INCREASE IS PREMATURE BECAUSE THE AMOUNT OF PLAINTIFF'S DAMAGES IS UNCLEAR AND THE SUBJECT OF MULTIPLE PENDING BRIEFINGS.

To begin with, Plaintiff's Motion reinforces that this Court should first resolve the issues presented by Beyond's previously filed Renewed Motion for Judgment as a Matter of Law (Dkt. No. 433) and Beyond's Supplemental Trial Brief Regarding the Court's Equitable Determinations Following the Jury Verdict (Dkt. 440), which may moot or significantly impact this Court's consideration of Plaintiff's motion to further *enhance* Plaintiff's damages award.

As Plaintiff concedes, the availability and extent of any enhanced damage award is a product of the actual damages awarded to Plaintiff.  *See* Plaintiff's Motion, p. 14 (quoting 15 U.S.C. § 1117 ("In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.").  Beyond's previously filed Rule 50 Motion asks the Court to reduce or eliminate the jury's actual damages award based on the speculative nature of the award and the absence of evidence offered at trial to support the award.  Because Plaintiff's request for *enhanced* damages cannot be resolved before this Court resolves the amount of actual damages to which Plaintiff is entitled, the latter issue should be resolved first. By definition, "actual damages" is limited to the non-speculative, financial harm incurred by Plaintiff, as a result of the confusion in the marketplace.  *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 162 (1st Cir. 1977) (district court's award of monetary damages was in error because the plaintiff's claim of actual harm was speculative and not supported by substantial evidence.) *First Act Inc. v. Brook Mays Music Co.*, 429 F. Supp. 2d 429, 439 (D. Mass. 2006) (the "Court must ensure that the facts adequately support the damages awarded and establish a causal link between those damages and the plaintiff's injury, lest the award become speculative or punitive.").  Here, as Beyond set forth

---

reference to the May 2020 Brand Guide and the February 2021 email. Dkt. No. 451-12 (Trial Testimony Day 6), 60:25-63:25.

in greater detail in its Rule 50(b) Motion, Plaintiff presented negligible evidence of *actual* damages—limited to the approximately $37,500 in lost profits that it hypothesized were attributable to Beyond's trademark infringement (as opposed to the impact of the Covid-19 pandemic on the restaurant industry). Dkt. No. 451-13 (Trial Transcript Day 7), 90:1-12. Perhaps recognizing the vulnerability of the jury's existing damages award, Plaintiff insists that the jury had a "multitude" of bases to award actual damages to Plaintiff in the amount awarded at trial. *See* Mot. at 3-4. Those grounds are unpersuasive. As Beyond explained in its Rule 50(b) motion, Plaintiff failed to present non-speculative evidence on which the jury could have awarded damages with reasonable certainty from the hypothesized sale of a New Endeavor that Plaintiff never consummated, selling products that Plaintiff never created. Plaintiff's even more specious attempt to suggest that it could have generated $35 million in sales from using Mr. Litten's sales team— just because his team generated such sales from entirely different products—is equally unavailing. Plaintiff's final theory supposes that "Beyond made sales that roughly approximated a portion of Vegadelphia's lost sales." Dkt. No. 432, p. 4. That theory is wildly inaccurate. Beyond sold products to different customers on a significantly different scale. What sales Beyond recorded during the period at issue says nothing about the amount of sales supposedly lost by Plaintiff—a vastly smaller company making roughly $100,000 in annual sales to four total customers.

Such speculative and unsupported theories cannot support actual damages or disgorgement. S*ee Quabaug Rubber, supra,* 567 F.2d at 162; *RFF Family P'ship, LP v. Link Dev., LLC*, 932 F. Supp. 2d 213, 227 (D. Mass. 2013) (citation omitted) ("Damages cannot be recovered when they are '[r]emote, speculative, [or] hypothetical'"). Accordingly, Beyond has argued elsewhere that the jury's damages award should be reduced and no disgorgement be awarded. Dkt. No. 440. Either way, however, the resolution of those questions should precede this Court's review of Plaintiff's request to expand its damages award even further. To issue a judgment based on the jury verdict, prior to the Court's application of its judicial discretion in determining the issue of disgorgement, actual damages or deciding Beyond's Rule 50(b) Motion would constitute a partial judgment, which is strongly disfavored in the First Circuit. *Alamo Rodriguez v. MCS Life Inc., Co.*

10

283 F. Supp. 2d 459, 469 (D. P.R. 2003) *citing Nichols v. Cadle Co.* 101 F.3d 1448, 1449 (1st Cir. 1996). See, also Beyond's Opposition to Plaintiff's Motion for Entry of Judgment; Dkt. 445]

## IV.   PLAINTIFF FAILS TO DEMONSTRATE THAT THIS COURT SHOULD ENHANCE THE AMOUNT OF ACTUAL DAMAGES OR INCREASE THE DISGORGEMENT AWARD

As explained elsewhere, Plaintiff's actual damages award should be reduced, and no disgorgement should be awarded.  At a minimum, however, Plaintiff's request for $10-30 million in additional damages should be rejected.  Plaintiff does not tie its broad request to any specific formula or theory.  Rather, it simply insists that a finding of willfulness and competition warrants the imposition of tens of millions in additional damages.  That is wrong - the facts and equities of this case strongly counsel in favor of a reduced damages award not an enhanced one.

15 U.S.C. § 1117(a) confirms that the Court's determination of any such award is entirely dependent on the specific facts of the case and should constitute compensation and not act as a penalty:

> In assessing damages, the court may enter judgment, **according to the circumstances of the case,** for any sum above the amount found as actual damages, not exceeding three times such amount.
> If the court shall find that the amount of the recovery **based on profits** is either **inadequate or excessive**, the court may in its discretion, enter judgment for such sum, **as the court shall find to be just, according to the circumstances of the case.**
> Such sum in either of the above circumstances **shall constitute compensation and not a penalty.** (emphasis added)

Section 1117(a) provides courts with considerable discretion in determining whether to increase or decrease an award of actual damages or profits.  For the reasons discussed below, the Court should deny Plaintiff's motion requesting enhancement of actual damages or an increase to the disgorgement award.

### A.   Enhancement of Actual Damages Not Appropriate

Plaintiff's request that the Court treble or even increase the jury's proposed award of actual damages ($23.4 million or a significantly lesser amount, if determined by the Court) should be

denied.  Equitable principles guide any determination of damages pursuant to 15 U.S.C. § 1117, including any requested enhancement. *See*, *Dialogo, LLC v. Bauza*, 549 F. Supp. 2d 131, 137 (D. Mass. 2008).  Notably, in *Dialogo*, the court refused to treble or enhance the jury award of damages because in the Court's opinion "the basic award itself already lies at the outer fringe of the credible supporting evidence." *Id.* at 136-37. Similarly here: The jury's award is *already* excessive and lies *beyond* the outer fringe of the credible supporting evidence.  As is evident from Plaintiff's brief, Plaintiff is unable to cite to First Circuit decisions that support enhancing a proposed actual damages award under Section 1117(a). By way of example, the Courts deciding *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 829 F. Supp. 458 (D. Mass. 1992), *aff'd* 999 F.2d 1 (1st Cir. 1993) and *Nat'l Fire Prot. Ass'n, Inc. v. Int'l Code Council, Inc.*, No. CIV.A.03-10848 DPW, 2006 WL 839501 (D. Mass. Mar. 29, 2006), did not enhance damages.  As a result, Plaintiff resorts to relying on decisions outside the First Circuit.   These decisions, in which enhancement was awarded, however, involve highly egregious conduct and/or a limited award of actual damages. For example, in *Lontex*, the defendant (Nike) ignored the express advice of counsel that using the mark at issue constitute trademark infringement—specifically, Nike kept using "Cool Compression" after its own lawyers reviewed Lontex's cease-and-desist letter and "instructed Nike to stop using Lontex's trademark." *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 156 (3d Cir. 2024).[7]

Similarly, in *Holiday Inns*, the infringement was egregious, the defendant going so far as to falsely represent itself with the plaintiff's registered trademark: "Indeed, the subsidiary sign bore upon its face the symbol (R) indicating the registration of the Holiday Inn mark. This is flagrant disregard of the rights of Plaintiff." *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1028 (N.D. Tex. 1980). Plaintiff's reliance on *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 150 (4th Cir. 1998) entirely misses the mark because the court awarded treble damages under Section 1117**(b)** for counterfeiting, not Section 1117(a), which applies here. As there have been no counterfeit allegations here, *Larsen* does not apply.  Finally, *American Express* is inapt as well.

---

[7] Notably, even while agreeing with the trial court that while trebling damages ($142,000 to $426,000) was acceptable, the Third Circuit agreed that, even though willfulness was found, disgorging Nike's considerable profits was unacceptable, as such disgorgement would have resulted in a windfall for the plaintiff.  *Id.*

12

The defendant, who was in prison, had effectively created fake "American Express" sight drafts, which were sent to third-party businesses and demanded payment: "In fact, there is evidence that defendant Lipscomb deliberately designed the instruments to emphasize plaintiff's trademark." *Am. Express Co. v. Lipscomb*, No. 79-72892, 1981 U.S. Dist. LEXIS 15049, at *9 (E.D. Mich. Jan. 12, 1981). (Court awarded $1,100.00 in actual damages, which were trebled to $3,300.00.)

Plaintiff also misleadingly refers to *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) for the proposition that "Where there are particularly high profits on the infringing products, then enhancement is near-mandated, as in such cases "'it might have been an abuse of discretion [] not to have awarded . . . treble damages." Dkt. 432, p. 16. *Gorenstein,* however, involved egregious conduct infringement [i.e., holding the trademark hostage as a bargaining tactic to pressure Quality Care into renegotiating the franchise] not found here and this Court's *actual* quote was "So weak are the Gorensteins' arguments regarding their infringement of Quality Care's trademark, and so deliberate the infringement, that it might have been an abuse of discretion for the district judge not to have awarded Quality Care treble damages…" *Id.*   In other words, it was the egregiousness of defendant's deliberate infringing conduct that resulted in the above quote and even then, given the Court's considerable equitable discretion, it only "might" have been an abuse of discretion not to enhance the award of actual damages. The facts in this case are quite different. Here Beyond (i) didn't ignore its attorney's advice to cease from using the tagline, (ii) selected the tagline independently to describe its products; (iii) received confirmation from the PTO that the tagline was descriptive and did not function as a trademark; and (iv) did not use the tagline to take advantage of Plaintiff's reputation or goodwill in the market (which was non-existent).  Dkt. 451-12 (Trial Testimony Day 6) 33:1-8; 33:21-35:3.  In light of the above, Plaintiff's request to enhance actual damages should be denied.

### B.    Plaintiff Is Not Entitled to Any Disgorgement – Never Mind an Increase

The First Circuit has identified three justifications for awarding disgorgement: "(1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary, to protect the plaintiff by deterring a willful infringer from further infringement."

13

*Monahan Prods. LLC v. Sam's E., Inc*., 463 F. Supp. 3d 128, 150 (D. Mass. 2020) (*citing Tamko Roofing Prods., Inc. v. Ideal Roofing Co.,* 282 F.3d 23, 36 (1st Cir. 2002)).  Plaintiff cannot show that any disgorgement is warranted under these justifications, let alone $10-30 million *beyond* the jury's advisory verdict.

The monetary award proposed by the jury consisted of $23.5 million in actual damages and an additional advisory award of $15.4 million in disgorgement.[8]  As discussed above, even under Plaintiff's highly speculative theory of actual harm, compensation to Plaintiff is capped at $25 million.  That cannot justify Plaintiff's request for $10-30 million in added relief.  As such, Plaintiff focuses on arguing that disgorgement is necessary to prevent Beyond's unjust enrichment and to deter Beyond from infringing Plaintiff's marks in the future. As shown below, Plaintiff is wrong on both counts.  And given that the current award is already excessive and unwarranted, any additional damages would amount to a windfall for Plaintiff and a penalty for Beyond, in violation of section 1117(a).

1.     Case Law Confirms Plaintiff Is Not Entitled to Disgorgement Here

Plaintiff cites to numerous cases and makes the outlandish claim that because the jury found willfulness this Court essentially must disgorge all or at least more of Beyond's profits.  That is not true.  In fact, a brief review of the cases so heavily relied on by Plaintiff confirms that disgorgement is not appropriate here at all, never mind the requested increase.  For example, Plaintiff's reliance on *Tamko Roofing Prods. v. Ideal Roofing Co.*, 282 F.3d 23, 28 (1st Cir. 2002) (which it cites to 10 times), is misplaced. *Tamko* consists of an entirely unique set of egregious facts not found here. In *Tamko,* among other things, the Defendant (i) copied Plaintiff's unique and arbitrary HERITAGE mark for roofing materials after seeing it used by Plaintiff at a tradeshow, (ii) only considered using other marks that were similar to marks owned by other companies, (iii) intentionally competed with Plaintiff for the same roofing business using the same mark, and (iv)

---

[8] The fact that the jury's proposed award of $15.4 million in disgorgement is merely advisory is covered in Beyond's Trial Brief re Disgorgement (Dkt. 440) and is not repeated here.

14

continued to use HERITAGE in violation of a preliminary injunction. Based on the specific facts in the case, the trial court awarded some of defendant's profits (approximately $200,000). *Id.* at 37. It is worth noting, however, that the *Tamko* Court also confirmed that it was appropriate for the Court to exclude profits generated by a defendant from sales in which the parties did not directly compete. *Id.* at 38; *citing, Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1221 (8th Cir, 1976) (awarding defendant's profits only from geographical areas where parties directly competed – even though the defendant's conduct was egregious as it knowingly and intentionally selected plaintiff's trademark). In short, the First Circuit in *Tamko* merely confirms that the Court has significant discretion, applying equitable considerations, in determining monetary awards under the Lanham Act, depending on the specific facts of the case.

Plaintiff's reliance on *Venture Tape Corp. v. McGillis Glass Warehouse* 540 F.3d 56 (1st Cir. 2008) is also misplaced. In *Venture*, the Defendant again intentionally selected and used Plaintiff's trademark in an attempt to palm off its products as Plaintiff's and benefit from the Plaintiff's goodwill. *Id.* at 59. Again, applying its equitable discretion to the *specific facts* there, the Court determined that an award of approximately $230,000 was appropriate. As with *Tamko,* the *Venture Tape* Court did not increase the advisory amount proposed by a jury.

Plaintiff urges the Court to copy the results of *Tamko* and *Venture Tape* even though the facts here are completely and significantly different and clearly do not include fraudulent conduct. Defendants in the cases discussed above fraudulently and intentionally copied Plaintiff's trademark with the intention of benefitting from its good will. That is not the case here. Beyond's conduct, which was significantly different, as discussed in more detail below, is much closer to the facts in *Visible Sys. v. Unisys Corp.*, 551 F.3d 65 (1st Cir. 2008). Plaintiff Visible Systems Corp. ("VSC") was a small Massachusetts company that employed 24 people whereas Defendant Unisys Corp. was a huge corporation that employed over 30,000 people. *Id.* at 69. Like here, VSC contended that Unisys had so saturated the market that potential customers were likely to think that VSC's goods originate with Unisys (i.e., reverse confusion). *Id.* at 70. "VSC also presented some damages evidence that the parties competed in the sale of consulting services" and that

Unisys's appropriation of the VISIBLE mark for its own services caused VSC harm…" (i.e., forward confusion). *Id.* VSC presented argument to the jury regarding reverse confusion. The jury concluded that Unisys' infringement was willful and awarded VSC $250,000 in damages. *Id.* at 71. On appeal, the First Circuit concluded that, although the jury found Defendant's conduct "willful," willfulness alone is not enough to justify disgorgement of profits. *Id.* at 81. Notably, the *Visible* Court also found that "bad faith, in trademark law, which may trigger disgorgement 'refers to an attempt by a junior user to exploit the good will and reputation of a senior user with the intent to sow confusion.' Bad faith differs from 'willfulness,' which arises when an infringer proceeds despite knowledge of the senior user's trademark." *Id.* at 75 (internal citations omitted). As a result, the Court declined to disgorge Defendant's profits. A disgorgement award is never automatic and is always a fact-intensive inquiry that is dependent upon the specific circumstances and equities of a particular case. *See, e.g.*, 5 McCarthy, *§*30:59, at 30-138 to -139 ("An accounting of profits is never automatic. The courts retain the right to withhold the remedy if, in view of the overall facts and equities of the case, it is not appropriate"); *Bandag, Inc. v. Al Bolster's Tire Stores,* 750 F.2d 903, 919 (Fed. Cir. 1984) (same). For the reasons discussed in more detail below, Plaintiff's request to increase the disgorgement amount awarded by the jury, based on unjust enrichment or as a deterrent, should be denied.

### 2.     Beyond Was Not Unjustly Enriched by the Use of Its Tagline

Unjust enrichment is only found where consumers purchased Defendant's products, mistakenly believing that Plaintiff was the source of the product. *Safeway Transit v. Disc. Party Bus,* 954 F.3d at 1179-80 (8th Cir. 2020) (affirming district court's ruling that because there was no evidence of actual confusion and that actual confusion, if any, was probably minimal, there was no unjust enrichment). Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d) ("A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain."). *See also, Visible Sys.* at 81(no evidence of unjust enrichment supports finding of no disgorgement).

An award of unjust enrichment is therefore only justified if defendant made such sales as a result of the confusion created by the similarity of the marks.   Here, Plaintiff's contention that "all $114.4 million attributable profits found by the jury is unjust enrichment" (Dkt. 432, p. 19) defies common sense and conflicts with the Verdict.  The jury was not asked: What profits did Beyond realize based on consumers purchasing the Beyond product, under the mistaken belief that Plaintiff was the source of the product?" Instead, the jury was asked: "What are Beyond Meats's profits that are attributable to its use of "Plant Based Great Taste."  (Dkt. 419, Questions 4a and 5a).  In other words, the jury was asked to determine what profits were derived from products associated with the tagline.  Beyond admitted that it could not track which sales were specifically made in connection with each of its many taglines over the years.  Accordingly, it was unable to break down its sales by tagline usage. As a result, Plaintiff took the position that it was entitled to recover ALL of Beyond's profits.  As evidence was introduced that all of Beyond's uses of the tagline also featured the Beyond house marks, and all of the Dunkin' uses of the tagline also featured both the Dunkin' and Beyond house marks, it is obvious that all of Beyond's sales were also attributable to its house marks.  Additionally, as evidence was presented that Beyond realized revenue both before and after its use of the tagline, any suggestion that all of Beyond's profits should be disgorged because they were the result of confusion in the marketplace caused by the tagline, defies common sense. Dkt. No. 451-13 (Trial Transcript Day 7), 75:8-76:3; Dkt. No. 451-8 (T.E. 606-43), p. 2 (Showing Beyond's considerable sales prior to any use of PLANT BASED GREAT TASTE.)  As a result, it is clear that the jury's responses to questions 4a and 5a provide no support for Plaintiff's claim that it is entitled to disgorge ALL Beyond's profits, based on a theory of unjust enrichment. As previously discussed, the jury's *advisory* findings are non-binding, and the Court has significant judicial discretion in determining an appropriate disgorgement amount, if any.[9]

---

[9] On remand, the District Court in *Romag Fasteners v. Fossil Inc.*, 3:10CV1827 (JBA), 2021 WL 1700695 (D. Conn. Apr. 29, 2021), awarded $90,759.36 in disgorgement, even though the jury made an advisory award of $6,704,046.00 of Fossil's profits under a deterrence theory.  The Court

17

The following undisputed facts further confirm that disgorgement, based on a theory of unjust enrichment, is not appropriate here: (i) No evidence that a single, actual consumer purchased Beyond's products thinking the source was Plaintiff;  (ii) No evidence that a single consumer came in contact with Plaintiff's slogan; (iii) Plaintiff spent virtually no money on marketing, Dkt. No. 451-7 (T.E. 606-32); (iv) Plaintiff had the same four customers for essentially a decade. Dkt. No. 451-6 (T.E. 606-30); (v) Plaintiff total *sales* were less than $200,000 annually. Dkt. No. 451-4 (T.E. 82); (vi) Plaintiff's total *profits* were less than $200,000 from 2018-2022. Dkt. No. 451-4 (T.E. 82); (vii) Beyond always used its house mark in connection with all its products and marketing Dkt. No. 451-2 (T.E. 41); (viii) Beyond adopted PBGT with no knowledge of Plaintiff. Dkt. No. 451-12 (Trial Transcript Day 6), 22:23-23:4; (ix) Beyond had no intent to palm off its products as Plaintiff's products. Dkt. 451-12 (Trial Testimony Day 6) 33:1-8; 33:21-35:3. (x) Beyond sold to different customers. Dkt. No. 451-12 (Trial Transcript Day 6), 26:1-9; 26:15-17; 27:13-16; 27:24-28:2; Dkt. No. 451-6 (T.E. 606-30); (xi) Beyond sold through other channels and to other states. Dkt. No. 451-12 (Trial Transcript Day 6), 26:1-17; 27:13-16; 27:24-28:2; (xii) No evidence of actual confusion; and (xiii) Only survey evidence confirms no likelihood of confusion.

As there is no evidence of unjust enrichment, this "justification" also fails to support a disgorgement award.  See, *4 Pillar Dynasty LLC v NY & Co.*, 933 F.3d 202, 212 (2d Cir. 2019) ("a defendant becomes accountable for its profits when the plaintiff can show that, were it not for defendant's infringement, the defendant's sales would otherwise have gone to the plaintiff.").

### 3.      No Support for Disgorgement Based on Deterrence

The Court can give consideration to the need for disgorgement as a deterrent, if necessary, to protect the plaintiff from further infringement by a willful infringer. *Monahan Prods. LLC v. Sam's E., Inc*., 463 F. Supp. 3d 128, 150 (D. Mass. 2020).  For example, disgorgement or deterrence may be appropriate if Defendant intentionally copied Plaintiff's mark and refused to stop even

---

concluded that $90,759.36 "is adequate to deter such infringement in the future while preventing Romag from receiving a windfall and being rewarded for its litigation misconduct." Id. at 11.

after a lawsuit was filed and even after a preliminary injunction was issued. *See Tamko, infra.* Alternatively, if the defendant intentionally selected and used plaintiff's trademark in an attempt to palm off its products as plaintiff's and benefit from the plaintiff's goodwill, disgorgement or deterrence may be necessary. *See Venture Tape, infra.* None of the cases relied upon by Plaintiff, however, suggest deterrence or, for that matter, disgorgement, is necessary based on the facts here. Moreover, as discussed above, any disgorgement award is not proper here, as it would constitute a penalty.

The following undisputed facts, further confirm there is no need for deterrence: (i) Beyond adopted PBGT in March 2019 without any knowledge of Plaintiff or its slogan; (ii) Beyond adopted the tagline because it simply describes and represents Beyond's product and its taste. Dkt. No. 451-12 (Trial Transcript Day 6), 22:24-23:4; 76:20- 77:5; (iii) Beyond did not select the tagline to associate with another company or to confuse consumers as to the source of the product. Dkt. No. 451-12 (Trial Transcript Day 6), 25:9-18.); (iv) When Jamie Grass learned of Plaintiff's registration, she saw no connection between it and Beyond's tagline, which were considerably different—Beyond's tagline described and represented its product, whereas Plaintiff's slogan differed in sight, sound and meaning (i.e., it was directional). Dkt. No. 451-12 (Trial Transcript Day 6), 33:9-15.); (v) The "Beyond Meat" primary mark was featured on all marketing materials and Ms. Grass confirmed that Beyond would not want to cause confusion or appropriate Plaintiff's goodwill or reputation—"because we would want people to know our brand." Dkt. No. 451-12 (Trial Transcript Day 6), 34:11-35:2.); (vi) No evidence of consumer awareness of or goodwill in Plaintiff's slogan - as confirmed by Seth Shipon: Plaintiff had done little to no marketing since 2014. Dkt. No. 451-10 (Trial Transcript Day 3), 66:12-14.); (vii) Plaintiff provided no evidence that a single consumer was ever exposed to Plaintiff's WHERE GREAT TASTE IS PLANT BASED slogan; (viii) In response to Beyond's trademark application, the PTO determined that PBGT was merely descriptive and did not function as a trademark. Dkt. No. 451-3 (T.E. 43); (ix) After receiving the letter from Plaintiff, Beyond promptly began transitioning away from its use of PBGT and essentially completed the transition by December 2020. Dkt. No. 451-12 (Trial

19

Transcript Day 6), 46:7-18; (x) Plaintiff did not file the lawsuit until April 2022, almost a year and half after Beyond ceased from using the tagline. [An unreasonable delay by plaintiff in bringing suit or otherwise asserting its rights weighs against disgorgement. *HipSaver Co*., *Inc. v. J.T. Posey Co.*, 497 F.Supp. 2d 96, 109 (D. Mass. 2007).]; (xi) No evidence that Beyond has been accused of infringing any other trademarks; and (xii) No evidence that Plaintiff is at risk of Beyond infringing any of its trademarks.

Unlike cases in which a disgorgement of profits is awarded, there is no evidence that Beyond (i) selected the tagline based on any association with Plaintiff, (ii) used the tagline in an attempt to draw any connection between it and Plaintiff, or (iii) unfairly gained anything, monetarily or otherwise, from using the tagline. See discussions regarding *Tamko, Venture Tape, Gorenstein Enterprises* or *Truck Equip. Serv. Co*, *infra.* Tellingly, Plaintiff fails to identify a single case which calls for an increase in a disgorgement award based on deterrence allegations. Moreover, Beyond's decision to promptly transition away from using PBGT, despite its belief that it was fair to use such a descriptive tagline, which was confirmed by the PTO, the lack of any awareness of Plaintiff's slogan in the marketplace, the lack of any evidence of confusion in the marketplace, and Beyond's prompt cessation of use, years before Plaintiff filed a lawsuit, demonstrates that deterrence is not necessary.

As discussed above, Beyond did not act in bad faith as the undisputed evidence confirms that Beyond did not seek to exploit Plaintiff's goodwill or reputation or intend to sow confusion. To the contrary, Beyond always used its house mark on the products and marketing materials and wanted people to know it was the source of the products. As a result, disgorgement is not necessary to deter Beyond from infringing upon Plaintiff's trademarks in the future. *Monahan Prods. LLC v. Sam's E., Inc*., 463 F. Supp. 3d 128, 150 (D. Mass. 2020)

## V.    **CONCLUSION**

In light of the above, the Court should deny Plaintiff's Motion to enhance the already substantial and highly speculative award of actual damages or increase the jury's advisory disgorgement amount, which is already inequitable.

Dated: January 26, 2026

Respectfully Submitted,

BUCHALTER LLP

By _/s/ Matthew Seror_____
 C. DANA HOBART *(Pro Hac Vice)*
 WILLMORE F. HOLBROW III *(Pro Hac Vice)*
 MATTHEW SEROR  *(Pro Hac Vice)*
 BUCHALTER
 A Professional Corporation
 1000 Wilshire Boulevard, Suite 1500
 Los Angeles, CA  90017-1730
 Telephone: 213.891.0700
 Fax: 213.896.0400
 Email:  dhobart@buchalter.com

 *and*

 Andrew T. O'Connor (BBO #664811)
 GOULSTON & STORRS PC
 One Post Office Square
 Boston, MA 02109
 Telephone: (617) 574-4153
 Email: aoconnor@goulstonstorrs.com

 *Attorneys for Defendant Beyond Meat, Inc.*

21

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 26, 2026, I electronically filed the foregoing with the Clerk's Office using the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants, and paper copies will be sent to those indicated as non-registered participants.

*/s/ Matthew Seror*

Matthew Seror
