# UNITED STATES DISTRICT COURT

# BOSTON DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SONATE CORPORATION D/B/A Vegadelphia Foods,<br><br>        Plaintiff,<br><br>   vs.<br><br>BEYOND MEAT, INC., a Delaware Corporation,<br>                  Defendant. | Civil Action No.  1:23-CV-10690 |

## VEGADELPHIA FOODS' RESPONSE TO
## BEYOND MEAT, INC'S "SUPPLEMENTAL TRIAL BRIEF" (DKT. 440)

324710861

**TABLE OF CONTENTS**

I.  RELEVANT FACTS FROM TRIAL ................................................................. 2

    A.  **Vegadelphia's Strong Slogan and Beyond's Infringing Slogans were Likely to Confuse Because the Latter Commandeered the Essence of the Former** ................................................................. 2

    B.  **Beyond Benefitted Massively, Being Unjustly Enriched with $115 Million in Profits Attributable to the Willfully Infringing Slogans** ................ 3

    C.  **Beyond Absconded Its Burden to Show More Apportionment or Deductions** ................................................................. 4

    D.  **The jury properly used a significant portion of attributable profits as a proxy for Vegadelphia's additional harm not included in its actual damages award** ................................................................. 6

II.  ARGUMENT ................................................................. 7

    A.  **The Challenges in Beyond's Brief Are Procedurally Improper Sidesteps** ................................................................. 7

    B.  **The Jury Made Non-Advisory Findings, Fully Supported by the Evidence, and the Only Outcome a Factfinder Could Conclude** ................ 8

        1.  The Juries Binding Findings on Attributable Profits Are Well Supported Particularly Where Beyond Failed Its Burden on Apportionment ................................................................. 8

        2.  The Jury Definitively Found Unjust Enrichment Via Infringing Profits ................................................................. 12

        3.  The Jury's Binding Findings On Direct Competition Were Well Founded ................................................................. 12

        4.  The Court Sent the Proxy Rationale to the Jury, Whose Award Maintained Ample Support ................................................................. 13

        5.  Equities Support Unjust Enrichment and Deterrence Profit Disgorgement ................................................................. 18

    C.  The Jury Finding on Likelihood of Confusion Was Well Supported, Properly Entitling a Binding Profit Disgorgement on the Proxy Rationale .......... 19

III.  CONCLUSION ................................................................. 20

324710861v3

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*,
999 F.2d 1 (1st Cir. 1993).............................................................................................13, 14

*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*,
2021 WL 4813257 (C.D. Cal. Oct. 6, 2021)........................................................................20

*Atlas Biologicals, Inc. v. Kutrubes*,
2022 WL 2840484 (10th Cir. 2022) ...................................................................................18

*Attrezzi, LLC v. Maytag Corp.*,
436 F.3d 32 (1st Cir. 2006)..................................................................................................8

*Bambu Sales v. Ozak Trading*,
58 F.3d 849 (2d Cir. 1995)..................................................................................................10

*BASF v. Old World Trading*,
41 F.3d 1081 (7th Cir. 1994) .............................................................................................12

*D & D Greek Rest., Inc. v. Great Greek Franchising, LLC*,
2022 WL 4596548 (C.D. Cal. Aug. 26, 2022)....................................................................20

*Clearline Techs. Ltd. v. Cooper B-Line, Inc.*,
2014 U.S. Dist. LEXIS 116647 (S.D. Tex. Aug. 19, 20214).........................................16, 18

*FabriClear v. Harvest Direct*,
2023 WL 11826606 (D. Mass. Oct. 31, 2023).....................................................................14

*Felker v. Pepsi-Cola Co.*,
899 F.Supp. 882 (D. Conn. 1995).........................................................................................1

*Fendi Adele S.r.l. v. Burlington Coat Factory Warehouse Corp.*,
2010 WL 11586698 (S.D.N.Y. Aug. 9, 2010)......................................................................11

*Ferring Pharma. v. Braintree Lab.*,
220 F.Supp.3d 149 (D. Mass. 2016) ...................................................................................14

*Fishman Trans. v. Paul*,
684 F.3d 187 (1st Cir. 2012)..........................................................................................13, 20

*Go Med v. Inmed*,
471 F.3d 1264 (Fed. Cir. 2006)............................................................................................1

324710861v3

*Grubhub Inc. v. Relish Labs LLC,*
 80 F.4th 835 (7th Cir. 2023) ..................................................................................19

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.,*
 921 F.3d 1343 (11th Cir. 2019) .............................................................................18

*JL Beverage Co., LLC v. Beam, Inc.,*
 318 F. Supp. 3d 1188 (D. Nev. 2018), *aff'd sub nom.*, 815 F. App'x 110 (9th
 Cir. 2020) ..............................................................................................................19

*Momenta Pharms., Inc. v. Amphastar Pharms., Inc.,*
 298 F. Supp. 3d 258 (D. Mass. 2018) ......................................................................1

*Perdoni Bros., Inc. v. Concrete Sys., Inc.,*
 35 F.3d 1 (1st Cir.1994) ...........................................................................................8

*Playboy Enters. v. Dumas,*
 831 F. Supp. 295 (S.D.N.Y. 1993) ...........................................................................9

*Romag v. Fossil,*
 590 US 212 (2020) ..................................................................................................20

*Primarque Prods. v. Williams W. & Witts Prod.,*
 988 F.3d 26 (1st Cir. 2021) ....................................................................................15

*Project Strategies v. Ntl. Communs.,*
 948 F. Supp. 218 (E.D.N.Y. 1996) ...........................................................................9

*Sands, Taylor & Wood Co. v. Quaker Oats Co.,*
 1995 U.S. Dist. LEXIS 4797, 1995 WL 221871 (N.D. Ill. Apr. 11, 1995) ...........19

*Tamko Roofing Prods. v. Ideal Roofing Co.,*
 282 F.3d 23 (1st Cir. 2003) .........................................................................12, 13, 14

*United Phosphorus v. Midland Fumigant,*
 205 F.3d 1219 (10th Cir. 2000) ..............................................................................16

*Variety Stores, Inc. v. Walmart Inc.,*
 852 F. App'x 711 (4th Cir. 2021) ...........................................................................19

*Venture Tape Corp. v. McGills Glass Warehouse,*
 540 F.3d 56 (1st Cir. 2008) ...............................................................................12, 17

*Visible Sys. Corp. v. Unisys Corp.,*
 551 F.3d 65 (1st Cir. 2008) ..............................................................................*passim*

*Vuitton et Fils, S.A. v. Crown Handbags,*
 492 F.Supp. 1071 (S.D.N.Y.1979), *aff'd,* 622 F.2d 577 (2d Cir.1980) .................18

324710861v3

*W.E. Bassett v. Revlon*,
   435 F.2d 656 (2d Cir. 1970)..................................................................................12

*Zafiro v. U.S.*,
   506 U.S. 534 (1993)...........................................................................................15

**Statutes**

15 U.S.C. § 1117................................................................................................1, 10, 18

324710861v3

Vegadelphia responds to Beyond's post-verdict "Supplemental" Trial Brief, a Brief asking the Court to wholly ignore the jury's factual and legal findings and reimagine all facts in a light favorable to Beyond. This utter lack of remorse for Beyond's willful infringement, the harm it caused, and the benefit it gained is the same all or nothing approach that set poorly with the jury.

Section 1117(a)'s equitable power to reduce damages is non-existent, it "does not allow a downward adjustment of actual damages." *Go Med v. Inmed*, 471 F.3d 1264, 1274 (Fed. Cir. 2006); 15 USC § 1117.[1] Equitable powers to *enhance* damages or disgorgement, or *reduce* disgorgement, are not to ignore a jury's legal or factual findings, but to resolve residual issues consistent with them.

The jury found both of Beyond's slogans willfully infringed, and factually tabulated its profits attributable to the infringing slogans at $114.4 million. Dkt. 419. Well-instructed, the jury found that this infringement cost Vegadelphia massive expansions with two industry titans, expansions so substantial under the credible and accepted evidence that it "suffered actual harm" in the amount of $38.9 million, first in the amount of $23.5 million in "actual damages...to reasonably and fairly compensate Vegadelphia for the injury caused by Beyond's infringement," (Dkt. 402 at 24), and second, $15.4 million of Beyond's $114.4 million infringing profits (*under 15%*) as a "rough measure to fairly compensate" for that use "not included in actual damages," (Dkt. 419).

As already briefed, these were Seventh Amendment *jury* issues, (Dkt. 393), and the profit findings were not "advisory".[2] Nor can Beyond couch it as equitable to absolve its responsibility for this monetary harm. Beyond simply wants to relitigate each issue post-hac before the Court, re-evaluate without deference to findings of willfulness, direct competition, and amount of net attributable profits. It perhaps teases a convoluted untimely JMOL grounded on likely confusion. It

---

[1]Beyond bizarrely requests it anyways, incorporating its Rule 50(b) motion. Plaintiff refers to its Opposition (Dkt. 450), where the well-supported jury verdict of actual damages is addressed.

[2] While not advisory here, findings "made in an advisory capacity are entitled to some deference." *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 298 F. Supp. 3d 258 (D. Mass. 2018); *Felker v. Pepsi-Cola Co.*, 899 F.Supp. 882, at 889 (D. Conn. 1995) ("purposeless" without deference.)

1

capstones with a request to eviscerate a monetary award. But each shotgun attack misses the mark.

## I.   RELEVANT FACTS FROM TRIAL

### A.   Vegadelphia's Strong Slogan and Beyond's Infringing Slogans were Likely to Confuse Because the Latter Commandeered the Essence of the Former

Vegadelphia selected Where Great Taste is Plant-Based, (Dkt. 446-1, T.E. 1), as an "eye-popping" slogan that "rhymes," is "single syllable words," "two equal parts" that will "reverse people's expectations" (about meat alternatives). (Dkt. 446-28, Day 2 TT, 143:20-144:14.) Dr. McDonald testified, while product description is a feature of *all* slogans, the value of a slogan is its "word play" to "create a kind of stickiness in the brain" that "make [a slogan] more memorable" – a "marketing flavor pill...full of the brands essence" that is "an extremely important asset for a brand." (Dkt. 446-34, Day 8 TT, 52:13-53:12, 77:16-78:7). Beyond picked from 60 options PLANT-BASED, GREAT TASTE as its key messaging and GREAT TASTE, PLANT-BASED for its sales through Dunkin', which copied all these same catchy features. (Dkt. 446-8, T.E. 22.0024, 0033, 0042, Dkt. 446-10, T.E. 27).

The slogan was central to Vegadelphia's sales. The largest feature of its homepage, (Dkt. 446-28, 153:7-19 citing Dkt. 446-3, T.E. 3), on its sells sheets, its "number one tool" for marketing prominently downloadable, (*Id.* 154:5-155:20 citing Dkt. 446-4, 5, T.E. 6, 7), and "regularly" emailed to establishments and distributors, (*Id.* 160:15-24). Inventory boxes had the slogan *and* website, "an extension of [Vegadelphia's] branding," completing this marketing ecosystem. (*Id.* at 162:5-163:17 citing T.E. 670, 671). Sell sheets were a "one-stop shop" of nutrition, portions, and ingredients, the result being establishments "typically have these sell sheets with them," with "the majority…on the counter or available for" consumers or close by "the consumer area", (*Id.* 154:5-12, 157:10-158:8). Even with "less-frequent visits" in recent years, store visits confirmed use with customers. (Dkt. 446-29, Day 3 TT, 96:11-98:11.)

This ecosystem had a consistent hundred-thousand units cruising altitude of veggie lean products per year from 2011 onward (minus the infringement-related decline) across a 35 state

-2-
324710861v3

distributor trade area.  (*Id.* at 15:24-16:3, Dkt. 446-28, 163:19-23.)  The two years of Beyond's market flooding suffered a 20% and 45% sales decline, (Dkt. 446-28, 164:5-165:2 citing Dkt. 446-17, 163:19-23, T.E. 82; Dkt. 446-29, 16:7-24)), a decline strongly evidencing both that Vegadelphia's slogan exerted a heavy impact on its target market and that actual confusion and harm resulted from Beyond's dilutive use. (Dkt. 446-35, Day 9 TT, 44:13-45:14).

> **B.**      **Beyond Benefitted Massively, Being Unjustly Enriched with $115 Million in Profits Attributable to the Willfully Infringing Slogans**

Beyond's sales grew wildly with the slogans.  Harking on Dr. McDonald's testimony, their value was the DNA of the combined word plays.  (Dkt. 446-29, 23:14-24:4, 24:22-25:7, Dkt. 446-28, 143:20-144:14).  The catchy DNA had been unique to Vegadelphia, as a 240-page trademark search showed.  (Dkt. 446-28, 149:7-154:2; Dkt. 446-18, T.E. 56 at 1,4,9,18,240.)

The PBGT slogan was core to Beyond's sales.  It permeated its channels of trade (grocery, food service, schools, etc.), in every medium (banners, wobblers, etc.), often larger than Beyond's logo. (Dkt. 446-7, T.E. 18 (table), Dkt. 446-14, T.E. 41 (examples). It was Beyond's "key messaging," (Dkt. 446-18, 23, T.E. 95.0025, 129.0010-11), a "tagline" in Beyond's vernacular, which Ms. Grass admitted meant it was "used as a consumer-facing motto to represent the brand in a concise way." (Dkt. 446-32, Day 6 TT, 67:8-19).  This lasted March 2019 through February 2021 and beyond. (*Id*. at 66:1-67:7; Dkt. 446-9, 19, 20, 24, 25, T.E. 23, 124, 125, 129, 128.001). Similarly, the GTPB Dunkin' variant spanned shirts and signage in every store, national TV ads, billboards, (Dkt. 424-1 at 139-143), from $12 million of promotions reaching over 751 million consumer impressions (Dkt. 446-6, T.E. 17.0002).

Beyond's fantasy of being *barely* willful ignores what the jury saw: Beyond started the wrong way down the road without looking, blazed past warning signs and offramps, sped up, and slowplayed its exit.  No prior art search.  All of 5 minutes dismissing Vegadelphia's registration in July 2020.  (Dkt. 424-1 at 47-49.)  Keeping it from Dunkin' so infringement exploded.  Dkt. 446-

32, 51:8-16). Betraying its guilt by fuming at Impossible for the same thing, even claiming "confusion." (*Id.* at 36:24-37:20; Dkt. 446-11, T.E. 28). Filing a sworn March trademark application and adding "TM" to their Partnership Style Guide draft in May 2020. (Dkt. 446-12, 13, T.E. 31, 32). Slow playing the May demand letter response in hopes of sneaking it by the USPTO, promising to stop in July only *after* the USPTO's June notice of a risk of confusion, (Dkt. 446-15, T.E. 43), but *never* telling Vegadelphia it planned to drag until the end of 2020. (Dkt. 446-29, 22:11-26:11). Not removing the PBGT slogan from branding guides for partners as of *February* 2021, (Dkt. 446-22), and continuing market use clear up until this 2022 suit. (Dkt. 446-29, 33:5-9).

Beyond made a calculated decision, and feigning innocence defied the jury's common sense. As marketing expert Dr. McDonald testified: "[T]he ROI on a great slogan is terrific. They make brands. They don't just get made by brands." (Dkt. 446-34, 69:22-70:9). Afterall this "key messaging," "represent[ed] the brand in a concise way." (Dkt. 446-18; Dkt. 446-32, 67:8-19).

For Beyond, before the infringing campaigns started in 2019, 55% of Americans had never heard of Beyond. (Dkt. 424-1 at 138). But Beyond's sales tripled in the first year of infringement in 2019, with another $100 million increase the next. (Dkt. 446-27, T.E. 606-43.002; Dkt. 446-30, Day 4 TT, 39:8-14); Dkt. 424-1 p.5-6 (confirming campaign drove sales). With those sales, net revenues for the most obvious infringement period (Q2 2019 through 202-0, (Dkt. 446-19)) were $481,828,766 excluding sales to Dunkin' - an additional $19,538,265, (Dkt. 446-31, Day 5 TT, 38:18-40:2). Reduced to incremental profits after proven deductions (COGS and marketing expenses) summates to $109,867,167 for Beyond's non-Dunkin' U.S. sales, and $5,420,242 after COGs for sales to Dunkin'. (Dkt. 446-34 at 25:12-18, 28:16-21, 29:3-9, 30:12-23.)

C.    **Beyond Absconded Its Burden to Show More Apportionment or Deductions**

*First*, Mr. Sheppard did not isolate to apportion out any sales for consumers "that didn't include use of the accused marked [sic] from 2018 through 2022," even as the corporate designee and person most knowledgeable. (Dkt. 426-2 at 7; Dkt. 446-30, 53:4-14). Nor did Mr. Plumpe, as

324710861v3

beyond his assignment to "make any sort of apportionment" between sales "related to the slogan and a sale that was made for a reason related to any of the other factors" that might go into a sale, admitting no "percentage to provide to the jury." (Dkt. 446-33, Day 7 TT, 123:24-124:20, 125:15-126:5).  And Ms. Grass similarly admitted Beyond could not identify retailers who did not use the infringing materials.  (Dkt. 424-1 at 16-17, TT at 42:18-43:13, 44:20 - 45:05).

*Second*, Beyond failed its burden of proof as to any operating expense deductions. Mr. Plumpe proposed using a sales ratio proportion to calculate each general category of operating expense.  (Dkt. 446-34, 20:2-23:18).  He did so even though Beyond does not track its incremental versus fixed costs, and despite not knowing if the matching principle of matching sales with costs was employed.  (Dkt. 446-30, 96:20-97:5, 105:3-16). Vegadelphia's expert Mr. Blum testified to 3 specific requirements for allowing a deduction under the AIPLA's incremental approach,[3] by which only "specific costs that would otherwise not have been incurred, but for the production of the infringing product can be deducted": (1) variable costs can be deducted (but not fixed costs absent rare exceptions unmet here), (2) costs incurred in one period invested toward future items cannot be deducted, and (3) the sales ratio cannot be used to allocate the amount of a deduction (absent a very mature company with steady costs and expenses, which Beyond was not). (Dkt. 446-34, 20:2-23:18).  Mr. Blum concluded no category of operating expenses that Beyond proposed for blanket deduction qualified for deduction, that Beyond did not provide sufficient validation, and therefore under AIPLA, audit, and forensic fraud methodology, none could be deducted.  (*Id.* at 25:8-28:21.)

Moreover, Beyond's starting numbers for categories of deductions were high-level and riddled with errors and overstatement.  Mr. Sheppard claimed "some time pressure to create the spreadsheet," he "wasn't aware" of other details, and missed a whole slew of underlying documents, resulting in attempts to revise numbers on the fly at trial. (Dkt. 446-30, 93:12-96:3). Beyond

---

[3] Plumpe acknowledged this AICPA approach.  Dkt. 446-33, 96:5-21. Indeed, Vegadelphia did not dispute Plumpe's calculations of incremental profits at trial.  Dkt. 446-25; Dkt. 446-26.

admitted that just before trial it had "a material weakness in financial reporting," specifically control deficiencies causing a reasonable possibility of material misstatement that it might not even timely detect. (*Id.* at 98:3-22). Plumpe's quarterly "operating profits" mysteriously showed profits up until the May 2020 notice, but losses *every* quarter afterward, lumping them together to suggest Beyond *owed less by continuing to infringe.* (Dkt. 446-26, T.E. 606-4.002; Dkt. 446-33, 110:10-111:17).

### D. The jury properly used a significant portion of attributable profits as a proxy for Vegadelphia's additional harm not included in its actual damages award

Thus, $15.4 million of those attributable profits (<15% of $114.4 million) were awarded as "proportional to Vegadelphia's actual harm attributable to the infringement" and solely to "restore Vegadelphia to the position it would have been in had the infringement not occurred" without including "any amount [the jury] took into account in determining actual damages." (Dkt. 402 at 29). This was because as direct competitors, the profit on this subset of sales would have inured to Vegadelphia's but-for the infringement, (*Id.* 28), through its existing channels and expanded channels Mr. Litton and Mr. Oberholtzer brought to the table. This New Venture is discussed in the Rule 50(b) Opposition (Dkt. 450) incorporated by reference. The jury was well supported.

*First*, the parties' trademark filings clearly recite both parties' central products under the slogans competed as plant-based meats. (Dkt. 446-2, T.E. 2; Dkt. 446-12, T.E. 31). Competing with Beyond's broader set of SKUs, Vegadelphia's veggie lean products are versatile, used anywhere meat goes for "unlimited presentations": sandwiches (including El Meson's breakfast sandwiches), bowls, pizza, etc. (Dkt. 446-28, 155:2-156:1; Dkt. 446-4). And while sold through distributors, both provided slogan-laced promotional materials used by competing establishments (p. 2-3 above). Each plant-based meal provided by one inherently means the other is not needed.

*Second*, both competed directly as they sold mainly through distributors to the same target markets (chain accounts, restaurants, diners, pizza chops, fast/casual, supermarkets). (Dkt. 446-28, 136:22-25; Dkt. 424-1 at 12-15; Dkt. 446-33, 43:8-25; Dkt. 446-32, 27:1-12). Further to

324710861v3

Vegadelphia's 35-state distribution region, Mr. Litton testified his Quality Foods' existing Philly steaks were "already in distribution in most of the chains," offering "endless" capacity for Vegadelphia sales to "our current national, regional chains." (Dkt. 446-28, 97:7-18, 99:11-19).  This infrastructure validated by $35 million a year in sales just for Mr. Litton's Philly steaks (and distribution that made his other company worth nearly $1 billion), facts Beyond elected not to cross examine. (*Id.* at 95:2-19; Dkt. 446-29, 35:3–36:17).

**Third**, Vegadelphia and Beyond did not just utilize similar distributors, they actually used the same distributors. **Sysco** accounted for 13% total of Beyond's gross revenues (in fact, 66% of sales were to just three distributors).  (Dkt. 446-27 at 25). The Shipons confirmed Vegadelphia similarly sold to Sysco. (*See* Dkt. 446-28, 159:2-7, 161; Dkt. 446-30, 16:6-21).  **US Foods** distributed competing Vegadelphia and Beyond products. (*See* Dkt. 446-28, 161:3-10; Dkt. 446-29, 95:17-21; Dkt. 431-8 (Ex. 14)).  These are two of the largest in the U.S.  (Dkt. 446-28, 159, 161). Mr. Litton also distributed through **Restaurant Depot**, whom Beyond also sells through.  (Dkt. 446-29, 36:1-17; Dkt. 446-32, 71:17-24).

**Fourth**, the evidence included specific instances of establishment-level competition and competition for their end consumers.  Dunkin' and El Meson were fast-casual chains competing for plant-based sandwich sales.   (Dkt. No. 424-1 at 128). El Meson (with Vegadelphia meat) and Subway (with Beyond meat) competed, including next door to each other. (Dkt. 446-24, T.E. 134 (next door)).  And "during the 2018 and 2022 time period," Vegadelphia did "compete against Beyond for national chain accounts," such as Vegadelphia pitching WaWa with samples in early 2020 only to have Beyond win the account two months later. (Dkt. 446-30, 16:19-21, 17:19-18:12).

## II.      ARGUMENT

### A.      The Challenges in Beyond's Brief Are Procedurally Improper Sidesteps

Beyond filed no Rule 50 motion on likely confusion, direct competition, net profits, or proxy disgorgement, so its Brief is procedurally improper and waived. It jointly crafted—and never

324710861v3

objected to—the ultimate jury instructions and verdict form on these issues. Its disagreement with the jury's view of the evidence is no basis to ignore the verdict, and even as a backdoor Rule 50 motion, the strict Rule 50 standard applies. (Dkt. 450 at 11-12) (Pl's Opposition to Rule 50).

**B.    The Jury Made Non-Advisory Findings, Fully Supported by the Evidence, and the Only Outcome a Factfinder Could Conclude**

Beyond is silent on legal standards on juries, let alone applying them to the trial evidence. "[W]hen a party has a right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim." *Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 78 n.8 (1st Cir. 2008); *see also Perdoni Bros., Inc. v. Concrete Sys., Inc.,* 35 F.3d 1, 5 (1st Cir.1994) (same); *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 42-43 (1st Cir. 2006) (same re willfulness).    That includes infringement, willfulness, attributable profits, and direct competition.    *See also* Dkt. 432 at 8-13 (briefing evidentiary support for willfulness and direct competition).[4]  It should also include disgorged profits as a proxy for actual harm, both because this is a Seventh Amendment jury issue (Dkt. 393 at 4–6) and because it was submitted to the jury for a non-advisory verdict. These factual findings meet any standard, but unquestionably this stringent standard of review.

1.    The Juries Binding Findings on Attributable Profits Are Well Supported Particularly Where Beyond Failed Its Burden on Apportionment

Asking to post-hoc recalculate the jury's apportionment and deductions,[5] Beyond does not cite the Court to a single legal authority or rule in this section. *See* Dkt. 440 at 22-23. Nor does it acknowledge Beyond carries the burden of proof. Consistent with the jury instruction, (Dkt. 402 (No. 18) at 25-26), the Court warned Beyond at the summary judgment stage:

> The award of damages for a violation of trademark rights is governed by 15 U.S.C. § 1117. Section 1117 "provides . . . that when a trademark violation occurs,

---

[4] *See also* Dkt. 446-34 149:12-21 ("I think he's right that they decide your profits, not me. I decide the amount of profit -- the amount of that that goes to them, if any. But I think he's right that the jury decides the profits…That's simply a finding of what your profits are.").

[5] Beyond ignores this $109m gives $372.1m in apportionment and allocation, i.e. just 22.6%.

-8-

the victim shall be entitled, 'subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.'" *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5 (1st Cir. 1993) (quoting 15 U.S.C. § 1117)...."In assessing profits[,] the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

(Dkt. No. 358 at 2) (Granting in part Vegadelphia's MSJ). Focusing on defendant's burden, the

Court explained the first step is to apportion between infringing and non-infringing revenue as:

> the defendant bears the burden of providing evidence sufficient to apportion profits between those resulting from the defendant's purported infringement and those unaffected by the purported infringement. *See Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 64 (1st Cir. 2008); *Tamko Roofing Prods. v. Ideal Roofing Co.*, 282 F.3d 23, 32-33 (1st Cir. 2003)

(Dkt. No. 386). Beyond's burden for then deducting costs from apportioned revenue is:

> [T]he question of whether Beyond has met its burden of producing evidence of deductible costs in the form of [expenses] that can be attributable to sales from its [infringement]. *See Kamar*, 752 F.2d at 1332 **("[t]he real question . . . is whether any of the overhead expenses were caused by the production or sale of the infringing goods, not the proportionate amount of sales of the goods in relation to total sales**"). The parties do not dispute as a general matter that "[i]f an infringer seeks to deduct overhead costs, the court must first 'determine what overhead expense categories ... are actually implicated by the production of the infringing product,' a process that requires determin[ing] whether there is 'a sufficient nexus ... between a category of overhead and the production or sale of the infringing product.'" *Fendi Adele S.r.l. v. Burlington Coat Factory Warehouse Corp.*, 2010 WL 11586698, at *4 (S.D.N.Y. Aug. 9, 2010) (*quoting Hamil Am. Inc. v. GFI*, 193 F.3d 92, 105 (2d Cir. 1999)); see Def.'s Opp. 17 [Dkt. No. 234] (arguing "there are triable issues of material fact with respect to . . . the nexus that [Beyond's] claim[ed] costs have to the production, sale and distribution of the product at issue").

(Dkt. No. 358 at 9-10) (emphasis added) ("collaboration with Dunkin'" adjusted to "infringement" and "Other Operating Expenses" adjusted to "expenses"). "Precedent" has set that, where an infringer fails to provide "evidence as to 'which and how much' each item of overhead contributed to the sales of the infringing items, the infringer is not allowed to deduct any of its indirect and overhead expenses from its gross revenues." *Playboy Enters. v. Dumas*, 831 F. Supp. 295, 320 (S.D.N.Y. 1993) (excluding costs that were not evidenced by invoices) (quotations and citations omitted). Summaries of expenses may not be probative without underlying documentation. *Project*

-9-

*Strategies v. Ntl. Communs.*, 948 F. Supp. 218, 221 (E.D.N.Y. 1996). Nor is testimony unaccompanied by documentary proof of bills. *Bambu Sales v. Ozak Trading*, 58 F.3d 849, 854 (2d Cir. 1995) (affirming court's refusal to deduct expenses not proven by documentary evidence).

   a.      At Trial Beyond Meat Failed as a Matter of Law to Apportion

Vegadelphia made quick work of its minimal burden "to prove defendant's sales only." 15 U.S.C. § 1117(a). Beyond's own documents purported Beyond's revenues (sales) during the time period of interest were $19.1 Millon in revenue made on sales to Dunkin' and $481.1M for all other U.S. generated revenue. (Dkt. No. 446-25 and 446-26). Beyond's own expert agreed to these revenues. (Dkt. No. 446-33, 60:17-61:5, 78:13-79:1.) As did Vegadelphia's expert. Transcript (Dkt. No. 446-31, 39:11-24). And the sales were limited to the U.S., where the flood of infringement occurred. (Dkt. 446-26). Despite Beyond's burden, (15 U.S.C. § 1117(a)), as discussed above (pp. 5-6), Beyond elected a total failure of proof to quantify any apportioning.

   b.      Similarly at Trial Beyond Meat Failed to Legally Deduct Costs

At trial, "defendant made only a cursory—and wholly unsubstantiated—attempt to connect the deductions sought to the specific infringing activity." *Diesel S.p.A.*, 2023 U.S. Dist. LEXIS 156499 *28 *quoting River Light V, L.P. v. Lin & J Int'l, Inc.*, 2015 WL 3916271, at *2 (S.D.N.Y. June 25, 2015) (overhead rejected). Beyond's brief only doubles down; conclusory claiming – still without documents – deductions for entire categories of alleged costs (e.g., Innovation).

To start, as detailed above (pp. 5-6), the evidence showed Beyond's summary proof failed even the most basic requirements for deducting these categories, and the jury reasonably agreed.

Moreover, Beyond and its witnesses relied solely upon a "financial model" producing aggregated data into one-page spreadsheets, with a few cells to allege hundreds of millions of expenses. (Dkt. No. 446-38, T.E. 547; Dkt. No. 446-39, T.E. 550; Dkt. No. 446-25; Dkt. No. 446-26). They were unreliable, laced with errors, overstatements and admitted infirmities. *Supra* p. 6.

These infirmities, improper categorical lumping and lack of specifics were not cured.

-10-

Beyond chose not to present specific documents, invoices, receipts, or categorized expenses. The jury (nor Mr. Plumpe) saw no evidence of how any of the challenged expenses actually contributed to or resulted from the alleged infringement so as to be deductible expenses or to quantify a subset.

Eschewing established law, Beyond claims a new rule, if "*all* of Beyond's profits, it is appropriate to deduct *all* of Beyond's costs" in that same time period. Dkt. No. 440 at 23. This disregards the statute and burdens of proof, after all, just because an expense "may be related to defendants' sales of infringing goods, [where] defendants have neither adequately documented these expenses to their infringing activities" those expenses cannot be apportioned. *Fendi Adele S.r.l.*, 2010 WL 11586698, *7. Some further examples bare mentioning:

*First*, Mr. Plumpe confirmed that certain expenses did not contribute to the infringement. (Dkt. No. 446-33 at 117:10-120:14). He deducted all Innovation expenses in 2019 and 2020, but could not identify a single product researched in 2019 and 2020 that was released before 2021, and admitted he hadn't analyzed that. (*Id.* at 118:4-14). Similarly, he deducted all Commercialization Process Engineering, but could provide no detail on if any of these expenses involved scaling products released before 2021. (*Id.* at 118:16-120:14). He even deducted $79 million in G&A without any "fixed versus variable analysis" or "stress test" of their relation to different sales volumes. (*Id.* 122:24-123:23). This was typical of his flawed and incomplete analysis throughout.

*Second*, Mr. Plumpe did not review individualized documented expenses, only "companywide" expenses. (*Id.* at 96:20-97:5, 105:3-16, 142:14-22). He heavily relied on unsubstantiated calls to Ms. Grass and Mr. Sheppard, whose reliability faltered at trial and themselves gave no better costing detail to the jury. *Id.* at 143:7-8. For example, Sheppard confirmed he "did not refer to any raw, underlying data" to prepare his spreadsheet. (*Id.* at 43:11-18).

Thus, Beyond failed its burden of proof at trial, and denied both the jury and Mr. Blum its books and records, (Dkt. 446-34, 27:9-28:13). The jury agreed these infirmities added up to a rejection of Beyond's proposed operating expense deductions, such denial of operating expense

deductions joining the case norms. *Diesel*, 2023 U.S. Dist. LEXIS 156499 *22-30 (collecting cases).

 2.  The Jury Definitively Found Unjust Enrichment Via Infringing Profits

By a single throwaway paragraph, Beyond proclaims "the evidence is that [Beyond] made no unjust profits and so was not unjustly enriched." Dkt. No. 440 at 19 quoting *Visible*, 551 F.3d at 81. Beyond misses the point: Attributable profit *is* unjust enrichment, while no attributable profits is *no* unjust enrichment.  Despite citing the Restatement, Beyond never defines unjust enrichment. The Restatement defines "unjust enrichment" synonymous with "net profit *attributable* to the underlying wrong." Rest. (3rd) of Restitution and Unjust Enrichment § 51(4).  Thus, "unjust enrichment" *is* the jury verdict's $114.4M finding of "profits that are attributable to" infringement. Dkt. 419 at 4.

Perfectly consistent, in Beyond's only authoritative cite, *Visible Sys.*, the "evidence did not show there were profits which accrued to [defendant] as a result of its infringement," so "no unjust profits" meant it "was not unjustly enriched." 551 F.3d at 80.  A defendant "would be unjustly enriched here if its [infringing sales] were attributable to its infringing use" of the trademark, again confirming they are by definition the same. *W.E. Bassett v. Revlon*, 435 F.2d 656, 664 (2d Cir. 1970) (disgorging profits in reverse confusion case).

Thus, while the jury here factually established the *amount* of unjust enrichment (a necessary step to find proxy profits), Beyond has done nothing to show why $15.4 million of $114.4 million in attributable profits is too much under the equities of unjust enrichment, which are "intended to make violations of the Act unprofitable," *BASF v. Old World Trading*, 41 F.3d 1081, 1092 (7th Cir. 1994); *Tamko,* 282 F.3d at 39 (full profits awarded); *Venture Tape,* 540 F.3d at 64 (same).

 3.  The Jury's Binding Findings On Direct Competition Were Well Founded

The jury explicitly found Direct Competition (Verdict 4B & 5B, Dkt. 419 at 3–4), As briefed at Dkt. 432 at 8–13 and further above at pp. 6-7, ample evidence supports the jury's finding.  Beyond fails in its two unsupported attempts to erect threshold legal requirements:

-12-

324710861v3

*First*, Beyond wrongly believes direct competition requires they "operate in a two-player market." *See* Dkt No. 440 at 17. Beyond confuses such *sufficient* showing as a *necessary* one, putting itself at odds with First Circuit precedent. *Tamko* affirmed direct competition despite "different types of roofing products [] asphalt and metal roofing" and only 20-30% market overlap. 282 F.3d at 27. The Court noted Defendant was only one member of the industry "Alliance," i.e. a multi-player market. *Id*. Multiple First Circuit analyses for direct competition do not ask if a two-player market exists. *See e.g.*, *Aktiebolaget Electrolux*, 999 F.2d at 6 (asking whether you would "place the products in different categories of consumer goods.").[6]

*Second*, Beyond claims its range of products and stores exceed those of overlap with Vegadelphia, thereby automatically preventing direct competition. However, apart from ignoring the breadth of Vegadelphia's product versatility, (*see* p. 6 above), this is directly akin to the denied argument made by the defendant in *Tamko*. 282 F.3d at 27 (defendant argued not directly competing "in all the markets in which it profited from use of the mark, and so all of its profits" is too much). The First Circuit rejected it, noting "the statute places the burden on the infringer to show the limits of the direct competition." *Id.* at 37. And like *Tamko* "[defendant] did not ask for a jury finding on the percentage of market overlap," (*id.*), nor even test such limits, (p. 7 above)*.* This did not bar direct competition, but merely reduced proxy profits from the starting profits attributable to the infringement – which the jury *did* here by awarding less than 15%.  In the face of ample evidence of overlap, Beyond failed its burden to show something less.

4. The Court Sent the Proxy Rationale to the Jury, Whose Award Maintained Ample Support

Beyond asserts the equities do not support disgorgement, but there are 3 equity rationales to support profit disgorgement 1) as a proxy of harm; 2) "to avoid unjust enrichment"; or 3) "if

---

[6] *Fishman Trans. v. Paul*, 684 F.3d 187, 196 (1st Cir. 2012) (Stating test is that "direct competition requires a substantial degree of equivalence and substitutability."

324710861v3

necessary to protect the plaintiff by deterring a willful infringer". *Tamko*, 282 F.3d at 36. And Beyond's citations similarly support that only the absence of all three allows the conclusion that "the equities in th[e] case simply do not favor an award of money". *Aktiebolaget*, 999 F.2d at 6 (noting the at issue "Weed Eater and Leaf Eater products do not directly compete [as t]he products serve different functions" and no applicable unjust enrichment or deterrence).

a.    Proxy Rationale Was Sent to the Jury Without an Advisory Limit

Beyond has no basis to now treat the jury's proxy-rationale disgorgement as "advisory." Tellingly Beyond deflects by citing the Court on the fifth day of trial, prior to any charge conference, and the Court noting its mid-trial perception as "probably getting only an advisory as to that last question of disgorgement." (*See* Motion n. 1 *citing* Dkt. 446-31, 22:17-23.) Beyond leaves out the remainder. The Court contemporaneously noted "from my point of view, it's cleanest to hear from the jury on everything, understand in advance of the verdict form going in what I'm taking as advisory." (Dkt. 446-31 at 23:6-9.) Thus, mid-trial, what was advisory was still unsettled and heading toward all bases for profit disgorgement. By close, that clearly shifted.

Rather Vegadelphia instead filed a trial brief (Dkt. 393) asserting a Seventh Amendment jury right to profit disgorgement, particularly proxy profit, which respectfully, the Court did not review until the charge conference days. (Dkt. 446-33, 245:10-246:2). At the charge conference, the parties extensively debated the jury's role for disgorgement, and "advisory" was never mentioned. Had the conversation been otherwise, as suggested days prior, this debate would have been sidestepped for post-trial. *E.g., FabriClear v. Harvest Direct,* 2023 WL 11826606, *2 (D. Mass. Oct. 31, 2023) (sending profit disgorgement under all rationales to jury, deferring to "a later time whether the jury verdict will be advisory" based on presence of direct competition); *Ferring Pharma. v. Braintree Lab.,* 220 F.Supp.3d 149, 151 (D. Mass. 2016) (same).

Instead based on discussions of jury rights the Court determined "we would have the jury award –consider disgorgement as a proxy for damages. But you wouldn't be arguing unjust

-14-

enrichment to the jury, assuming you want to argue it to me." (Dkt. No. 446-34, 114:14-17). At no point did the parties seek or the Court condition any of the findings as advisory. Rather the Court made clear the proxy-based disgorgement would be for the jury. *See* (*Id.* at 115:2-4; 115:17-20; 141:9-19). Nor did Beyond – if it felt the jury should be advisory still despite a lack of communication – follow the Court's instruction to file objections. (*Id.* at 159:4-6.)

Beyond demanded a jury, proposed jury instructions on disgorgement, only belatedly, informally and abstractly suggested some striking, and argued for a limited jury decision rather than a broader advisory one, but still wants to rewrite even that jury decision. It was not advisory.

> b.    The Jury's Well-Supported Verdict With No Double Counting

Other than speculating to assume the worst – Beyond provides no basis for it double counting claim.  The jury determined Vegadelphia suffered $23.5 million in actual damages and an award of Beyond's profits in the amount of $15.4 million should be awarded to Vegadelphia "as a rough measure to fairly compensate Vegadelphia for harm proximately caused by Beyond… <u>that was not included in actual damages</u>." Dkt. No. 419 at 4. Vegadelphia's closing even reminded the jury not to double count.[7] After the Court instructed not to double count, (Dkt. 402 No. 18), and upon determining actual damages, the verdict form not only reminded the jury it could not double count but required filling in a verdict line expressly affirming it had not.  "Jurors are presumed to follow their instructions." *Zafiro v. U.S.*, 506 U.S. 534, 540-41 (1993). The First Circuit has reinstated a verdict on the very basis that the jury was indeed presumed not to double count. *Primarque Prods. v. Williams W. & Witts Prod.*, 988 F.3d 26, 43 (1st Cir. 2021). It is the same here.

Beyond states a "general" rule, but fails to identify the specifics applicable here: When an award combines lost profits and disgorged profits "based on the same sales" there is double recovery,

---

[7] Dkt. 446-35, 68:13-18 ("[T]here's an actual damages side and a profit disgorgement side. And between the two, we're asking that they be somewhere between 25 and 36.75 million. And we're asking that, as much of that as you can justify putting on the actual damages side, that's where you put it, but you're not going to count dollars twice. You'll hear an instruction about that as well.")

-15-

but where "the lost profits and disgorged profits are not based on the same sales, [] there is no double recovery." *Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 2014 U.S. Dist. LEXIS 116647, *10 (S.D. Tex. Aug. 19, 20214).  If the award is "less than the corresponding figures" for either sides' proffered profits, "there is no basis [] to conclude the jury's award *necessarily* amounts to a double recovery." *Id.* at *10.  Awarding lost profits for some years and disgorged profits for other years is not double counting.  *Id.* *11.  Finally, as Beyond's own case holds, when multiple items of actual damages could be awarded, no matter how "persuasive" the double counting explanation, even "the slightest chance" of another explanation is fatal to the challenge, because the Court must not "speculate as to the jury's deliberations and calculations," *United Phosphorus v. Midland Fumigant*, 205 F.3d 1219, 1228 (10th Cir. 2000). Applying these rules readily defeats Beyond's speculative challenge:

*First*, there are other explanations for the damage award than profits.  As discussed further in Vegadelphia's concurrently-filed Rule 50(b) Opposition, (Dkt. 450), the jury instructions stated actual damages could include: 1) injury to reputation; 2) injury to goodwill; 3) lost profits; and 4) loss of value to Vegadelphia's business. Dkt. 402 at 27. Beyond fails to explain how the verdict could not under any light represent different, non-duplicate damages.

*Second*, the jury heard evidence that Vegadelphia's damages ranged from $35 to $40 million and could have determined that the proxy of Vegadelphia's harm from Beyond's profits amounted to $38.9 Million of which $23.5 million went as Actual Damages, and *assuming* overlap, entered the remainder after following instructions to subtract the $23.5 million in Actual Damages.

*Third*, given there were many competitors in the over $1 billion market, (p. 7), the jury could conclude that not every lost sale of Vegadelphia went to Beyond, and vice versa. Thus, the evidence supported awarding $15.4 million of Beyond's profits (less than 15% of total infringing profits) as sales Vegadelphia lost to Beyond, while awarding $23.5 million for profits on *additional* sales the infringement cost Vegadelphia that *other* competitors like Impossible picked up.  And Vegadelphia's lost profits continued into 2021 and on, while Beyond's disgorgement sales ended in 2020.  And

-16-

324710861v3

none of these combinations is or suggests double counting.

*Fourth*, the $15.4 million proxy award could well represent the proxy profits Vegadelphia would have made on sales in the years building up the New Venture.  Meanwhile the $23.5 Million Actual Damages could reflect the value from the lost opportunity to sell off the New Venture once it was established. That amount represents exactly a 6% "single-digit" reduction of the $25 million from the $100 million value agreed on in 2021 – the amount of recent market decline Beyond's Sheppard testified to.  This again represents two distinct, non-duplicative harms.

Presuming the jury followed instructions, recognizing multiple explanations for the awards are non-duplicative, rejecting Beyond's invite speculation, and viewing the verdict in "the light most flattering," (*Rodríguez-Valentin*, 27 F.4th at 20), Beyond's challenge fails many times over.

c.    Actual Harm is Neither Required, Nor is it Lacking in the Slightest

Beyond next claims that "under this [proxy rationale] theory a plaintiff must prove [] actual harm" to receive profit disgorgement. This doubly fails. *First*, as discussed *ad naseum*, Vegadelphia suffered significant actual harm:  the lost expansion, actual confusion resulting in a decline in its existing sales channels,[8] loss of goodwill to its legacy brand, loss of brand control to flooding, to name a few.  *See* pp. 6-7 above; Dkt. 450 (Opp. to Rule 50b Mtn.).  The jury flatly *rejected* Beyond's regurgitated theory that these damages must be cabined by Vegadelphia's historical sales.

*Second*, Beyond's 'requirement' fails because the First Circuit's rule for proxy profit is the *opposite*.  As this Court's prior ruling (Dkt. 358) recognized citing to *Venture Tape*: "When a mark owner <u>cannot prove actual damages</u> attributable to the infringer's misconduct (e.g., specific instances of lost sales), its recovery of an equitable share of the <u>infringer's profits serves, *inter alia,* as a 'rough measure' of the likely harm</u> that the mark owner incurred because of the infringement." 540 F.3d at 60, 64 (emphasis added) ("[Plaintiff] eventually requested only

---

[8] The First Circuit recognizes the inference of "actual reverse confusion from the company's decline in revenues." *Visible*, 551 F.3d at 74.

-17-

$230,339.17, the amount that it estimated to be [defendant]'s net profits.... there was no clear error in the district court's determination that $230,339.17 represented an equitable share of [defendant's] $1.9 million in gross sales during the three-and-a-half year infringement period").[9]

Third, while its absence can help a proxy award, to be clear the statute conjunctively allows both. 15 U.S.C. § 1117(a) (using conjunctive "and"). Thus, both are regularly awarded. *Atlas Biologicals, Inc. v. Kutrubes*, 2022 WL 2840484 (10th Cir. 2022) (awarding lost profits and infringer's profits); *Clearline*, 2014 U.S. Dist. LEXIS 116647, *10 (same; damages and profit disgorgement); *cf. Visible Sys. Corp.*, 551 F.3d at 81 (assuming it possible to suffer "lost profits" and "for the infringer to have been unjustly enriched").

   5.   Equities Support Unjust Enrichment and Deterrence Profit Disgorgement

Other than self-serving proclamations that "Beyond made no unjust enrichment" and that "no deterrence is necessary," Beyond fails to support either statement. Indeed, as noted *supra,* Beyond by the Restatement's well-settled definition explicitly was unjustly enriched, a stark contrast to the cited *Visible Systems*, where "the evidence did not show there were profits which accrued to [defendant] as a result of its infringement." 551 F.3d at 80.

As to deterrence, even if downplaying the willfulness finding as Beyond did, Beyond still ignores and without remorse holds faultless its own actions. Indeed Beyond fails to mention that it continued to utilize the mark despite learning of Vegadelphia's mark on two separate trademark searches. (*See* Dkt. 446-32, 53:25-54:10, 77:7-10) Nor does the evidence of record support the fairytale story of an immediate cessation of the infringement. (*See* Dkt. 446-19) (2/21 still circulating brand guide); (*See also* Dkt. 446-23) (4/21 branding appearing at Costco); (Dkt. 446-29, 33:5-9) (4/22).

---

[9] *E.g. Vuitton et Fils, S.A. v. Crown Handbags,* 492 F.Supp. 1071, 1077 (S.D.N.Y.1979), *aff'd,* 622 F.2d 577 (2d Cir.1980) ("plaintiff may also be able to recover defendant's profits without demonstrating his own actual damages."); *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1354 (11th Cir. 2019) (same; "the focus is entirely on the alleged infringer's gain; the plaintiff is not required to present any evidence of particular financial harm that it suffered").

-18-

Ultimately, the question remains "[w]ould a profit-seeking businessperson not unwilling to violate federal law pay 10 cents to make one dollar? If the answer is, 'Yes,' then the willful trademark infringement has not been made sufficiently unprofitable." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 1995 U.S. Dist. LEXIS 4797, *7, 1995 WL 221871 (N.D. Ill. Apr. 11, 1995) quoting *Sands v. Quaker Oats*, 34 F.3d 1340, 1348 (7th Cir. 1994). Beyond fails to explain why it should retain all of the net attributable profits from the trademark infringement.  As Vegadelphia's pending enhancement brief reiterates (Dkt. 432), the First Circuit's uniform result of finding direct competition <u>and</u> willfulness is disgorgement of *all* net attributable profits.

> C.    The Jury Finding on Likelihood of Confusion Was Well Supported, Properly Entitling a Binding Profit Disgorgement on the Proxy Rationale

Through a series of untethered sections Beyond presents multiple statements on reverse and forward confusion. It is unclear what remedy or procedure Beyond appears to be invoking by the same. As detailed above, the jury made a unanimous finding of likelihood of confusion. Beyond did not request to poll or hold the jury for further questioning. Yet Beyond now appears to both challenge the sufficiency of the evidence to such finding and argue that the jury should have determined forward and reverse likelihood of confusion separately.[10]  Neither argument is proper, and certainly not by this post-trial "supplemental brief."

Despite now claiming that "evidence presented to the jury fail to support a finding of forward confusion" and "reverse confusion theory was not borne out by the evidence," Beyond made no Rule 50 challenge for either. (Dkt. No. 440 at 11, 13). Nor does Beyond even pretend to perform a

---

[10] Beyond also implies Vegadelphia improperly proceeded with both forward and reverse confusion, but includes no analysis for that argument. Vegadelphia could find no case supporting Beyond's novel complaint, but instead the opposite. *See e.g. Variety Stores, Inc. v. Walmart Inc.*, 852 F. App'x 711, n. 4 (4th Cir. 2021) ("[T]his case involves both forward confusion and reverse confusion."); *JL Beverage Co., LLC v. Beam, Inc.*, 318 F. Supp. 3d 1188, 1203 (D. Nev. 2018), *aff'd sub nom.*, 815 F. App'x 110 (9th Cir. 2020) ("JL Beverage is pursuing theories of both forward and reverse confusion.");  *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835 (7th Cir. 2023) ("Home Chef has advanced both forward and reverse theories of confusion.")

*Pignon* Factors analysis to either. *See* Dkt. No. 344 (denying summary judgment to Beyond on likelihood of confusion, the same rationales supporting jury here).

Even considering what can be derived from the Brief, Beyond attempts to create a new distinction for reverse and forward confusion cases and additional requirements for profit disgorgement under each. Yet Beyond fails to cite a single case (let alone post-*Romag v. Fossil*, 590 US 212 (2020)*,* the seminal Supreme Court case) denying profit disgorgement simply because the case was that of reverse or combined reverse and forward confusion. *C.f. D & D Greek Rest., Inc. v. Great Greek Franchising, LLC*, 2022 WL 4596548, at *12 (C.D. Cal. Aug. 26, 2022) ("disgorgement of profits" is an available remedy in reverse confusion cases)*; Thrive Nat. Care, Inc. v. Thrive Causemetics,* 2021 WL 4813257, at *5 (C.D. Cal. Oct. 6, 2021). ("[D]isgorgement of profits in reverse confusion cases is now possible"); *W.E. Bassett v. Revlon*, 435 F.2d at 664 (same).

Further undercutting Beyond's belief is the First Circuit case Beyond actually cites. Beyond premises reverse verse forward confusion as paramount distinction here because the First Circuit has noted reverse confusion "does not lend itself to **any automatic** assumption that there is an equivalence between defendant's profits and plaintiff's diverted sales," *See* Brief at 10 *quoting Visible*, 551 F.3d at 80. However, all the First Circuit noted in *Visible* is the mere label of reverse confusion does not **automatically** fulfill the proxy rationale requirements. Thus, as opposed to being distinct from forward confusion, reverse confusion still requires a proxy showing. But no distinct rule exists beyond showing that "the two companies are in the same line of business." *Fishman*, 684 F.3d at 196. Ample evidence supports the jury's finding that Beyond and Vegadelphia as suppliers and sellers (predominantly each through distributors) of alternative meat are in the same line of business with substitutable products.

## III.    CONCLUSION

Beyond's procedurally improper Supplemental Brief rests upon an impermissible reweigh of the evidence without any deference to the jury. The motion should be denied in its entirety.

-20-

324710861v3

Dated: January 20, 2026

Respectfully Submitted,

*/s/ Ben L. Wagner*
L. Andrew Tseng
Mass. Bar No. 689192
TROUTMAN PEPPER LOCKE LLP
19th Floor, High Street Tower
125 High Street
Boston, MA 02110-2736
Tel: (617) 204-5100
Email: andrew.tseng@troutman.com

Ben L. Wagner (*Lead Counsel)
Cal. Bar No. 243594 (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
11682 El Camino Real, Suite 400
San Diego, CA 92130
Tel. (858) 509.6010
Email: ben.wagner@troutman.com

*Attorneys for Plaintiff Sonate Corporation, d/b/a Vegadelphia Foods*

-21-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2026, the Plaintiff Vegadelphia Foods' Response to Beyond Meat, Inc's "Supplemental Trial Brief" (Dkt. 440) was served by electronic mail on counsel of record using the email addresses registered on the CM/ECF system.


s/ *Ben L. Wagner*
Ben L. Wagner

-22-

324710861v3