UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SONATE CORPORATION, d/b/a Vegadelphia Foods,<br><br>Plaintiff,<br><br>v.<br><br>BEYOND MEAT, INC.,<br><br>Defendant. | * * * * * * * * * * | Civil Action No. 1:23-cv-10690-IT |

MEMORANDUM AND ORDER

September 18, 2026

After a two-week trial in this trademark infringement litigation, a jury returned a verdict in favor of Plaintiff Sonate Corporation, d/b/a Vegadelphia Foods ("Sonate" or "Vegadelphia") and against Defendant Beyond Meat, Inc. ("Beyond"). The jury found that Beyond's use of "PLANT BASED GREAT TASTE" and "GREAT TASTE PLANT BASED" infringed on Sonate's "Where Great Taste is Plant Based" trademark. Special Verdict Form 1 [Doc. No. 419]. The jury awarded Sonate $23.5 million in actual damages caused by Beyond's infringement of Sonate's trademark and $15.4 million in disgorged profits. Id. at 3.

Now pending before the court are Beyond's Renewed Motion for Judgment as a Matter of Law [Doc. No. 433] ("Renewed Motion") and Sonate's Motion for Equitable Enhancement and Additional Profit Disgorgement [Doc. No. 430] ("Enhancement and Disgorgement Motion") and Motion for Prejudgment Interest [Doc. No. 437] ("Prejudgment Interest Motion").[1]

---

[1] Beyond's Supplemental Trial Brief Regarding the Court's Equitable Determinations Following the Jury Verdict [Doc. No. 440] and Sonate's Response [Doc. No. 453] are also before the court.

For the reasons stated below, the court finds Beyond's Renewed Motion [Doc. No. 433] to be procedurally proper, GRANTS the motion in part, and DENIES the motion in part, and DENIES Sonate's Enhancement and Disgorgement Motion [Doc. No. 430] and Prejudgment Interest Motion [Doc. No. 437].

The court finds that Sonate has proven actual damages of $37,500 only. The court will accept the jury's advisory verdict as to disgorgement and award Sonate $15.4 million of Beyond's profits as an equitable matter.

## I. Beyond's Renewed Motion for Judgment as a Matter of Law

Beyond does not challenge liability but asserts that the actual damages award was based on "purported lost profits that were uncertain, contingent, conjectural, or speculative" and that Sonate "failed to introduce evidence sufficient to let the jury award damages from [Sonate's] lost [Vegadelphia 2.0] [n]ew [e]ndeavor with reasonable certainty, or to show that any infringement caused such damages." Mem. ISO Renewed Mot. 1, 16 [Doc. No. 436]. Beyond therefore seeks entry of judgment as a matter of law "in the amount of zero actual damages but, in any event, no more than $37,500 [of actual damages]" based on the evidence presented to the jury. Id. at 20.[2]

Sonate opposes the Renewed Motion [Doc. No. 433] on both procedural and substantive grounds. Opp'n to Renewed Mot. 1–2 [Doc. No. 450].

### A. *Legal Standard*

"A renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is bounded by the movant's earlier Rule 50(a) motion. The movant cannot use such a motion as a

---

[2] The $15.4 million disgorged profits award is not at issue in the Renewed Motion [Doc. No. 433]. The disgorged profits award is at issue in Sonate's pending Enhancement and Disgorgement Motion [Doc. No. 430] and will be addressed below.

vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995). A Rule 50(a) motion "preserves for review only those grounds specified at the time, and no others," id., and "a 50(b) motion may only restate those arguments raised by a prior 50(a) motion." Jones ex rel. United States v. Mass. Gen. Hosp., 780 F.3d 479, 488 (1st Cir. 2015).

A Rule 50 motion for judgment as a matter of law may only be granted "when, after examining the evidence of record and drawing all inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001). "Ultimately, courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Mass. Gen. Hosp., 780 F.3d at 487 (quotation omitted). Review "is weighted towards preservation of the jury verdict." Est. of Berganzo-Colon ex rel. Berganzo v. Ambush, 704 F.3d 33, 38 (1st Cir. 2013) (quotation omitted).

B. *Scope of Beyond's Renewed Motion*

The court first addresses Sonate's contention that Beyond's motion is based on "procedurally improper" and "untimely hearsay, discovery, and other evidentiary arguments" raised by Beyond for the first time in its posttrial briefing. Opp'n to Renewed Mot. 2 [Doc. No. 450].

Beyond first moved for judgment as a matter of law pursuant to Rule 50(a) at the close of Sonate's case-in-chief, focusing on Sonate's purported $100 million valuation for its planned "Vegadelphia 2.0" venture. See Nov. 17, 2025 Trans. 49:22–23, 64:21–65:19 [Doc. No. 410]. Beyond argued that the loss of this opportunity—which Sonate attributed to its potential business partners' decision to end their involvement in the venture in light of Beyond's trademark

infringement—was speculative. Id. at 64:21–65:19 [Doc. No. 410]. Sonate reserved its response "for the opposition papers[,]" id. at 65:20-22, and the court deferred a decision on the motion, id. at 64:3-20, 65:20-22.

Immediately following the jury's return of the verdict, Beyond orally renewed its motion for judgment as a matter of law. See Nov. 24, 2025 Trans. 11:14–16 [Doc. No. 415]. Beyond subsequently filed its pending Renewed Motion [Doc. No. 433] pursuant to Rule 50(b), in which it argues that Sonate failed to provide both "non-speculative evidence of [actual] damages" for the purposes of the Lanham Act and "non-speculative evidence of causation[.]" Mem. ISO Renewed Mot. 4, 8 [Doc. No. 436]. Sonate contends that Beyond's Renewed Motion [Doc. No. 433] is procedurally defective along two dimensions.

Sonate first argues that Beyond seeks to "relitigate evidentiary issues it either lost or failed to raise at trial[,]" including by improperly attempting to characterize a lay witness's testimony as expert testimony; raising an untimely objection to purportedly improper statements in Sonate's counsel's closing argument; "seek[ing] improper reinterpretation of the evidence of the record[;]" and presenting testimony "out of the context in which the jury heard it." Opp'n to Renewed Mot. 8–10 [Doc. No. 450].

To the extent Beyond did not previously object to, but now challenges, the "expert" versus "lay" testimony offered at trial and representations made by Sonate's counsel during closing argument, see Mem. ISO Renewed Mot. 5 n.3, 10–12 [Doc. No. 436], or asks the court to adopt Beyond's view of the trial evidence and testimony post hoc, the court agrees that such arguments are beyond the scope of Rule 50(b) and will not consider them. See Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 10–11 (1st Cir. 2021) (holding that defendant's "procedural failure" of not objecting to a witness's testimony during trial prevented defendant from raising

the issue for the first time in a Rule 50(b) motion); Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994) (when evaluating a motion for judgment as a matter of law, "the court may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence").

Second, Sonate asserts that Beyond's Renewed Motion [Doc. No. 433] "improperly advances a new causation theory it did not raise in its Rule 50(a) motion." Opp'n to Renewed Mot. 10 [Doc. No. 450]. Sonate contends that Beyond's Rule 50(a) motion dealt only with the "speculative and uncertain" nature of the $100 million valuation "because the deal did not exist and required expert testimony to substantiate[.]" Id. In Sonate's view, Beyond did not sufficiently "raise its interpretation of Litten's testimony" or otherwise claim that "the record generally" "lacked evidence to support a finding of causation of the failure of the venture" in its Rule 50(a) motion. Id. at 10–11.

As the trial transcript indicates, this characterization of Beyond's Rule 50(a) motion is without merit. When Beyond first made its Rule 50(a) motion at the close of Sonate's case-in-chief, Beyond's counsel twice referenced the causal link, or lack thereof, between the purported infringement on Sonate's mark and Sonate's lost business opportunity for Vegadelphia 2.0: (1) "[t]he plant-based market was declining, and [a potential business partner's] two reasons for not proceeding were because he had deal points that still hadn't been worked out and because of the threat and eventuality of litigation[,]" Nov. 17, 2025 Trans. 65:3-6 [Doc. No. 410] (emphasis added); and (2) "[the business partner] also testified that he didn't go forward with it, not

because of any trademark issue with Beyond or alleged infringement, but because he was concerned about the litigation potential[,]" id. at 65:12–15 (emphasis added).[3]

Even assuming the first reference was merely a component of Beyond's argument as to Sonate's failure to prove actual damages, the second reference—in which Beyond explicitly connected the potential business partner's unwillingness to go forward with Sonate "because he was concerned about the litigation potential[,]" rather than about the infringement on Sonate's mark—suffices as a "distinctly articulated" legal theory in Beyond's Rule 50(a) motion. RFF Fam. P'ship, LP v. Ross, 814 F.3d 520, 537 (1st Cir. 2016) (quotation omitted). Beyond's Rule 50(a) motion was thus "sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion" in this regard, T G Plastics Trading Co. v. Toray Plastics (Am.), Inc., 775 F.3d 31, 39 (1st Cir. 2014) (quotation omitted), and it is therefore proper for Beyond to again raise its causation argument in the Renewed Motion [Doc. No. 433] under Rule 50(b).

C. *Discussion*

Under the Lanham Act, 15 U.S.C. § 1117(a), a prevailing plaintiff in a trademark infringement case is entitled, "subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) (emphasis added); see Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 5 (1st Cir. 1993) ("[T]he victim shall be entitled, 'subject to the principles of equity, to recover (1) defendant's profits, (2) any

[3] The only litigation referenced during the trial was the current litigation brought by Sonate against Beyond, and not any threat of litigation against Sonate.

damages sustained by the plaintiff, and (3) the costs of the action.'" (quoting 15 U.S.C. § 1117(a))).

To show causation under the Lanham Act, Sonate, as the "aggrieved party[,]" was required to "demonstrate that the [infringement] actually harmed its business." Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 318 (1st Cir. 2002). A "precise showing is not required, and a diversion of sales, for example, would suffice." Quabaug Rubber Co. v. Fabiano Shoe Co., Inc., 567 F.2d 154, 161 (1st Cir. 1977).

Sonate claimed damages for lost profits from its then-existing business operations and for lost business opportunity. The court understands Beyond's argument as directed at both and addresses each damages category separately.

1. Lost Profits from Then-Existing Business Operations

At trial, evidence of Sonate's lost profits from its then-existing business primarily came from documentary evidence and the testimony of Seth Shipon, one of Sonate's co-owners. As to the former, the evidence included a statement of Sonate's profits and losses during the period in which Beyond employed the accused mark, showing a decline in sales and profits during the relevant time period.  82 ("Sonate Profit & Loss Statement"). During his testimony, Shipon reported sales declines roughly aligning with these numbers. Nov. 12, 2025 Trans. 164:25–165:2 [Doc. No. 407].

**a. Causation**

Shipon attributed the decline in sales to the impact of Beyond's trademark infringement on Sonate's business. Nov. 13, 2025 Trans. 92:10–14 [Doc. No. 408] (attributing "the drop in sales" to Beyond's infringement of Sonate's tagline).

Beyond argues that Sonate's decline in sales cannot be considered without accounting for the impact of the COVID-19 pandemic in the same period. See Mem. ISO Renewed Mot. 4, 16

[Doc. No. 436] (citing testimony of Beyond's expert, John Plumpe, that Sonate "didn't take into effect any other possible reasons sales might have been down, most notably COVID" (quoting Nov. 19, 2025 Trans. 90:1–12 [Doc. No. 412])).

Although Shipon's testimony was conclusory, Beyond did not seek to strike it. See Nov. 13, 2025 Trans. 92:10–93:4 [Doc. No. 408]. Beyond did play for the jury a portion of Shipon's videotaped deposition testimony, in which Shipon gave a vague answer when asked if he was aware of any "monetary impact" from Beyond's infringement outside of the Vegadelphia 2.0 business venture:

> Q: Other than the [Vegadelphia 2.0] venture . . . are you aware of any monetary impact defendants' use of the tagline had on Sonate?
>
> A: Not specifically.
>
> Q: Do you have anything—[e]very time you say specifically it makes me think there is something unspecific. Do you have anything that's unspecific that you can answer that question on it?
>
> A: No.

Def.'s Not. of Lodging of Dep. Test. Video Clips Played at Tr., Ex. 1a, at ECF 4:263:10–263:25 [Doc. No. 425-2]; see Nov. 13, 2025 Trans. 92:15–22 [Doc. No. 408]. Jurors were thus entitled to accept or reject Shipon's trial testimony blaming the infringement for the lost sales, accept or reject Plumpe's suggestion that the COVID-19 pandemic negatively impacted Sonate's sales, and, by extension, determine whether Sonate's lost sales during this period were attributable to Beyond's conduct or other causes.

Accordingly, the court finds that Sonate offered minimally sufficient evidence at trial to allow a reasonable jury to conclude that Sonate's lost profits between 2018 and 2020 were attributable to Beyond's trademark infringement. See Quabaug Rubber Co., 567 F.2d at 161 ("precise showing" not required).

**b. Amount**

Where Sonate is entitled to actual damages in the amount of lost profits attributable to the infringement, the court must determine the highest amount of actual damages supported by the evidence at trial. See Loan Modification Grp., Inc. v. Reed, 694 F.3d 145, 154 (1st Cir. 2012) ("[T]he jury is free to select the highest figures for which there is adequate evidentiary support." (quotation omitted)).

According to the Sonate Profit & Loss Statement, Sonate's sales declined from $121,724.80 in 2018 to $98,836.50 in 2019. Tr. Ex. 82. In 2020, sales fell to $66,468. Id.; see Nov. 12, 2025 Trans. 164:25–165:2 [Doc. No. 407] (including Shipon's testimony that Sonate's sales experienced an "approximately 20 percent dip in 2019 and [an] approximately 45 percent dip in 2020."). Across the same period, Sonate reported gross profit and net income of $46,424.80 in 2018, $37,316.40 in 2019, and $25,103.20 in 2020. Tr. Ex. 82.

From the figures set forth above, the jury could have calculated Sonate's lost profits to have been $21,321.60, or the difference in profits between 2018 and 2019 plus the difference in profits between 2019 and 2020.[4] See id. Alternatively, the jurors could have accepted the calculation by Sonate's expert witness, Sidney Blum, of lost profits at a slightly higher amount—namely, $37,500, as reported by Beyond's expert, Plumpe. Nov. 19, 2025 Trans. 21:12–24, 89:18–90:12, 137:20–138:16 [Doc. No. 412]; see Nov. 17, 2025 Trans. 27:1-6 [Doc. No. 410].[5]

---

[4] Although Sonate at times presented the infringement period as occurring between 2018 and 2022 (the year in which Sonate filed this lawsuit), for the reasons discussed infra, the evidence at trial did not support an infringement period persisting after 2021. In any event, the cumulative lost profits between 2018 and 2021 (a loss of $4,151.62), and between 2018 and 2022 (a loss of $11,682.76), were less than Sonate's cumulative lost profits between 2018 and 2020. See Tr. Ex. 82.

[5] Blum testified at trial but not as to Sonate's lost profits. See Nov. 17, 2025 Trans. 37:4–44:11 [Doc. No. 410]; Nov. 20, 2025 Trans. 19:18–45:16 [Doc. No. 413]. Plumpe referenced, but did

Accordingly, the court finds that the evidence at trial was minimally sufficient to support an actual damages award of $37,500 for Sonate based on lost profits during the infringement period.

2. Lost Profits from Lost Business Opportunity

Given Sonate's modest sales in the relevant period—amounting to annual sales of only $121,724.80 in the highest grossing year, see Tr. Ex. 82—the balance of the $23.5 million awarded by the jury in actual damages is traceable only to Sonate's claim of lost future business prospects.

Sonate sought such damages based on two theories: (1) Sonate's business growth if tied to an existing food manufacturing company owned by Paul Litten, a distributor of Sonate's other products since 2014 or 2015, see Nov. 12, 2025 Trans. 122:2–19 [Doc. No. 407]; and (2) Sonate's anticipated share of the business had the Vegadelphia 2.0 venture gone forward as expected and the hypothetical business was then acquired by another party in three to five years.[6] The court addresses the issue of causation as to both theories, beginning with the former.

---

not discuss in detail, Blum's $37,500 calculation. See Nov. 19, 2025 Trans. 21:12–24, 89:18–90:12, 137:20–138:16 [Doc. No. 412]. Neither Blum's nor Plumpe's expert report was entered into evidence. See Admitted Ex. List [Doc. No. 403].

[6] During closing arguments, Sonate offered various "approximations" for what it believed to be an appropriate award: $36.75 million, based on the "triangulation" of business associate Paul Litten's estimated $35 million of annual sales in an unaffiliated meat company and Sonate's 35% gross profit margin, see Nov. 21, 2025 Trans. 62:1–63:1 [Doc. No. 414]; $25 million, or 25% of business associate Erik Oberholtzer's three-to-five-year $100 million exit valuation of Sonate under Sonate's planned expansion (Vegadelphia 2.0), see id. at 63:2–13; and a "rough measure" of Sonate's lost profits as a percentage of Beyond's $115 million in incremental profits generated from its trademark infringement, see id. at 62:14–64:10. With these figures as context, Sonate ultimately asked the jury for $31 million in actual damages, or "the average of [$]36.75 and $25 million. We take the profit amount of $115 million, and we shimmy it down to just that average." Id. at 64:11–18. An award based on the "rough measure" of Sonate's lost profits will be addressed below in connection with Sonate's Enhancement and Disgorgement Motion [Doc. No. 430].

**a. Sonate's Damages in Reference to Paul Litten's Existing Business**

As to the theory of actual damages based on Litten's existing business, the court finds that "reasonable persons could not have reached the conclusion that the jury embraced" on this basis. Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 37 (1st Cir. 2006) (quoting Sanchez v. P.R. Oil Co., 37 F.3d 712, 716 (1st Cir. 1994)). The only evidence at trial even remotely supportive of this theory of damages arose from two brief portions of testimony from Litten and Shipon.

Shipon testified that Litten had opened "his own facility" in 2019 and "was essentially at max capacity almost day one, doing about $35 million a year in business, and [Litten] had approached [Sonate] as he was interested in plant-based product." Nov. 13, 2025 Trans. 35:3–9 [Doc. No. 408]; see id. at 36:5–7 ("Q: And what was [Litten's] capacity, you said?; A: He was doing about $35 million a year in sales."). Shipon also testified to Litten's prior success in growing food businesses and about Shipon's positive experience meeting with Litten's existing sales team. See id. at 35:21–24, 36:7–17.

Litten testified that (1) Vegadelphia products would be a good "bolt-on" to Litten's existing company, Quality Foods, that "only . . . manufactures Philly beefsteak and chicken steak[,]" Nov. 12, 2025 Trans. 98:16–17 [Doc. No. 407]; and (2) Litten believed he could have supported "endless" sales of Vegadelphia products because there would be little to no additional production or distribution infrastructure needed in light of Litten's existing company's capacity, id. at 98:22–99:19. At the same time, Litten noted the decline in the plant-based market beginning in late 2021, id. at 103:17–23, and in reference to his belief that his company was already set up for distribution of Sonate's products, articulated his assumption of relatively low quantities: "[O]ne of my companies that's in the Philly steak category, we already had distribution, so adding 20 cases here, 20 cases there wouldn't have been a big problem because we're already in distribution with most of the chains[,]" id. at 99:12–15 (emphasis added).

Based on these snippets of testimony, Sonate asserts that the jury could reasonably find that Sonate would generate revenues in the future in a manner identical to Litten's existing company, which exclusively sold meat products and already existed at scale relative to Quality Foods' production capacity. But without more, Sonate's brief attempt to graft Litten's success with Quality Foods or other ventures onto its own business did not form a sufficient basis on which a reasonable jury could have found that Beyond's infringement caused actual damages for lost business opportunities beyond the speculative level.

**b. Sonate's Future Share of Vegadelphia 2.0**

As to Sonate's lost business opportunity with Vegadelphia 2.0, Beyond argues that Sonate failed to "present non-speculative evidence sufficient to establish that Beyond's infringement caused [Vegadelphia 2.0] to fail." Mem. ISO Renewed Mot. 18 [Doc. No. 436]. Sonate rejects this contention, arguing that there was sufficient evidence of direct causation at trial and that Beyond's position is based on an "artificial distinction [that] runs contrary to established law of intervening cause." Opp'n to Renewed Mot. 13–14 [Doc. No. 450].

Review of the timing of events, the trial testimony, and the documentary evidence demonstrates that no reasonable jury could find it probable, based on non-speculative evidence, that Beyond's infringement of Sonate's trademark was a substantial factor in the abandonment of Vegadelphia 2.0.

The infringement occurred prior to the commencement of negotiations between Sonate and its two potential business partners (Litten and Erik Oberholtzer). Sonate sent a cease-and-desist letter to Beyond regarding the infringing mark on May 28, 2020. Tr. Ex. 37, at ECF 2–3. Beyond's Rule 30(b)(6) witness, Jamie Grass, testified that, upon receipt of the letter, Beyond's marketing department directed personnel to "stop the use [of the accused mark]—collect all the places that had it, and stop the use of it." Nov. 18, 2025 Trans. 45:7–21 [Doc. No. 411].

"[D]igital [use of PLANT BASED GREAT TASTE] switched out . . . almost immediately[,]" and Beyond was "no longer using" the "GREAT TASTE PLANT BASED" tagline "[i]n May of 2020." Id. at 45:23–46:1, 46:2–47:23.

As to physical "marketing collateral" bearing the "PLANT BASED GREAT TASTE" tagline that had already been deployed by Beyond, Grass affirmed that the company moved "promptly" to remove that collateral and replaced "PLANT BASED GREAT TASTE" with other language. Id. at 46:2–23. Evidence presented at trial indicated that the removal process was somewhat protracted but did not extend beyond early 2021. See, e.g., Tr. Ex. 129 (in which Beyond personnel emailed  on April 11, 2021, about the use of a product box with "PLANT BASED GREAT TASTE" printed on it and indicated there was "one pallet left" of that box); Tr. Ex. 128 (indicating a Beyond brand style guide containing "PLANT BASED GREAT TASTE" as a "messaging lock-up" may have still been circulating as of February 2021); Tr. Ex. 127 (in which Beyond personnel communicated via an internal email, dated October 7, 2020, about instructing a third-party to "pull any remaining collateral" with "PLANT BASED GREAT TASTE" on it); Tr. Ex. 125 (in which Beyond personnel communicated via an internal email, dated September 11, 2020, about "roughly 900K . . . shipper cases for club [retailers] in current inventory" bearing "PLANT BASED GREAT TASTE"); Tr. Ex. 124 (in which Beyond personnel communicated via an internal email, dated September 9, 2020, about the removal dates for various promotional items that included the infringing mark, the latest of which was "Dec 2020").[7]

[7] Although Shipon testified that Sonate "still saw uses" of Beyond's infringing marks on "social media and other uses" through the filing of the lawsuit in April 2022, see Nov. 13, 2025 Trans. 33:1–9 [Doc. No. 408], the weight of the evidence does not support that timeline. See, e.g., Nov. 18, 2025 Trans. 45:7–47:23 [Doc. No. 411]; Tr. Ex. 129; Tr. Ex. 127; Tr. Ex. 125; Tr. Ex. 124.

Shipon also testified that Sonate was unable to "ship any samples or approach any accounts" associated with Litten's existing distribution network because "there was concern around . . . the trademark being used by Beyond and Dunkin', and we didn't want to appear as if we were coming to the market as the copycat." Nov. 13, 2025 Trans. 38:25–39:10 [Doc. No. 408].[8] But Beyond's application with the U.S. Patent and Trademark Office for the tagline "PLANT BASED GREAT TASTE" was rejected in June 2020, making Beyond's competing trademark application no longer an issue as of that date. See Tr. Ex. 43.

When Shipon informed Oberholtzer about the recent discovery of Beyond's tagline at Dunkin' Donuts, Oberholtzer recalled that this was an "issue particularly for the Shipon brothers . . . it came up as a point of concern or at least something that we should be aware of as we . . . navigated this relationship that we had." Oberholtzer Dep. Test. 103:83:15-83:21 [Doc. No. 424-1].

Nonetheless, on October 23, 2020—well after Vegadelphia sent its May 2020 cease-and-desist letter, after much of the infringing promotional material had been removed from the market, and after Beyond's trademark was rejected in June 2020—Litten emailed Shipon, stating: "To follow up on our meeting[,] I want to get the ball rolling on the Veg sooner than later. . . . We need to get samples out Asap." Tr. Ex. 36. On December 2, 2020, approximately seven months after Beyond received the cease-and-desist letter and began removing the infringing mark, Shipon sent an email to Litten demonstrating that the Vegadelphia 2.0 venture was, at most, still at a preliminary stage:

---

[8] Oberholtzer also testified about the possibility of "confusion" or "dilution" arising from Dunkin' and Beyond's use of a "tagline" similar to Sonate's. See Stip. Re: Dep. Test. Entered at Tr., Ex. A, at ECF 113:120:14–121:14 [Doc. No. 424-1] ("Oberholtzer Dep. Test.").

> [Oberholtzer] is working on the next round of samples and we'll reach out to schedule the tasting shortly. With that said, we want to kick things into high gear and start putting real resources behind these opportunities, but in order to do so we need to begin formalizing things:
>
> Vegadelphia Foods: I believe we're all on the same page here, but as a quick summary:
>
> - Sonate gives Quality exclusive rights, all accounts, all business, etc.
> - [Oberholtzer] and his team, Cohere, will be in charge of all R&D and Marketing.
> - Quality to pay Sonate 8% royalty fee.
> - Sale of company would be split 50% Quality, 25% Sonate, 25% Cohere
>
> If in agreement on these base terms, we will move forward to contract. Any specific questions or are we good to get started?
>
> [. . . .]
>
> Ideally, what I'd like to see is ONE deal between SONATE and QUALITY to cover EVERYTHING (Vegadelphia and [another business owned by the Shipons]) and then just get to work!!......but if that is going to slow down progress with Vegadelphia, let's separate the two issues.
>
> Please review and let me know your thoughts….but let's get this done….it[']s time!

Tr. Ex. 262.

Negotiations appear to have occurred during the first half of 2021, with no allegations of new infringement of Sonate's trademark by Beyond. At trial, Sonate introduced two draft License and Services Agreements ("LSAs"), alongside communications from the parties' attorneys contextualizing the drafts. The first draft, labeled "DRAFT 1-14-2021[,]" see Tr. Ex. 266, identified Sonate as the Licensor and Quality Foods as the Licensee, and would have granted Quality Foods an exclusive license to distribute the licensed products, see id. at 1, 4 ¶ 2.0. The first draft included the following carve-out:

> The Parties acknowledge and agree that Licensee shall not be entitled to any proceeds resulting from any litigation between the Licensor, Dunkin' Brands Group, Inc. and Beyond Meat, Inc. Further the Parties acknowledge and agree that the rights and license to the trademark, WHERE GREAT TASTE IS PLANT-BASED (U.S. Registration No. 4,698,499) may be terminated.

Id. at 9 ¶ 8.7. Litten's attorney commented on the draft in a letter to Shipon on April 5, 2021, but raised no objection to the carveout. See id. (containing the attorney's unpaginated cover letter). Litten's attorney instead identified nine items that required discussion and were not finalized, including fee arrangements and a three-year $1,000,000 guaranteed minimum gross sales requirement. Id.

Sonate's attorney sent non-substantive emails to Litten's attorney on May 5 and May 17, 2021. Tr. Ex. 88 (containing the attorneys' unpaginated email exchanges in May 2021 and July 2021). On July 20, 2021, Sonate's attorney wrote to Litten's attorney that he understood that their clients were moving forward with the agreement, and the attorneys then exchanged further emails setting up a call. Id. The next day, July 21, Sonate's attorney emailed Litten's attorney with a "revised" draft agreement "[p]er our discussion" and offered to discuss the draft once more. Id. The draft agreement terms that contained revisions or required additional input from Litten's attorney involved, inter alia, an initial non-refundable royalty term and waiver provision, the start and termination dates of the agreement, and the mechanism for making royalty payments. Id. at 9 ¶¶ 9.1–9.2, 11 ¶¶ 11.1–11.3, 11.5–11.6. No changes were made to the carve-out regarding Sonate's infringement claims against Beyond and Dunkin' Donuts. See id. at 9 ¶ 8.7. No further draft contracts or written communications pertaining to the proposed agreement were entered into evidence.

Testimony from Litten, Oberholtzer, and Shipon underscored the indefiniteness of the contemplated Vegadelphia 2.0 venture. Litten, for example, confirmed that he never entered a formal agreement with Sonate. See Nov. 12, 2025 Trans. 101:7–14 [Doc. No. 407] ("Q: By the time you decided not to proceed in partnering with Vegadelphia, was there an agreement in place?; A: There wasn't."). Litten also acknowledged that one term in the draft agreement

remained unsettled through the point at which he decided to stop pursuing the venture, although he believed the issue "could have been worked out with [his] attorney." Id. at 102:6–12. Oberholtzer likewise testified that, although he and Litten were "operating in good faith towards a contract[,]" his work on Vegadelphia 2.0 was not done pursuant to a contract and was unpaid. Oberholtzer Dep. Test. ECF 94:41:24–25 [Doc. No. 424-1]; id. at ECF 101:46:20–47:15 (confirming that Oberholtzer never entered an agreement with Litten and, although the parties referred to Oberholtzer's work as having a value of $80,000 in "sweat equity" in an email, never received any payment).

Shipon testified that, in his opinion, the parties were "close" to signing a final agreement as to Vegadelphia 2.0, although they never did so:

> Q: And so—and aside from the Beyond issue, how close was the company, Paul Litten and Erik Oberholtzer, in your mind, to sign the final contract?
>
> A: We were close. We had, you know—we had an agreement written up, we had attorneys going back and forth, different variations. And basically came down to the end, and it didn't get signed.

Nov. 13, 2025 Trans. 42:24–43:5 [Doc. No. 408]. How "close" the parties were, however, remained nebulous throughout the trial.

The various communications between the parties on which Sonate relied at trial were certainly optimistic and expressed a desire to move quickly. See, e.g., Tr. Ex. 36 (email exchange involving Shipon, Litten, and Oberholtzer, dated October 23, 2020); Tr. Ex. 262 (email exchange involving Shipon and Litten, dated December 2, 2020). But the evidence demonstrated that, despite this enthusiasm, the practical steps necessary for Vegadelphia 2.0 to materialize as an actual business venture were not completed and terms unrelated to the infringement remained unresolved. Litten, for example, testified that, although he had been working on the venture for "a few years" at the time he discontinued his involvement, Nov. 12, 2025 Trans. 101:15–17

[Doc. No. 407], no products were ready to be introduced to the market at that point. See id. at 101:22–102:1 ("Q: Did you ultimately develop a product that you were happy with and ready to take to the market?; A: We were close.; Q: But not quite there?; A: Not quite there."); see also id. at 119:13–120:15 ("Q: Okay. So this was almost two years into the process and the product still was not correct?; A: Correct."); Tr. Ex. 270 (including a discussion via email dated October 27, 2021, between Oberholtzer, Litten, and Shipon about ongoing development of samples of the new products, including their color). Shipon's testimony about product development offered more specifics about the process, but, like Litten, Shipon did not claim that a ready-for-market product existed. See Nov. 13, 2025 Trans. 42:11–23 [Doc. No. 408] (testifying to Sonate's completion of test batches of a reformulated product and stating that the reformulation "got . . . as far as down to some minor tweaks. I think it came down to some changes in color").

Oberholtzer likewise testified to new ideas for, and some testing of, new or reformulated Sonate products, but he did not testify to their market-readiness:

> Q: And what—what would hasty order mean to you?
>
> A: Well, as you can read in the tone of [Litten's October 23, 2020 email] that there's a feeling that there was a window of opportunity, that there was demand and he was eager to commercialize a product, not just like an upgraded version of Vegadelphia's plant-based cheese steak, but there were a lot of other SKUs that were talked about.
>
> Q: What were those other SKU[s]?
>
> A: We talked about a—you know, a demand for some sort of a sausage. I remember him being somewhat excited about a sausage of some sort plant-based. And my enthusiasm was, you know, [b]eyond this leveraging my psyllium to move this away eventually from, you know, the isolates into—into—to more of a whole food ingredient.
>
> Q: And was the sausage product ever created?
>
> A: No.
>
> Q: So what was created?
>
> A: The version two built on the—the existing product.

Oberholtzer Dep. Test. ECF 98:37:18–38:14 [Doc. No. 424-1].

According to Oberholtzer, the "version two[,]" a reformulation of Sonate's existing plant-based cheese steak product, was "tested at scale" and "sent . . . out to existing customers and then . . . some other accounts all felt would . . . be receptive to it." Id. at ECF 98:38:18–21; see id. at ECF 100:45:25–101:46:05 (in which Oberholtzer testified it "was [his] understanding" that some of Sonate's existing customers and Wawa, a chain of stores that was not an existing customer, received samples of the reformulated product). Oberholtzer did not know if the reformulated product was ever purchased or otherwise ordered by Sonate's customers. Id. at ECF 99:39:25–40:19 ("Q: And to your knowledge did any customer ever purchase this test product that was created?; A: I don't know."). Separate from product development, Oberholtzer also testified that packaging for the product was never developed and, although there were "beginnings of an outline" for marketing the new product, no formal marketing plan existed. Id. at ECF 100:43:09–44:08.

The circumstances surrounding Oberholtzer's $100 million valuation of Sonate are also relevant to the causation analysis. According to Oberholtzer, the $100 million figure emerged "in a document that we put together, just an early questionnaire we put the potential of this business in valuation if we got it all right at a hundred million." Id. at ECF 110:113:17–20. That this valuation came about in "an early questionnaire[,]" particularly when contextualized by Oberholtzer's testimony that he perhaps never saw a "full financial statement" for Sonate, speaks to the preliminary and largely hypothetical nature of the Vegadelphia 2.0 venture. Id. at ECF 104:90:13–17 ("Q: And you were provided with Sonate's information related to their sales and revenue[,] is that correct?; A: I don't know that I ever got a full financial statement or number to be honest.").

In view of the cumulative evidence, and resolving all inferences in Sonate's favor, the evidence adduced at trial did not demonstrate or give rise to a reasonable inference that Vegadelphia 2.0 was ever a certainty or even near-certainty where: (1) no contract was signed or even fully drafted; (2) although Beyond stopped deploying the infringing mark and began rescinding all materials with the mark soon after receiving Sonate's cease-and-desist letter in May 2020, the parties did not initiate the development of a contract until December 2020, at the earliest; and (3) despite Beyond's retraction of materials bearing the infringing mark by no later than early 2021 and Sonate's continued work on the Vegadelphia 2.0 venture through 2022, no ready-for-market reformulation or new products existed, and marketing for the reformulation did not go further than the "beginnings of an outline[.]"

In short, there was no basis on which a reasonable jury could infer, without speculating, that the continued involvement of Litten and Oberholtzer would have resulted in a binding contract and real future sales. See Loan Modification Grp., Inc. v. Reed, 694 F.3d 145, 154 (1st Cir. 2012); see also Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1580 (Fed. Cir. 1992) (in patent infringement case, jury's damages award "must be upheld unless the amount is . . . based only on speculation or guesswork"); id. at 1581 ("The burden of proving future injury is commensurately greater than that for damages already incurred, for the future always harbors unknowns.").

But even if a reasonable jury could somehow have concluded that the proposed business had reached a non-speculative stage, no reasonable jury could find that Beyond's trademark infringement was a non-speculative cause of Sonate's claimed damages for the loss of Vegadelphia 2.0. As Beyond argues, the evidence instead shows, at most, that the "Beyond issue" raised throughout the testimony about Vegadelphia 2.0 was Sonate's decision to sue

Beyond almost two years after sending the May 2020 cease-and-desist letter, not Beyond's infringement itself.

As detailed above, the past infringement was well-known to the parties when they first started their negotiations. Even assuming the jury could reasonably infer that Beyond's use of Sonate's mark persisted through February or April 2021, see Tr. Ex. 128; Tr. Ex. 129, there is no evidence that any continued use by Beyond was even considered by the parties to the proposed deal. Moreover, as described supra, when the draft LSAs were exchanged, Sonate not only carved out from the proposed deal any recovery Sonate would receive for the infringement, but also the right to give up the trademark itself, without objection from the other parties. See Tr. Ex. 266, at 9 ¶ 8.7; Tr. Ex. 88, at 9 ¶ 8.7.

Rather than support a claim that Beyond's infringement caused negotiations to end, the evidence at most supported that the litigation Sonate intended to initiate ended the negotiations. Litten explained that he had expected the dispute would have been resolved "within the first three, four weeks" after Sonate sent Beyond a cease-and-desist letter. See Nov. 12, 2025 Trans. 133:19–24 [Doc. No. 407]. A further colloquy demonstrates his concern with the litigation, rather than Beyond or Dunkin's infringement of the Vegadelphia trademark:

> Q: How, if at all, then, did Dunkin's use of the slogan impact your decision-making as it related to the Vegadelphia project?
>
> A: It was just, you know, whenever you have any kind of litigation going on in any company, it causes the culture of the business to go into separate places, right? You're not all focused. You're not driven. You're just worried about how many emails you can respond to for an attorney.
>
> So even with all the companies we purchased, we make sure there's no litigation because we don't want to deal with that.

Id. at 132:24–133:9.

Similar to Litten's testimony, several of Oberholtzer's statements directly link the decision not to proceed with Vegadelphia 2.0 to Sonate's decision to pursue litigation against Beyond. For example, Oberholtzer testified that:

> You know, truthfully in the agreement this . . . situation came up with . . . Dunkin'. I was sort of brought up to speed about what . . . it meant to [Sonate]. And there was . . . a carveout in that agreement that stated if there were any gains or proceeds . . . from a suit or settlement, that me and [Litten] . . . would not be part of that. And . . . what it did was center us a little bit on the stickiness of it and—and some of the—yeah, maybe the distraction or risk that it . . . might present.

Oberholtzer Dep. Test. ECF 94:22:25–23:13 [Doc. No. 424-1]. He referred to Sonate's impending lawsuit as a "distraction for the Shipons and therefore more and more a distraction to the effort at a stage when you can't afford a lot of distraction" and opined that the Shipons "needed the bandwidth for [the lawsuit][,]" to the detriment of progressing with the Vegadelphia 2.0 venture. Id. at ECF 108:108:10–109:108:21; see id. at ECF 109:108:22–24.("[Litten's] busy and I'm busy, so you know, honestly it was go take care of this and then come back to us. And [at the time of Oberholtzer's deposition] that is still going.").

As to why the agreement for Vegadelphia 2.0 was never signed, in addition to his comments about the "stickiness" and "distraction" associated with Sonate's lawsuit noted supra, Oberholtzer also testified:

> Well, the agreement was never signed, so I guess it wasn't terminated. But . . . as we really got closer to . . . getting this out to market in the new version—I mean there was already obviously product and customers out there, legacy customers. You know, [Litten] in particular because he . . . had an existing wholesale customer channel for this had—you know, I remember him having some concern. And I echoed it partly because it was less about for me the litigation itself, but the risk that if we were poking a big bear, a big company, that . . . we could be just sort of crushed out of the gate.

Id. at ECF 94:24:04–95:24:16 (emphasis added). Oberholtzer also affirmed that, under the proposed Vegadelphia 2.0 agreement, neither he nor Litten would receive any portion of the damages or settlement that might arise from the lawsuit. See id. at ECF 94:23:04-09.

Shipon testified repeatedly to the "Beyond issue" being the impediment to the Vegadelphia 2.0 deal. See Nov. 13, 2025 Trans. 42:24–43:5, 47:12–14; 49:18–21 [Doc. No. 408]. But no reasonable jury could find that the "Beyond issue" that caused the deal to fail was Beyond's infringement, rather than Sonate's litigation regarding past infringement.

Accordingly, Beyond's Renewed Motion for Judgment as a Matter of Law [Doc. No. 433] is GRANTED insofar as the actual damages awarded to Sonate were based on Sonate's lost business opportunities.

## II. Sonate's Enhancement and Disgorgement Motion

In its Enhancement and Disgorgement Motion [Doc. No. 430], Sonate takes the position that "the jury's verdict is certainly the floor of the final judgment, but equitable enhancement [of actual damages] and additional profit disgorgement is warranted here." Mem. ISO Mot. for Equitable Enhancement & Additional Profit Disgorgement 20 [Doc. No. 432] ("Mem. ISO Equitable Enhancement"). Sonate therefore "requests the final judgment include an additional $10–30 million total for enhancement and additional profit disgorgement." Id. Beyond opposes any equitable award and contends that the $15.4 million of disgorged profits constitute an advisory award subject to post-trial modification by the court. See Beyond Suppl. Tr. Br. 1–3 [Doc. No. 440]. Beyond asks the court to reject the jury's allocation of $15.4 million of disgorged profits to Sonate and any "enhancement" of the actual damages awarded. See Opp'n to Mot. for Equitable Enhancement & Additional Profit Disgorgement 13–14, 20 [Doc. No. 452] ("Opp'n").

"The Lanham Act directs the question of entitlement of plaintiffs to defendants' profits be subject to 'the principles of equity.'" Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 77 (1st Cir. 2008) (quoting 15 U.S.C. § 1117(a)). "[I]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive[,]" the Lanham Act further provides

that "the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). Such relief may not function as a penalty. See id.; Visible Sys. Corp., 551 F.3d at 78.

A. *Nature of the Disgorgement Award*

The court begins with Sonate's contention that the jury's disgorgement award of $15.4 million sets a mandatory floor "because it was submitted to the jury for a non-advisory verdict." Sonate Resp. to Supp. Tr. Br. 8 [Doc. No. 453]; see Supp. Br. on Profit Disgorgement Question [Doc. No. 393]; Opp'n 4, 14 n.8 [Doc. No. 452]; Beyond Suppl. Tr. Br. 1–3 [Doc. No. 440].

At trial, the jury was tasked both with making a factual finding as to the outer limit of disgorged profits that could be awarded to Sonate based on the evidence at trial and with presenting an advisory amount of disgorged profits within that boundary that the court should award to Sonate. During an initial charge conference held on the fifth day of trial, for example, the court explained:

> at the end of the day, I'm probably getting only an advisory as to that last question of disgorgement. But there are steps along the way that I think I have to figure out, right, to get there about whether the—whether the chains of distribution are the same, whether the willfulness—I mean, there are pieces along the way that I think the jury decides.

Nov. 17, 2025 Trans. 22:17–23 [Doc. No. 410].

Similarly, at another charge conference held on the seventh day of trial, the court responded to Beyond's counsel's request that the court take disgorgement away from the jury:

> I think because it's an equitable issue, at the end of the day, I do think I'm the one who has to make the decision on the dollars.
>
> I think the jury has to make the decision on confusion, on willfulness, on bad faith, whatever. All of those pieces are for the jury, not me. But if the jury gets all of the way there, I do think that the dollars for restitution is ultimately an equitable question, I think.

Nov. 19, 2025 Trans. 244:12–25 [Doc. No. 412]. Sonate voiced its disagreement with this view and directed the court to its Supplemental Brief on [the] Profit Disgorgement Question [Doc. No. 393]. Nov. 19, 2025 Trans. 245:1–25 [Doc. No. 412]. The next day, the court reiterated that the jury would determine Beyond's total profits, but the court would decide after trial the amount of profits, if any, that would go to Sonate. Nov. 20, 2025 Trans. 149:12–21 [Doc. No. 413].

Sonate cannot now credibly assert that the court affirmatively sought a binding, rather than advisory, jury verdict on this final issue. As discussed infra, the issues of willfulness, direct competition, and the upper limit of profits potentially available for disgorgement were "pieces along the way" committed solely to the jury's discretion. Nov. 17, 2025 Trans. 22:17–23 [Doc. No. 410]. But such "pieces" referred to the jury by the court did not include a binding determination of an appropriate final award of disgorged profits.

B. *The Jury's Findings and Advisory Recommendation*

The jury made the following findings relevant to the court's determination of an equitable award:

As to Beyond's infringing use of the tagline "PLANT BASED GREAT TASTE[,]" the jury determined that (1) $109 million of Beyond's profits were "attributable to [Beyond's infringing] use of 'PLANT BASED GREAT TASTE'"; (2) Sonate's products "directly compete in the marketplace with [Beyond's] products that are marketed with 'PLANT BASED GREAT TASTE'"; and (3) Beyond's infringing use of "PLANT BASED GREAT TASTE" was willful. Special Verdict Form 3–4 [Doc. No. 419]. The jury advised that $15.4 million of disgorged profits should be awarded to Sonate "as a rough measure to fairly compensate [Sonate] for harm proximately caused by Beyond Meat's use of 'PLANT BASED GREAT TASTE' that was not included in actual damages[.]" Id. at 4.

As to Beyond's infringing use of the tagline "GREAT TASTE PLANT BASED[,]" the jury determined that (1) $5.4 million of Beyond's profits were "attributable to [Beyond's infringing] use with Dunkin' [Donuts] of 'GREAT TASTE PLANT BASED'"; (2) Sonate's products "directly compete in the marketplace with Beyond Meat's products and/or Dunkin's products"; and (3) Beyond's infringing use of "GREAT TASTE PLANT BASED" was willful. Id. at 4–5. Having made these findings, however, the jury advised that no disgorged profits should be awarded to Sonate "as a rough measure to fairly compensate [Sonate] for harm proximately caused by Beyond Meat's and Dunkin's use of 'GREAT TASTE PLANT BASED' that was not included in actual damages[.]" Id. at 5.

C. *Sonate's Entitlement to Equitable Relief*

The First Circuit recognizes three justifications for awarding an accounting of a defendant's profits as a remedy for trademark infringement: "(1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement." Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 36 (1st Cir. 2002). "The sufficiency of the evidence must be evaluated against each of the rationales for an award of the defendant's profits." Visible Sys. Corp., 551 F.3d at 79.

1. Rough Measure of Harm

Working under the assumption that the jury's $15.4 million award for disgorgement of profits was "non-advisory[,]" Sonate's posttrial briefing offers little legal argument as to the purpose and appropriateness of such an award on the facts of this case. Beyond argues "that disgorgement is not appropriate here at all, never mind the requested increase[,]" particularly where Sonate's request is premised on "the outlandish claim that because the jury found

willfulness this Court essentially must disgorge all or at least more of Beyond's profits." Opp'n 14 [Doc. No. 452].

The court begins by distinguishing between the binding and non-binding components of the jury's decision-making regarding profit disgorgement as a "rough measure to fairly compensate [Sonate] for harm proximately caused by Beyond Meat's use of 'PLANT BASED GREAT TASTE' that was not included in actual damages[.]" Special Verdict Form 4 [Doc. No. 419].

As explained supra, the amount of Beyond's disgorged profits allocated to Sonate by the jury was advisory. But "even if the accounting is viewed as an equitable claim for the judge, the judge is bound by the jury's determination of issues . . . which affect the disposition of the accompanying equitable claim." Visible Sys. Corp., 551 F.3d at 78 n.8 (citing Attrezzi, 436 F.3d at 43 n.5); see Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009) ("[T]rial judges do not sit as thirteenth jurors, empowered to reject any verdict with which they disagree." (citing Coffran v. Hitchcock Clinic, Inc., 683 F.3d 5, 6 (1st Cir. 1982))). The court is therefore bound by the jury's factual determinations that (1) the amount of Beyond's profits "attributable" to its infringing use of "PLANT BASED GREAT TASTE" equaled $109 million, Special Verdict Form 3 [Doc. No. 419]; and (2) Sonate "prove[d], by a preponderance of the evidence, that [Sonate's] products directly compete in the marketplace with Beyond Meat's products that are marketed with 'PLANT BASED GREAT TASTE[,]'" id. at 4.

Beyond argues in its Supplemental Trial Brief [Doc. No. 440] and in its Opposition [Doc. No. 452] to Sonate's Enhancement and Disgorgement Motion [Doc. No. 430] that Sonate did not present sufficient evidence to support the jury's finding that Beyond and Sonate's products directly compete in the marketplace. Beyond Suppl. Tr. Br. 13 [Doc. No. 440] ("[F]or a proxy-

based award, [Sonate] must prove that it was direct competitors with Beyond, such that Beyond's sales effectively would necessarily have gone to [Sonate] absent infringement. . . . The evidence confirmed this was not so, and the jury's supposition otherwise should be given little weight, as the Court evaluates this equitable remedy."); Opp'n 4 [Doc. No. 452] ("Even recognizing the jury's contrary finding, any evidence of competition was negligible, deeply undermining [Sonate's] demand for any disgorgement in equity[.]").

Beyond may very well be correct on this point. But where Beyond did not seek judgment as a matter of law on direct competition at trial or in its posttrial Rule 50(b) motion, Beyond cannot now ask the court to jettison the jury's decision through a supplemental brief and an opposition to Sonate's motion. See Nov. 17, 2025 Trans. 64:1–65:23 [Doc. No. 410] (containing Beyond's oral motion for judgment as a matter of law at the close of Sonate's case-in-chief); Mem. ISO Renewed Mot. [Doc. No. 436] (containing Beyond's argument for judgment as a matter of law posttrial, which focused exclusively on actual damages).[9]

---

[9] During the court's final charge conference, Beyond objected to the jury instruction on direct competition. See Nov. 21, 2025 Trans. 14:8–17:7 [Doc. No. 414]. But this objection did not go to the submission of the factual determination of direct competition to the jury:

> [Beyond's Counsel]: Your Honor, again, the—the Fishman Transducers case, which is a First Circuit case, states that . . . "Under this direct competition theory, the plaintiff and defendant's products may be such complete substitutes that a sale by the infringer under the infringed party's mark is almost automatically a lost sale by the plaintiff."

Id. at 15:9–11, 15:25–16:4. The court ultimately agreed to modify the proposed instructions:

> The Court: Then I'm going to add a sentence here. I'm going to copy that next sentence[:] "Under this direct competition theory, the plaintiff and defendant products may be such complete substitutes that a sale under the infringed party's mark is almost automatically a lost sale by the plaintiff."

Id. at 16:24-17:3. Beyond's counsel accepted that change, stating "subject to our objections, Your Honor, we would live with that." Id. at 17:4-6 (emphasis added). Beyond's "objections" stemmed from the use of an "either/or" construction in a draft instruction stating:

Beyond faces a similar hurdle as to the jury's finding on the amount of Beyond's profits "attributable" to its infringing use of "PLANT BASED GREAT TASTE[.]" Special Verdict Form 3 [Doc. No. 419]. Although Beyond raised concerns about asking the jury to determine these profits during a charge conference, see Nov. 20, 2025 Trans. 115:21–116:9, 117:10–18 [Doc. No. 413], Beyond did not formally object, ultimately contributed to the crafting of the final special verdict form question and jury instructions on the issue, and, again, did not seek to address the jury's finding through its Rule 50 motions. See id. at 149:4–156:18; see also Nov. 17, 2025 Trans. 64:21–65:15 [Doc. No. 410] (in which Beyond orally moved for judgment as a matter of law pursuant to Rule 50(a)); Mem. ISO Renewed Mot. [Doc. No. 436].

With the jury's binding findings of direct competition and Beyond's profits attributable to "PLANT BASED GREAT TASTE" as a backdrop, the court turns to the jury's $15.4 million advisory award for disgorged profits.

To the extent Beyond seeks a reduction in this amount, the court first observes that, as a proportional matter, the $15.4 million advisory award represents approximately 14% of the $109 million of Beyond's profits that the jury attributed to Beyond's infringing use of "PLANT BASED GREAT TASTE" and approximately 13.5% of the $114.4 million of Beyond's total profits the jury attributed to all infringing uses. See Special Verdict Form 3 [Doc. No. 419]. The court also takes into account the relevant burdens of the parties as to disgorgement:

> [I]f the two companies are in the same line of business, defendant's profits may be presumptively similar to what plaintiff would have earned on the sale. Congress has further provided that where profits are the measure of recovery, the plaintiff

---

> A direct competitor m[u]st operate at the same level of the market, and there must either be a substantial degree of equivalence of … substitutability … [b]etween the parties' products or a sale by Beyond.

Id. at 6:16–7:11; see id. at 12:10–17:6.

> need only prove the defendant's sales and the defendant must prove costs and other deductions.

Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 194 (1st Cir. 2012); see Tamko Roofing Prods., 282 F.3d at 37 ("[W]e think once plaintiff has shown direct competition and infringement, the statute places the burden on the infringer to show the limits of the direct competition[.]"). Similarly, to the extent Beyond argued at trial or now argues in its posttrial filings that any direct competition between Beyond and Sonate was negligible, the First Circuit instructs that "the defense of only partial direct competition [is] very similar to an element of cost or deduction claimed, which defendant has the burden of showing." Tamko Roofing Prods., 282 F.3d at 37.

Here, both parties offered documentary evidence of Beyond's financials during the infringement period and elicited testimony as to those financials from Beyond's vice president of financial planning, Paul Sheppard. See, e.g., Nov. 14, 2025 Trans. 37:21–46:12, 49:6–58:9, 59:21–75:11, 77:3–92:19, 93:1–99:6 [Doc. No. 409] (containing Sheppard's testimony at trial); Tr. Ex. 547 (containing Beyond's revenue and expenses associated with its partnership with Dunkin' Donuts between April 2019 and December 2021); Tr. Ex. 550 (containing Beyond's revenue and expenses for its United States Business, including its sales to Dunkin Donuts, between April 2019 and December 2021); Tr. Ex. 606-43 (containing Beyond's annual report for 2020). Although Beyond was "unable to isolate sales that used or did not use" the "PLANT BASED GREAT TASTE" mark, see Nov. 14, 2025 Trans. 53:10–14 [Doc. No. 409], Beyond presented to the jury various testimony and pieces of evidence that qualitatively spoke to the significant differences in Beyond and Sonate's business models, scope, and sales, described in greater detail infra. Jurors were free to weigh this evidence as they saw fit both when arriving at their direct competition finding and when determining the advisory disgorgement award.

Both Sonate and Beyond also offered expert testimony as to the profits attributable to Beyond's infringing use of "PLANT BASED GREAT TASTE[,]" for which the jury rendered the $15.4 million advisory disgorgement award, and Beyond's infringing use of "GREAT TASTE PLANT BASED[,]" for which the jury advised that no disgorgement should be awarded. See Special Verdict Form 3–5 [Doc. No. 419]. Sonate's expert, Blum, opined that Beyond's revenue "available for disgorgement" totaled $501,367,031. See Nov. 17, 2025 Trans. 39:11–24 [Doc. No. 410]. In rebuttal to the testimony of Beyond's expert, described infra, Blum also testified as to Beyond's profits available for disgorgement: $5,420,242 attributable to the infringing use of "GREAT TASTE PLANT BASED" and $109,868,167 attributable to the infringing use of "PLANT BASED GREAT TASTE[.]" Nov. 20, 2025 Trans. 25:12–17, 30:16–23 [Doc. No. 413].

Beyond's expert, Plumpe, arrived at roughly the same revenue figure as Blum. See Nov. 19, 2025 Trans. 53:5–11, 78:19–79:12 [Doc. No. 412] (opining that the revenues totaled approximately $500.2 million). But Plumpe's opinion as to profits available for disgorgement varied tremendously: $3.98 million attributable to the infringing use of "GREAT TASTE PLANT BASED" and effectively zero dollars attributable to the infringing use of "PLANT BASED GREAT TASTE" where Beyond lost approximately $11.8 million on those sales. Id. at 74:17–75:7, 87:2–15.

The significant difference in Blum and Plumpe's opinion is traceable to the two experts' different accounting methodologies. Compare id. at 88:3–8 (in which Blum testified to using "the fully allocated method" to calculate Beyond's profits), with Nov. 20, 2025 Trans. 20:19–21:6 [Doc. No. 413] (in which Plumpe testified to using the "incremental approach" to calculate Beyond's profits). Although they agreed that $33,257,576 in marketing costs were deductible

from Beyond's revenues when calculating profits, see Nov. 20, 2025 Trans. 24:23–25:7 [Doc. No. 413], Blum and Plumpe fundamentally disagreed as to whether Beyond's other domestic operating expenses should also be deducted and as to the treatment of fixed costs and costs incurred in service of future, unrealized profits. See Nov. 19, 2025 Trans. 80:18–82:17, 83:6–87:21 [Doc. No. 412] (Plumpe); Nov. 20, 2025 Trans. 22:4–23:3, 25:12–27:11, 28:10–21 [Doc. No. 413] (Blum).

Jurors were free to credit some, all, or none of Blum and Plumpe's conclusions and to decide for themselves the soundness of the experts' competing calculation methods. Insofar as the jury found that Beyond's profits attributable to its infringing use of "PLANT BASED GREAT TASTE" totaled $109 million, the jurors evidently found Blum's calculation to be the more appropriate figure. See Special Verdict Form 3 [Doc. No. 419]. But the $93.6 million difference between the total attributable profits and the jury's advisory disgorgement award indicates to the court that the jury also took into account the other factors presented by Beyond that counseled against an exact one-to-one relationship between Beyond's infringing sales and Sonate's purported lost sales, even in light of the jury's finding of direct competition.[10]

Accordingly, where the jury's advisory award reasonably arises from the evidence offered at trial, and where the court is bound by the jury's factual findings as to direct

[10] Beyond also points to the First Circuit's decision in Visible Systems Corp., in which the panel opined that Lanham Act cases brought under a theory of reverse confusion "[do] not lend [themselves] to any automatic assumption that there is an equivalence between defendant's profits and plaintiff's diverted sales." 551 F.3d at 80. In this case, Sonate proceeded on both a theory of forward confusion and a theory of reverse confusion. But jurors were not instructed on these theories or the distinctions between them, nor were jurors asked to determine whether forward or reverse confusion occurred.

competition and Beyond's total profits attributable to its infringing use of "PLANT BASED GREAT TASTE[,]" the court adopts the jury's $15.4 million award of disgorged profits.

2. Avoidance of Unjust Enrichment

As to Sonate's request for additional disgorgement, Beyond first argues that awarding profits to Sonate to remedy unjust enrichment is inappropriate because "[u]njust enrichment is only found where consumers purchased Defendant's products, mistakenly believing that Plaintiff was the source of the product." Opp'n 16 [Doc. No. 452] (citing first Safeway Transit v. Disc. Party Bus, 954 F.3d 1171, 1179–80 (8th Cir. 2020); and then citing Restatement (Third) of Restitution & Unjust Enrichment § 51(5)(d) (A.L.I. 2011)). Sonate contends that "all $114.4 million in attributable profits found by the jury is unjust enrichment, whether or not a proxy sale" and seeks an additional award on that basis. Mem. ISO Equitable Enhancement 19–20 [Doc. No. 432].

Sonate and Beyond's respective arguments reflect fundamentally different views of the role of unjust enrichment in trademark infringement cases. Sonate points the court to the jury's factual findings of Beyond's willfulness and direct competition between the two companies and, citing to Tamko, 282 F.3d at 37, asserts that "the failure of proof by a defendant [as to net profits attributable to the infringement] results in unjust enrichment disgorging all related profits." See Mem. ISO Equitable Enhancement 18–19 [Doc. No. 432]. Rather than focus on the burden-shifting for disgorgement under a theory of unjust enrichment, Beyond argues that Sonate's premise "defies common sense" and is incorrect where the evidence does not support the conclusion that any of Beyond's sales during the infringing period resulted from confusion of Beyond's marks and Sonate's mark. Opp'n 17 [Doc. No. 452].

Again, the court is bound by the jury's factual findings, including the jury's determinations that Sonate and Beyond directly compete and that Beyond's infringement of

Sonate's mark was willful. Special Verdict Form 4–5 [Doc. No. 419]; see Visible Sys. Corp., 551 F.3d at 78 n.8; Attrezzi, 436 F.3d at 43 n.5. But in determining what, if any, additional profit disgorgement is warranted on the facts of this case, the court must also contextualize those findings within the trial record and avoid providing Sonate with an unintended "windfall[.]" Aktiebolaget Electrolux, 829 F. Supp. at 464 (quoting Quabaug Rubber Co., 567 F.2d at 161).

Sonate's argument for additional disgorgement heavily relies on Tamko. See Mem. ISO Equitable Enhancement 17–20 [Doc. No. 432]. In Tamko, the First Circuit concluded that:

> [e]ven assuming that [the plaintiff] and [the defendant] directly compete as to only a portion of [the defendant's] sales, and even if we were to give [the defendant] the benefit of plain error review, we could not say that there was an abuse of discretion in awarding defendant's profits in order to avoid unjust enrichment where the infringement was willful.

282 F.3d at 37 (emphasis added). Sonate essentially argues the inverse—i.e., where there is direct competition and a willful infringement finding, the court would abuse its discretion by declining to award Sonate all, or at least more, of Beyond's profits. See, e.g., Mem. ISO Equitable Enhancement 19 [Doc. No. 432] ("As Tamko emphasized, the failure of proof by a defendant results in unjust enrichment disgorging all related profits." (citation omitted)). But the language of Tamko does not support such a lockstep relationship between willfulness and disgorgement for unjust enrichment. See 282 F.3d at 37; see also id. at 38 (cautioning that "[m]echanical rules are of little aid" in determining the appropriate equitable award for a Lanham Act violation).

The court is otherwise unpersuaded by Sonate's argument that it should be awarded more, or all, of Beyond's relevant profits under Tamko for unjust enrichment. Although the First Circuit took the defendant's willfulness into account in Tamko, willfulness was only one of

several factors in the First Circuit's affirmance of the disgorged profits awarded to the plaintiff for unjust enrichment:

> The award itself was conservative. Further, the evidence is that the infringement was willful, intended to divert customers from Tamko, and, importantly, to trade on the goodwill Tamko had established, nurtured, and assiduously guarded in its [brand] mark. There was also evidence of customer confusion. Thus, even in the absence of palming off, it is reasonable to conclude that [the defendant] was unjustly enriched by trading on Tamko's goodwill beyond the two companies' areas of direct competition.

Id. at 37–38 (emphases added).

This dispute is different in almost every respect. First, Sonate's damages award is not fairly characterized as "conservative" where the actual damages award assumes that no other factor except for Beyond's infringement contributed to the decline in Sonate's profits in 2019 and 2020 and where Sonate will be awarded $15.4 million in disgorged profits.

Separately, although the jury's willfulness finding stands, the evidence shows at most that Beyond acted willfully in using a catchy, trademarked phrase, but not that Beyond did so in an effort to take any of Sonate's four customers or to capitalize on Sonate's goodwill. Where Sonate spent approximately $20 on marketing between January 2018 and October 2022, see Tr. Ex. 606-32, at 2, plus an unknown amount equivalent to up to $2.00 per case of product sold to a distributor, see Nov. 13, 2025 Trans. 69:5–17 [Doc. No. 408], there is little to no evidence that Sonate had meaningful goodwill or brand awareness on which Beyond even could capitalize. Even Litten, whose company had distributed Sonate's products since 2014 or 2015, was not aware of Sonate's "Where Great Taste is Plant-Based" slogan until he began working on the Vegadelphia 2.0 venture in or around 2020. See Nov. 12, 2025 Trans. 121:17–122:19 [Doc. No. 407].

Sonate also did not point the jury to any instances of actual consumer confusion between Beyond's products and Sonate's products, nor did the evidence at trial give rise to an inference that confusion was anything more than a possibility. See, e.g., Tr. Ex. 41, at 1–23 (demonstrating that Beyond always included its house mark alongside its use of "PLANT BASED GREAT TASTE"); Nov. 14, 2025 Trans. 34:6–25 [Doc. No. 409] (in which Shipon testified that Sonate's mark was always used with the Vegadelphia brand name and that he was not aware of any confusion arising from Beyond's infringing marks as to whether Beyond and Sonate were somehow connected).

Finally, any additional disgorgement would, in the court's view, constitute an impermissible windfall to Sonate and contravene the Lanham Act's statutory prohibition on awarding damages to penalize an infringer. See 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum . . . shall constitute compensation and not a penalty." (emphasis added)).

Upon entry of judgment, Sonate will be awarded both $37,500 in actual damages and $15.4 million in disgorged profits as a rough measure of other harm Sonate sustained because of Beyond's trademark infringement, discussed supra. Although the court may have decided these awards differently in the first instance, these figures reflect a reasonable jury's assessment of the evidence produced at trial. But the court does not find in the record any viable basis on which to conclude that additional compensation is required to make Sonate whole where the direct

competition between Sonate and Beyond was highly circumscribed[11] and the amount which the court will award—$15,437,500 in total—is itself magnitudes larger than any measure of Sonate's existing business. Additional profit disgorgement would therefore function as an impermissible punishment for Beyond. See 15 U.S.C. § 1117(a).

Accordingly, Sonate's Enhancement and Disgorgement Motion [Doc. No. 430] is DENIED insofar as Sonate seeks disgorgement for unjust enrichment.

3. Deterrence

Sonate asserts that it should be awarded Beyond's profits to deter Beyond from infringing on others' intellectual property, including the property of smaller market participants. See, e.g., Mem. ISO Equitable Enhancement 6 [Doc. No. 432] ("Companies like Beyond must be

[11] In the relevant period, Sonate's sales centered on a plant-based chicken product and a plant-based steak product. See Nov. 13, 2025 Trans. 56:2–8 [Doc. No. 408]. Sonate sold these products to four customers. See Tr. Ex. 606-30, at 1–4 (listing Sonate's sales by customer between January 2018 and October 2022). With this limited customer base, Sonate's geographic presence was also relatively small, with its products going to Puerto Rico, Florida, Illinois, and, through a redistributor, some unknown locations that trial testimony suggested, but did not fully confirm, centered on the "Mid-Atlantic" region. See Nov. 14, 2025 Trans. 26:11–13 [Doc. No. 409]; Stip. Re: Dep. Test. Entered at Tr., Ex. A, at ECF 159:48:02–17 [Doc. No. 424-1] ("Liebowitz Dep. Test."). But see Nov. 14, 2025 Trans. 26:19–27:11 [Doc. No. 409]; Liebowitz Dep. Test. ECF 151:22:02–152:22:09 [Doc. No. 424-1].

The evidence of Beyond's sales footprint reveals a vastly different model. Unlike Sonate, a significant portion of Beyond's sales are generated by sales to retail-facing customers, such as grocery store chains. See, e.g., Nov. 18, 2025 Trans. 27:13–28:16 [Doc. No. 411] (describing Beyond's sales channels, including "club retailers[,]" such as "Costco or . . . BJ's" and "grocery retailers[, which] would be a supermarket"); Stip. Re: Dep. Testimony Entered at Tr. Ex. A, at ECF 14:38:14–15:40:15 [Doc. No. 424-1] ("Grass Dep. Test.") (confirming that Beyond's products were distributed in "28,000 retail outlets" in the United States as of 2021); Tr. Ex. 606-43, at 72 (reporting that approximately 65% of Beyond's 2019 net revenues in the United States were generated by sales in the retail channel). And, although Beyond does sell plant-based steak and plant-based chicken products, those products are part of a broad portfolio that includes, inter alia, plant-based burgers, sausages, ground beef, crumbled beef, and meatballs. See, e.g., Tr. Ex. 606-43, at 7–8; Tr. Ex. 21, at 1.

prevented from making the intentional, tactical, or reckless decision to infringe under the belief that most of their profits will go undisturbed.”). Beyond counters that deterrence is unnecessary here and that there is “[n]o evidence that [Sonate] is at risk of Beyond infringing any of its trademarks” going forward. Opp’n 18–20 [Doc. No. 452]. For the reasons set forth below, the evidence adduced at trial does not form a sufficient basis on which to award Sonate a portion of Beyond’s profits for the purpose of “deterring a willful infringer from further infringement.” Tamko Roofing Prods., 282 F.3d at 36.

As Sonate correctly observes, the jury found that both Beyond’s infringing use of “PLANT BASED GREAT TASTE” and infringing use of “GREAT TASTE PLANT BASED” were willful. Special Verdict Form 4–5 [Doc. No. 419]; see Mem. ISO Equitable Enhancement 15, 19 [Doc. No. 432]. But willfulness, standing alone, does not automatically translate to disgorgement of profits for the purpose of deterrence.[12] Visible Sys. Corp., 551 F.3d at 81.

In other First Circuit trademark cases validating a district court’s award of profits as a deterrence mechanism, the defendants’ conduct reflected a level of egregiousness or deceit that is not evident in the record of this case. In Tamko, for example, the First Circuit concluded that, where the plaintiff “had an unusually strong interest in deterrence, given [the defendant’s] track record, . . . it would not be an abuse of discretion to conclude that the accounting of profits should reflect some recognition of that interest.” 282 F.3d at 38. The “track record” to which the panel referred included the defendant’s adoption of an infringing mark after its sales manager “attended several . . . trade shows where [the plaintiff] prominently displayed its . . . mark[,]” id.

[12] In Romag Fasteners, Inc. v. Fossil Inc., 590 U.S. 212, 219–20 (2020), the Supreme Court held that, for Lanham Act violations arising under 15 U.S.C. § 1125(a), willfulness is not a prerequisite for awarding defendant’s profits to a prevailing plaintiff. Where the jury found that Beyond acted willfully, Romag does not impact the court’s analysis here.

at 27; the defendant's decision to forgo a trademark search before adopting the mark despite the advice of its hired advertising agency, see id.; that the defendant only considered marks for its business that were "similar to marks owned by other manufacturers in the . . . industry[,]" id.; and the defendant's continued use of the infringing mark even after a preliminary injunction entered against it, such that the court held the defendant in contempt and imposed a fine, see id. at 28.

In Venture Tape Corp. v. McGillis Glass Warehouse, 540 F.3d 56, 64 (1st Cir. 2008), the First Circuit upheld the trial court's decision to award the plaintiff $230,339.17 as "an equitable share" of defendant's gross sales. In relevant part, the defendant in that case admitted to intentionally using the plaintiff's mark to leverage the plaintiff's goodwill for its own gain: "[The defendant company's owner] even admitted that he intentionally used [the plaintiff's] marks on [the defendant's] website for the express purpose of attracting customers to [the defendant's] website and that he chose [one of the marks] because of its strong reputation in the . . . industry." Id. at 61; see id. at 61, 63 (noting that "the record contains numerous admissions that metatags and invisible background text on [the defendant's] website incorporated [the plaintiff's] exact marks" in an act of "intentional concealment").

The facts of this case do not raise concerns similarly necessitating or justifying a measure of deterrence. Although Sonate engages in a dramatic retelling of "all the wrong way signs and off ramps Beyond blew past" and the "utter hypocrisy" of Beyond's "choices" in light of the company's "multiple internal blowups over [a large competitor] using a similar slogan[,]" Mem. ISO Equitable Enhancement 1, 3 [Doc. No. 432], the evidence adduced at trial is not nearly as nefarious as Sonate portends.

Beyond began using "PLANT BASED GREAT TASTE" in March 2019 and suggested the "GREAT TASTE PLANT BASED" tagline for its partnership with Dunkin' Donuts as early as June 2019. See Nov. 18, 2025 Trans. 22:16–22, 29:16–31:23 [Doc. No. 411]. In approximately June 2019 or July 2019, Grass, who at the time worked as a brand partnerships manager at Beyond, discovered Sonate's registered "Where Great Taste is Plant Based" mark. Id. at 32:16–25. Despite this awareness of Sonate's mark, Beyond continued to use the infringing marks and did not inform a business partner, which was deploying one of the infringing marks in connection with a joint product campaign in 2019, that it had discovered Sonate's registered mark. Id. at 49:13–51:16.

In January 2020, another Beyond employee began covering Grass's duties while she was on employment leave. Id. at 52:24–53:15. Grass did not inform the employee about Sonate's registered mark, but he discovered it independently. See id. at 52:24–53:3, 53:12–54:7. Soon after, Beyond filed a trademark application for "PLANT BASED GREAT TASTE[,]" see id. at 54:6–10; Tr. Ex. 43, which remained pending when Sonate sent its cease-and-desist letter on May 28, 2020, but was denied by the United States Patent and Trademark Office ("USPTO") in a "nonfinal office action" on June 12, 2020, see Tr. Ex. 43.

The evidence at trial thus demonstrated that Beyond elected to proceed with "PLANT BASED GREAT TASTE" and "GREAT TASTE PLANT BASED" despite its knowledge of Sonate's registered mark. But the evidence does not support a reasonable inference that Beyond did so in an effort to associate itself with Sonate or Sonate's products, to induce sales by confusing consumers as to the source of Beyond's products, or to otherwise benefit from Sonate's brand. See, e.g., Venture Tape Corp., 540 F.3d at 61. Instead, Grass testified that the adoption of "PLANT BASED GREAT TASTE" and "GREAT TASTE PLANT BASED" was

predicated on the belief that these taglines were sufficiently "different" from Sonate's mark and were merely "descriptive[.]" Nov. 18, 2025 Trans. 33:1–34:6 [Doc. No. 411]. Grass also testified that Beyond affirmatively "wouldn't want to cause confusion" with Sonate's Vegadelphia brand. See id. at 34:11–19.

Unlike the defendant in Tamko, which persisted in using an infringing mark despite a court order, Beyond also stopped deploying its infringing marks after receiving Sonate's cease-and-desist letter in May 2020. See id. at 45:7–21 (explaining that, in response to the letter, Beyond's marketing department directed personnel to "stop the use—collect all the places that had it, and stop the use of it"); id. at 45:23–46:1 (testifying that, with respect to Beyond's Dunkin' Donuts collaboration, "we were no longer using [GREAT TASTE PLANT BASED] . . . [i]n May of 2020"); id. at 46:2–47:23 (testifying that, upon receipt of the May 2020 letter, "PLANT BASED GREAT TASTE" was "being used across some marketing collateral" already deployed, but "some of it had changed out"; that "digital [use of the phrase] switched out . . . almost immediately"; and Beyond replaced the tagline with other phrases, such as "Eat What You Love" or "Beef with Better Benefits"). This is particularly salient where Sonate did not file suit against Beyond until April 2022. See Restatement (Third) of Unfair Competition § 37(2)(e) (A.L.I. 1995) (listing "any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights" as a factor in awarding defendant's profits).

To the extent Sonate points to Beyond's failed attempt to trademark "PLANT BASED GREAT TASTE" in early 2020 despite its awareness of Sonate's mark at that time, Mem. ISO Equitable Enhancement 2–3 [Doc. No. 432], the court finds it necessary to clarify that, according to the exhibit introduced at trial, the USPTO gave two reasons for rejecting Beyond's application: (1) "[l]ikelihood of [c]onfusion" with respect to Sonate's already-registered mark, in

alignment with Sonate's position; and (2) "descriptive refusal" because "the applied-for mark merely describes a characteristic of applicant's goods[,]" in alignment with Beyond's position. See Tr. Ex. 43.

Finally, for the reasons discussed supra, the court again finds that any additional disgorgement of Beyond's profits would be contrary to the Lanham Act's statutory prohibition on awarding damages that serve a punitive, rather than compensatory, function. See 15 U.S.C. § 1117(a).

Accordingly, the court, taking into account the jury's willfulness determination, finds that the evidence in this case is not sufficient to satisfy the deterrence justification for awarding profits. Accord Visible Sys. Corp., 551 F.3d at 81 ("[W]illfulness alone is not enough to justify a remedy of an accounting of defendant's profits where there is a damages award to the plaintiff, no showing of unjust enrichment, no bad faith, and an injunction has been entered."). Sonate's Enhancement and Disgorgement Motion [Doc. No. 430] is DENIED insofar as Sonate seeks disgorgement on the basis of deterrence.

D. *Enhancement of Actual Damages*

Under the Lanham Act, the court may enhance actual damages awarded to a prevailing plaintiff, up to and including trebling the award. 15 U.S.C. § 1117(a) ("In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."). "While damages in trademark or false advertising cases can be awarded without any special showing of scienter or equitable factors," the First Circuit "usually require[s] willfulness . . . to allow . . . more than single damages." Fishman Transducers, Inc., 684 F.3d at 194.

Here, Sonate asks the court for an enhancement of actual damages in light of the jury's willfulness finding. Mem. ISO Equitable Enhancement 14–16 [Doc. No. 432]. Beyond argues

that enhancement is inappropriate where, in contrast to the defendants in Sonate's cited authorities, Beyond "(i) didn't ignore its attorney's advice to cease from using the tagline, (ii) selected the tagline independently to describe its products; (iii) received confirmation from the [USPTO] that the tagline was descriptive and did not function as a trademark; and (iv) did not use the tagline to take advantage of Plaintiff's reputation or goodwill in the market (which was non-existent)." Opp'n 13 [Doc. No. 452].

Although Beyond's conduct in this case was willful, and its insistence on using the infringing marks despite its knowledge of Sonate's registered mark was ill-advised, the court does not view Beyond's conduct as "exceptional" for many of the same reasons the court finds disgorgement under the deterrence rationale inappropriate, described supra. The cases to which Sonate cites in support of its request for enhancement, all of which are out-of-circuit decisions, are distinguishable from the facts of this case.[13] And, again, the court is cognizant of the need to avoid both imposing punitive measures on Beyond under 15 U.S.C. § 1117(a) and providing Sonate with an unwarranted "windfall." Here, where the court has already determined that

---

[13] See, e.g., Lontex Corp. v. Nike, Inc., 107 F.4th 139, 156 (3d Cir. 2024) (affirming treble damages where the district court entered such an award on the basis of the jury's willfulness finding and in light of the district court's "separate decision to reject [the plaintiff's] request for profit disgorgement, which would have significantly increased [the plaintiff's] compensation because [the defendant's] estimated profits greatly exceeded the compensatory damages. Instead the District Court exercised its discretion to provide adequate compensation to [the plaintiff] through a damages enhancement."); Larsen v. Terk Techs. Corp., 151 F.3d 140, 150 (4th Cir. 1998) (affirming treble damages under the relevant provision of 15 U.S.C. § 1117(b), rather than under 15 U.S.C. § 1117(a)); Holiday Inns, Inc. v. Airport Holiday Corp., 493 F. Supp. 1025, 1028 (N.D. Tex. 1980) (trebling damages where "Defendants did not undertake to use Plaintiff's marks innocently" and had "flagrant disregard[ed] . . . the rights of Plaintiff[,]" including by placing a false "symbol (R) indicating the registration of [the infringing mark]" on its own materials), aff'd sub nom. Holiday Inns, Inc. v. Alberding, 683 F.2d 931 (5th Cir. 1982); Am. Express Co. v. Lipscomb, No. 79-72892, 1981 WL 40529, at *2 (E.D. Mich. Jan. 12, 1981) (trebling damages where the defendant produced and sold illegitimate "sight drafts" deliberately designed to mimic "travelers cheques" issued by American Express).

Sonate is entitled to $37,500 in actual damages and will adopt the jury's $15.4 million advisory award for profit disgorgement as a rough measure of harm to Sonate, the court finds that any enhancement of the actual damages award would be inappropriate on the facts of this case.

Accordingly, Sonate's Enhancement and Disgorgement Motion [Doc. No. 430] is DENIED insofar as Sonate seeks enhancement of actual damages.

### III. Prejudgment Interest

Separately, Sonate asks the court to award prejudgment interest in the "range" of $13,801,190 to $17,894,000, arguing that, even if the Lanham Act's statutory language does not specifically provide for prejudgment interest, "[p]rejudgment interest is available and awarded where it comports with the purpose of the federal statute to do so." Mem. ISO Mot. for Prejudgment Interest 1–2 [Doc. No. 439] ("Interest Mem.") (citing TMTV, Corp. v. Mass Prods., Inc., 645 F.3d 464, 474–75 (1st Cir. 2011)). Beyond opposes the motion, arguing that prejudgment interest is unavailable under 15 U.S.C. § 1117(a) and, even if it was available, is unwarranted on the facts of this case. Opp'n to Mot. for Prejudgment Interest 2–3 [Doc. No. 447] ("Interest Opp'n").

The parties do not direct the court to any First Circuit cases explicitly contemplating or deciding the availability of prejudgment interest in trademark infringement cases under 15 U.S.C. § 1117(a).[14] In interpreting the language of § 1117(a) and reviewing decisions from other

---

[14] The First Circuit cases offered by Sonate are not on point for this issue. See, e.g., Nevor v. Moneypenny Hld'gs, LLC, 842 F.3d 113 (1st Cir. 2016) (involving a bench trial on a maritime dispute under the Jones Act); TMTV, Corp. v. Mass Prods., Inc., 645 F.3d 464 (1st Cir. 2011) (addressing prejudgment interest under the Copyright Right Act, rather than under the Lanham Act); SEC v. Druffner, 517 F. Supp. 2d 502 (D. Mass. 2007) (examining an agency enforcement action arising from mismanagement of mutual funds), aff'd sub nom. SEC v. Ficken, 546 F.3d 45 (1st Cir. 2008).

federal circuits, the court concludes that Sonate is not entitled to prejudgment interest either as a statutory or discretionary matter.

Again, 15 U.S.C. § 1117(a) of the Lanham Act authorizes a prevailing party "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of any actions." Absent from this list is prejudgment interest. Although such an exclusion is not dispositive on its own, the court looks to a "traditional rule" of statutory interpretation: "When Congress includes particular language in one section of a statute and omits it from a neighbor, [the court] normally understand[s] that difference in language to convey a difference in meaning[.]" Bittner v. United States, 598 U.S. 85, 95 (2023). Here, the Lanham Act explicitly provides for prejudgment interest in § 1117(b), which concerns the trebling of damages in counterfeit cases:

> The court shall . . . enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of—
>
> > (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services; or
> >
> > (2) providing good or services necessary to the commission of a violation specified in paragraph (1), with the intent that the recipient of the goods or services would put the goods or services to use in committing the violation.
>
> In such a case, the court may award prejudgment interest. . . .

15 U.S.C. § 1117(b).

That Congress could have included a similar provision in § 1117(a), but chose not to, counsels against the statutory availability of prejudgment interest in trademark violation cases controlled by § 1117(a). See Kars 4 Kids, Inc. v. Am. Can!, 8 F.4th 209, 225 (3d Cir. 2021) ("[B]ecause § 1117(b) allows courts to award prejudgment interest and § 1117(a) does not provide for prejudgment interest, prejudgment interest is unavailable under § 1117(a).");

Georgia-Pacific Cons. Prods. LP v. von Drehle Corp., 781 F.3d 710, 722 (4th Cir. 2015), as amended, Apr. 15, 2015 ("[W]hen, as here, a statute provides particularized forms of monetary relief and explicitly authorizes prejudgment interest in some circumstances but not others, we conclude that prejudgment interest is not intended to be awarded except as provided in the statute."). But see United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1236–37 (10th Cir. 2000) (noting that the Tenth Circuit "has adopted a preference, if not a presumption, for prejudgment interest" for federal claims, including those arising under § 1117(a)); Gorenstein Enters., Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 436 (7th Cir. 1989) (affirming prejudgment interest award under § 1117(a)).

Even assuming, without deciding, that prejudgment interest is available under § 1117(a) as Sonate urges, see Interest Mem. 2–4 [Doc. No. 439], the court is not convinced that Sonate is entitled to such an award. The court notes that, in the two district court cases from within the First Circuit where prejudgment interest was awarded under § 1117(a), it was not awarded automatically.

In the most recent case, the plaintiff was awarded prejudgment interest where the district court determined the case was "an 'exceptional' case of deliberateness and willfulness in the copying of the [plaintiff's] three marks." Conair Corp. v. Next G, Corp., No. 20-1093 (SCC), 2023 WL 11824301, at *7 (D.P.R. Mar. 17, 2023), report and recommendation adopted No. CV 20-1093 (SCC), 2023 WL 11824305 (D.P.R. Mar. 31, 2023). In an earlier case under § 1117(a), the court determined that "[a]lthough § 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases." Perfumania, Inc. v. Perfulandia, Inc., No. 02-2733 (CCC), 2004 WL 1753249, at *23 (D.P.R. July 30, 2004) (report and recommendation) (citing first EFCO Corp. v. Symons Corp.,

219 F.3d 734 (8th Cir. 2000); and then citing Am. Honda Motor Co., Inc. v. Two Wheel Corp., 918 F.2d 1060 (2d Cir. 1990)). Thus, to the extent prejudgment interest under § 1117(a) must be considered, the court would conclude that Sonate is not entitled to prejudgment interest where, for the reasons set forth in the court's discussion of the inappropriateness of disgorgement for unjust enrichment and deterrence, supra, Sonate's case is not "exceptional."

## IV. Conclusion

For the foregoing reasons, Beyond's Renewed Motion for Judgment as a Matter of Law [Doc. No. 433] is GRANTED in part and DENIED in part. Sonate is entitled only to $37,500 in actual damages.

Sonate's Motion for Equitable Enhancement and Additional Profit Disgorgement [Doc. No. 430] is DENIED. Sonate's Motion for Prejudgment Interest [Doc. No. 437] is also DENIED.

Where the court accepts the jury's advisory verdict as to the disgorgement of Beyond's profits, Sonate is entitled to $15.4 million awarded in equity.

IT IS SO ORDERED.

September 18, 2026

/s/ Indira Talwani
United States District Judge